# EXHIBIT A



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | SOP Team nwsop@nationwide.com<br>Nationwide Mutual Insurance Company<br>1 Nationwide Plz<br>Columbus, OH 43215-2226 |
| **Electronic copy provided to:** | Ashley Roberts |
| **Entity:** | Scottsdale Insurance Company<br>Entity ID Number  3286058 |
| **Entity Served:** | Scottsdale Insurance Company |
| **Title of Action:** | Vcs Venture Securities, LLC, d/b/a New Age Venture Capital, Rocco Michael Masseli, and Adam Maggio vs. Scottsdale Insurance Company |
| **Matter Name/ID:** | Vcs Venture Securities, LLC, d/b/a New Age Venture Capital, Rocco Michael Masseli, and Adam Maggio vs. Scottsdale Insurance Company (15956509) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Nassau County Supreme Court, NY |
| **Case/Reference No:** | 610488/2024 |
| **Jurisdiction Served:** | Ohio |
| **Date Served on CSC:** | 07/09/2024 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | Scottsdale Insurance Company |
| **How Served:** | Client Direct |
| Sender Information: | Schwartz, Conroy & Hack, PC<br>N/A |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NASSAU
-------------------------------------------------------------------x
VCS VENTURE SECURITIES, LLC, d/b/a NEW AGE
VENTURE CAPITAL, ROCCO MICHAEL MASSELI, ET AL
                 Plaintiff/Petitioner,

    - against -                 Index No.610488/2024

SCOTTSDALE INSURANCE COMPANY,

               Defendant/Respondent.
-------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Consensual Case)
(Uniform Rule § 202.5-b)

**You have received this Notice because:**

    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

    2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

 **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

 The **benefits of participating in e-filing** include:

      - serving and filing your documents electronically

      - free access to view and print your e-filed documents

      - limiting your number of trips to the courthouse

      - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit:  http://www.nycourts.gov/efile-unrepresented  or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

J00219023003070324

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**

An attorney representing a party who is served with this notice must either consent or decline consent to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).


Dated:  06/17/2024


Evan Schwartz, Esq.                            666 Old Country Road, 9th Fl.
        Name                                              Address
Schwartz, Conroy & Hack, PC

       Firm Name                               Garden City, NY 11530



                                               (516) 745-1122
                                                     Phone


                                               aja@schlawpc.com; ess@schlawpc.com
                                                        E-Mail


To:     SCOTTSDALE INSURANCE COMPANY


        8877 N Gainey Center Dr.


        Scottsdale, AZ 85258

        SCOTTSDALE INSURANCE COMPANY
        c/o New York State Department of Financial Services
        1 State Street
        New York, NY 10004

                                                                          6/6/18

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 06/14/2024

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NASSAU

VCS VENTURE SECURITIES, LLC, d/b/a NEW AGE VENTURE CAPITAL, ROCCO MICHAEL MASSELI, AND ADAM MAGGIO,

Plaintiff,

-against-

SCOTTSDALE INSURANCE COMPANY,

Defendant.

Date Filed: 6/14/2024
Index No.: 610488/2024

**SUMMONS**

Plaintiff designates Nassau County as the place of trial.

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you upon default, with interest thereon, together with the costs and disbursements of this action.

Dated: Garden City, New York
June 14, 2024

**SCHWARTZ, CONROY & HACK, PC**

By:    /s/Evan S. Schwartz
       Evan S. Schwartz, Esq.
       *Attorneys for Plaintiffs*
       666 Old Country Road, Ninth Floor
       Garden City, New York  11530
       (516) 745-1122

TO:

SCOTTSDALE INSURANCE COMPANY
c/o New York State Department of Financial Services
1 State Street
New York, NY 10004

SCOTTSDALE INSURANCE COMPANY
8877 N Gainey Center Dr.
Scottsdale, AZ, 85258

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO.: 610488/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 06/14/2024

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NASSAU

VCS VENTURE SECURITIES, LLC, d/b/a NEW
AGE VENTURE CAPITAL, ROCCO MICHAEL
MASSELI, and ADAM MAGGIO,

Index No.: 610488/2024

**COMPLAINT**

Plaintiff,

-against-

SCOTTSDALE INSURANCE COMPANY,

Defendant.

VCS VENTURE SECURITIES, LLC, d/b/a NEW AGE VENTURE CAPITAL, ROCCO

MICHAEL MASSELLI ("MASSEI") and ADAM MAGGIO by their attorneys SCHWARTZ

CONROY & HACK, P.C., bring this action against SCOTTSDALE INSURANCE COMPANY,

and upon information and belief allege as follows:

## JURISDICTION AND VENUE

1.    This Court has personal jurisdiction over Defendant pursuant to CPLR §§ 301 and

302, as well as New York Insurance Law §1213 as Defendant SCOTTSDALE is a domiciliary of

Ohio but issues insurance policies in New York, and at relevant times, upon information and belief,

conducted activities in New York giving rise to the claims asserted herein; that PLAINTIFFS hold

policies of insurance issued or delivered in this state by SCOTTSDALE, which is authorized to do

business in this state, and SCOTTSDALE solicited applications for such insurance contracts,

collected premiums, membership fees, assessments or other considerations for such contracts, and

otherwise transacted business in the State of New York.

2.    The acts, events, and or omissions alleged herein occurred in various counties in

New York, one of which is Nassau County.

Page 1 of **13**

3.    This Court has subject matter jurisdiction over this action as the amount of damages PLAINTIFFS seek exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

4.    Venue for this action is proper in the County of Nassau pursuant to CPLR § 503 as Plaintiff VCS has its principal place of business in the County of Nassau, State of New York, and its principal ADAM MAGGIO is a resident of Suffolk County. MASSELI is also a resident of Nasau County.

5.    SCOTTSDALE caused acts or events to occur within New York out of which PLAINTIFFS' claims arise, conducted activities in New York giving rise to the claims asserted herein, PLAINTIFFS holds policies of insurance issued or delivered in this state by SCOTTSDALE, which is authorized to do business in this state, solicited applications for such insurance contracts, collected premiums, membership fees, assessments or other considerations for such contracts, and transacted business in the State of New York, including the County of Nassau.

## PARTIES

6.    VCS is a New York limited liability company  with its principal place of business in Nassau, New York. It is engaged in the business as a Broker-Dealer for financial services.

7.    ADAM MAGGIO is a resident of the State of New York, County of Suffolk, and a principal and owner of VCS.

8.    MASSELLI is a resident of the County of Nassau and is an active registered representative of at the time frame in the underlying allegations.

9.    SCOTTSDALE is an Ohio domiciled Insurance Company with its principal place of business at 8877 N Gainey Center Dr Scottsdale, AZ, 85258-2108, and transacts business in the

Page 2 of 13

FILED: NASSAU COUNTY CLERK 06/14/2022 04:40 PM          INDEX NO. 610488/2024

NYSCEF DOC. NO. 1                                        RECEIVED NYSCEF: 06/14/2024

State of New York and upon information and belief is authorized to issue and deliver insurance policies in the State of New York.

## BACKGROUND AND FACTS

10.     SCOTTSDALE issued to VCS a Broker-Dealer Financial Services Professional Liability Insurance policy bearing Policy No. BFS0003062-NY-09-01 which was effective for the Policy Period of September 10, 2022, to October 10, 2023, extended by endorsement ("The Policy"). The Policy was a claims-made-and reported based policy with an aggregate limit of $1,000,000. (**See Exhibit "A" for the policy**).

11.     The policy contains, in part, sections that state:

Section II—Coverage Agreements—of the Policy states:

A. COVERAGE

We will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the insured shall become legally obligated to pay as "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible, but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":

1. arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative";

2. occurs during the "coverage period" for both the insured and the "individual", if any, for whose acts the insured is legally responsible; and

3. results in a "written claim" which is first made against the insured and presented to us during the insured's "policy period"; provided, in case of cancellation or non renewal of this policy with respect to an insured, if a "written claim" is first made against that insured during the last fifteen days of that insured's "policy period", that "written claim" may be presented to us no later than fifteen days immediately following the effective date of such cancellation or non renewal if, as a condition precedent to that right, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply in the absence of this policy.

Page 3 of 13

FILED: NASSAU COUNTY CLERK 06/14/2024 04:10 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 06/14/2024

Section IV—Who is Insured under this Policy—of the Policy states:

Each of the following is an insured under this policy to the extent set forth below:

A. The First Named Insured.
B. Each "financial services professional" who is a named insured on this policy.
C. If a named insured "entity" is a partnership, association, corporation or limited liability company, each of that insured's present, former and future partners, members, officers and directors, but each is covered only for his/her vicarious liability as a result of such status and arising out of the provision of covered "financial services" by a named insured or a "representative"; provided, no such partner, member, officer or director is an insured under this policy with respect to liability arising out of or in conjunction with his/her own acts or omissions as a "financial services professional" unless he/she is a named insured on this policy.

Terms used in the Policy are defined in Section I of the Policy. The defined terms include:

"Financial services" means the provision of: services by a "broker"-"dealer" to its "clients" of its "registered representatives"; "financial planning services" by a "financial planner"; "investment management services" by a "registered investment adviser" or an "associated person" of a "registered investment adviser"; the purchase or sale of "securities" or the provision of "investment advice" by a "registered representative"; and the proposed sale or sale of products authorized to be sold by a properly licensed "life insurance agent", including, without limitation, life, health, disability and accident insurance products and annuities; provided "financial services" does not include any advice with respect to or the sale of viatical products.

\*\*\*

"Financial services professional" means any "individual" who is a "financial planner", "registered investment adviser", "associated person", "life insurance agent" and/or "registered representative".

\*\*\*

"Wrongful act" means any negligent breach of duty, error, misstatement, misrepresentation, omission, "publication injury", or other negligent act done or attempted by an insured, or by any "individual" for whose acts the insured is legally responsible, in conjunction with the provision of covered "financial services", as set forth in the Limitation of Coverage Endorsement, for the "clients" of a named insured or "representative". Any such "wrongful act", together with any related "wrongful acts" or series of continuous, repeated or

Page 4 of 13

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 06/14/2024

"interrelated wrongful acts", shall be considered one "wrongful act" for purposes of the application of our Limits of Liability and the applicable "retention". A "wrongful act" which is continuing in nature shall be deemed, for all purposes of this policy, to occur only on the date on which such "wrongful act" commences and not on any subsequent date. A series of continuous, repeated or "interrelated wrongful acts" shall be deemed to have occurred on the date on which the earliest of such "wrongful acts" commences. If a continuing "wrongful act" or a series of repeated or "interrelated wrongful acts" is committed by an insured, or by any "individual(s)" for whose acts such insured is legally responsible, prior to such insured's applicable "retroactive date", there shall be no coverage under this policy for any insured for any of those "wrongful acts" even if some of those acts occur during the "policy period".

## The Underlying Claim

12.     James A. Stamulis filed a claim against the PLAINTIFFS, making the following allegations: on or about October 2019, Masselli is alleged to have directed James A. Stamulis ("Stamulis") to sell call options on an existing position in Cara Therapeutics that Stamulis held since 2014. According to Stamulis, Masselli also started directing Stamulis to purchase low-price, speculative stocks such as Milestone Scientific at $1.34 per share, Aytu BioSciences at $1.77 per share, and Fuel Cell at $1.37 per share. Stamulis alleges that he closed his managed account with Baxter Brothers and opened an account with Jospeh Stone Capital LLC ("JSC"), where Masselli was then registered.

13.     Stamulis contends in an Amended Statement of Claim as part of a Financial Industry Regulatory Authority ("FINRA") Arbitration ("The Arbitration") that on September 8, 2022, JSC signed a Letter of Acceptance, Waiver, and Consent ("AWC") accepting and consenting to certain regulatory violations.

14.     Stamulis asserts that Stamulis and Damian Maggio entered into an agreement with VCS "to effectively act as the successor to JSC." According to Stamulis, "Respondent Masselli hurriedly joined Respondent VCS in September 2021, and transferred Stamulis's account to the new firm." Stamulis alleges that after his account at JSC and VCS showed significant losses,

Page 5 of 13

Masselli "induced Stamulis into opening a new type of account at E*TRADE" and that "Respondent Masselli's new game was to trade financial and commodities futures and options for the Stamulis."

15.    Stamulis asserts that "Respondents, acting through their registered representative, Respondent Masselli, engaged in excessive and unsuitable securities trading on margin in Stamulis's accounts and concentrated those accounts in high-risk stocks." Stamulis further alleges "a pattern of self-dealing and deceit to manipulate Stamulis into opening an account with JSC and transfer that account to Respondent VCS."

16.    Stamulis contends that PLAINTFFS and others "had complete and total control of Stamulis's accounts from their inception" and "Stamulis made clear, and Respondents knew full well that he totally relied upon them to make all the investment recommendations."

17.    Stamulis asserts claims for relief based on fraud in violation of the Federal Securities Laws; violation of the New York Consumer Protection Act; breach of contract; common law fraud; breach of fiduciary duty; negligence; and gross negligence. Stamulis seeks the recovery of damages in an amount to be determined by the arbitration panel, believed to be approximately $500,000, as well as bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, and punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper. (**See Exhibit "B" for the Amended Claim**).

18.    VCS denies all of the allegations. VCS in fact asserts that Stamulis was an experienced investor who has sued brokers every time he has had a loss, which sometimes occur when you invest. More importantly, they assert they did not have "complete and total control" of his accounts and in fact he authorized approved every transaction and was provided with the appropriate and timely account statements.

Page 6 of 13

19.    PLAINTIFFS are entitled to a defense in the arbitration and indemnification by SCOTTSDALE for covered claims but as discussed below, SCOTTSDALE has disclaimed coverage.

### Tender to Scottsdale and Scottsdale's Improper Disclaimer

20.    The Claim was filed a month before the expiration of the SCOTTSDALE policy. The Claim was timely tendered by the terms of the policy by PLAINTIFFS to SCOTTSDALE for defense of the entire arbitration and indemnity for covered claims. Despite the fact that the Claim and/or portions of the Claim clearly fell within the four corners of the policy, SCOTTSDALE refused to defend PLAINTIFFS against the arbitration nor indemnify for covered claims and issued a disclaimer. (**See Disclaimers Attached as Exhibit "C" and "D"**).

21.    Under both New York and California law, the duty of an insurer to defend its insured is exceedingly broad and far more expansive than the duty to indemnify its insured. The insurer's duty to provide a defense is invoked whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how groundless those allegations might be. Thus, the general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy.

22.    An insurer must defend even if facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered. If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend. *Hartford Casualty Insurance Company v. J.R. Marketing, L.L.C.* (2015) 61 Cal.4th 988 (Ca. Sup. Ct.) "This court has long maintained that if any claims in a … complaint . . . are even potentially covered by the [liability] policy, the insurer must provide its insured with a defense to all claims." (*Id.* at 991.)

Page 7 of 13

23. Here, not only has SCOTTSDALE disclaimed coverage, but they have improperly refused to defend VCS and the other PLAINTIFFS in the arbitration despite them being an insured for whom coverage applies.

24. The policy provides it will provide coverage (in excess of the retention up to the limits of liability) and pay on behalf of an insured "and which the insured shall become legally obligated to pay as "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible" under various listed circumstances that exist here-namely arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative"

25. PLAINTIFFS clearly are alleged to have provided financial services to the client Stamulis as defined under the policy resulting in a claim for a "Wrongful Act" and clearly met all of the other conditions precedent for coverage under the policy.

26. Moreover, the policy provides coverage for claims such as negligence, which are asserted in the Claim. An insurance company must defend if any claims against its insureds are potentially covered by the policy even if other claims are not covered under the policy.

27. *Hartford Casualty* unequivocally states when a lawsuit "includes some claims that are potentially covered, and some that are clearly outside the policy's coverage," the insurance company must nevertheless "defend the entire action." (*Id.* at 997-998.) This makes sense as claimants typically allege a myriad of claims, even when they contradict each other, some of which are potentially covered and some of which are not.

28. The written claim occurred during the coverage period and was properly reported by PLAINTIFFS during the applicable period for coverage by VCS.

29.    SCOTTSDALE has collected the premiums for the policy. It is now time for it to pay for the defense in the arbitration.

30.    Because of SCOTTSDALE's improper refusal to provide a defense, PLAINTIFFS have been forced to incur the fees to defend themselves (even though that is why VCS paid such high premiums to SCOTTSDALE) and bring this action to force SCOTTSDALE to live up to its obligations under the policy. To date, upon information and belief, Plaintiffs have spent approx. $30,000 to defend the arbitration and will continue to incur additional defense fees in the future (See **Exhibit "E," Statement of Answer**).

31.    VCS is a named insured under the policy. Adam Maggio is a named insured, inter alia, by virtue of him being the Registered Principal and Branch Owner of VCS. Masselli is named insured as an active registered representative of VCS. Pursuant to, inter alia, the Representatives Endorsement, all of the PLAINTIFFS are covered by the policy as insureds and/or named insureds.

### FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

32.    The PLAINTIFFS are insureds under the policy which constitutes a valid contract for which consideration has been paid in the form of the policy premiums.

33.    At all times relevant, the policy was in full force and effect.

34.    The Claim is in whole or in part a covered claim under the policy entitling the PLAINTIFFS defense and indemnity under the policy.

35.    The Claim was timely made and reported.

36.    PLAINTIFFS lived up to all of their obligations under the policy and are entitled to the benefits of it.

37.    Even if there is no indemnity or only partial indemnity under the policy, the PLAINTIFFS are entitled to have SCOTTSDALE defend them in the arbitration, by paying the

Page 9 of 13

FILED: NASSAU COUNTY CLERK 06/14/2024 01:40 PM                INDEX NO. 610488/2024
NYSCEF DOC. NO. 1                                            RECEIVED NYSCEF: 06/14/2024

reasonable and customary legal fees and expenses associated with defending the arbitration, including reimbursement of approx. $30,000 in fees already expended.

38.     The PLAINTIFFS are entitled to hire outside counsel of their choice to defend them in the arbitration at the cost and expense of SCOTTSDALE under the policy.

39.     Despite due and timely tender, SCOTTSDALE has refused to both indemnify and defend the PLAINTIFFS in the arbitration despite being required to do so under the contract and has wrongfully disclaimed coverage.

40.     SCOTTSDALE's refusal to acknowledge coverage under the Policy is a willful and wrongful breach of the Policy terms and conditions.

41.     Due to the foregoing breach, PLAINTIFFS have sustained damages in an amount to be determined by the trier of fact after trial, but not less than the cost of defense of the arbitration to date and in the future, together with interest thereon from the dates of the loss, plus consequential damages, as well as damages in the amount of any damages awarded to Stamulis for covered claims in the arbitration.

## SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT

42.     PLAINTIFFS repeat and reiterate the allegations contained in the above paragraphs.

43.     At all times hereinafter mentioned, the Policy was issued for the benefit of the PLAINTIFFS in exchange for the payment of premiums by the PLAINTIFFS

44.     Upon information and belief, at all times alleged herein, the Policy was in full force and effect.

45.     The PLAINTIFFS fulfilled all of their obligations under the policy and filed a claim for coverage due to the claims made in the arbitration.

46.     The Defendant wrongfully disclaimed coverage.

47.    The Defendant's refusal to acknowledge coverage under the policy is not supported by the facts or the terms and conditions of the policy and is a breach of its obligations under the contract.

48.    PLAINTIFFS seek  a declaratory judgment that PLAINTIFFS are entitled to coverage under the policy including the defense of the underlying action and indemnity for any damages awarded Stamulis for covered claims.

### JURY TRIAL DEMAND

49.    PLAINTIFFS demand a jury trial on all issues

**WHEREFORE,** it is respectfully requested that the Court grant judgment in this action in favor of PLAINTIFFS and against SCOTTSDALE:

A.    On the First Cause of Action, for breach of contract, damages in an amount to be determined at trial, together with interest thereon;

B.    On the Second Cause of Action for a Declaratory Judgment that the PLAINTIFFS are entitled to coverage under the policy including the defense of the underlying action and indemnity for any damages awarded Stamulis for covered claims.

C.    The costs and disbursements of this action, and for such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
       June 14, 2024

Respectfully Submitted,

SCHWARTZ, CONROY, & HACK, PC

*/s/Evan S. Schwartz*
By:  Evan Schwartz, Esq.
*Attorneys for Plaintiffs*
666 Old Country Road, 9th Floor
Garden City, New York 10036

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 1                                                          RECEIVED NYSCEF: 06/14/2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------X
VCS VENTURE SECURITIES, LLC, D/B/A NEW AGE
 VENTURE CAPITAL, ROCCO MICHAEL MASSELI,
 AND ADAM MAGGIO,

                                        Plaintiffs,

         — *against* —

SCOTTSDALE INSURANCE COMPANY,

                                        Defendant.

-------------------------------------------------------------------X


### SUMMONS & VERIFIED COMPLAINT


*Attorneys for Plaintiffs*

Garden City, NY


### CERTIFICATION

        Pursuant to 22 NYCRR §130-1.1-a, the undersigned, an attorney duly admitted to practice in the courts of the State of New York, certifies that, upon information and belief, and reasonable inquiry, the contentions contained in the annexed document are not frivolous as defined in subsection (c) of the aforesaid section.

                                        */s/Evan S. Schwartz*
                                        Evan S. Schwartz, Esq.

INDEX NO. 610488/2024

RECEIVED NYSCEF: 06/14/2024

# EXHIBIT A

# EXHIBIT A

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM INDEX NO. 610488/2024

NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 06/14/2024

## POLICY HOLDER'S GUIDE TO REPORTING A CLAIM OR INCIDENT

A. As soon as you are aware of a claim against you or an event that may give rise to a claim being made against you, please be sure to immediately report the matter to Nationwide E&S/Specialty and ProSurance Group. Please be sure to include your policy number and the name of the insured as it is stated on the policy and all details regarding the matter.

B. New claim may be reported 24/7 to Nationwide E&S/Specialty as follows:

    1. By Electronic Mail: ESSReportaloss@nationwide.com

    2. By website: https://nationwideexcessandsurplus.com

    3. By Telephone: 1-800-423-7675

C. With a copy to ProSurance Group:

    1. By Mail: ProSurance Group, Inc.
                         2685 Marine Way, Suite 1408
                         Mountain View, CA 94043

    2. By Email: financialservices@prosurancegroup.com

    3. By Fax: 650-428-0860

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

## NEW YORK NOTICE

Scottsdale Insurance Company is on the New York Insurance Commissioner's list of approved non-admitted insurers. This means that it is authorized to issue policies to New York residents. However, since Scottsdale Insurance Company is not directly licensed by the State of New York, we are required by New York Insurance Department regulations to provide you with the following notice:

"THE INSURER NAMED HEREIN IS NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS."

If you have any questions on this notice, please call us at (650) 428-0818.

Thank You.

VCS Venture Securities, LLC FKA Primary Capital, LLC

_____

Signature

_____

Date

1/1/13

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

NEW YORK NOTICE

Scottsdale Insurance Company is on the New York Insurance Commissioner's list of approved non-admitted insurers. This means that it is authorized to issue policies to New York residents. However, since Scottsdale Insurance Company is not directly licensed by the State of New York, we are required by New York Insurance Department regulations to provide you with the following notice:

"THE INSURER NAMED HEREIN IS NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS."

If you have any questions on this notice, please call us at (650) 428-0818.

Thank You.

1/1/13

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024



Nationwide®



SCOTTSDALE INSURANCE COMPANY®

Home Office:
One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office:
18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675
A STOCK COMPANY

### BROKER-DEALER
### FINANCIAL SERVICES
### PROFESSIONAL LIABILITY
### INSURANCE POLICY

**(Claims Made and Reported)**

Administered By:
ProSurance Group, Inc.
2685 Marine Way, Suite 1408
Mountain View, California  94043

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM

INDEX NO. 610488/2024

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 06/14/2024

DECLARATIONS
BROKER/DEALER
FINANCIAL SERVICES PROFESSIONAL LIABILITY INSURANCE POLICY
THIS IS A CLAIMS MADE AND REPORTED POLICY

SCOTTSDALE INSURANCE COMPANY®
Home Office Address:
One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office:
18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675
A STOCK COMPANY

Renewal
Of
BFS0002962-FL-09-00

Policy Number
BFS0003062-NY-09-01

| ITEM 1. First Named Insured and Address: | | Administrator Name and Address: |
|---|---|---|
| VCS Venture Securities, LLC<br>FKA Primary Capital, LLC<br>29 Broadway, Suite 1502<br>New York, NY 10006<br><br>Acting as a: "Broker"-"Dealer".<br><br>And the "Representatives" as defined on<br>the Representatives Endorsement. | | ProSurance Group, Inc.<br>2685 Marine Way Suite #1408<br>Mountain View, CA 94043<br><br><br>Administrator No.: 04548 |

ITEM 2. The "policy period" is from 12:01 a.m. on September 10, 2022 to 12:01 a.m. on September 10, 2023 local time at the address of the First Named Insured as stated herein.

ITEM 3. "Retroactive Date": ................................................................................................. September 10, 2021

ITEM 4. The First Named Insured is: a Limited Liability Company

ITEM 5. Our Limits of Liability under this policy shall be as stated below, subject to all of the terms of this policy having reference thereto.
Each "Wrongful Act" Aggregate: ............................................................. $1,000,000.00
"Representative" Aggregate: .................................................................... $1,000,000.00
Policy Aggregate: .................................................................................... $1,000,000.00

ITEM 6. Premium:
Minimum Annual Premium: ...................................................................... $30,000.00
Annual Premium per Additional "Representative": ................................... N/A
Minimum Policy Premium: ........................................................................ $10,000.00

ITEM 7. Each "Wrongful Act" "Retention": ........................................................................ $50,000.00

ITEM 8. Policy Coverage Form and Endorsements attached to and forming a part of this policy at the time of issuance:

Policy Coverage Form BFX-P-60a (12-07)
1. Limitation Of Coverage FNX-11 (7-21)
2. Other Insurance FNX-80 (12-10)
3. Service Of Suit UTX-m9g (10-07)
4. Claims Exclusion FNX-17 (7-21)
5. Claims Exclusion (BROAD) FNX-17a (6-15)
6. Troubled Securities FNX-7 (7-21)
7. Penny Stock FNX-121 (12-10)
8. Choice Of Law FNX-148 (1-21)
9. Incident Report FNX-129 (5-12)
10. Investigation. Settlement & Defense FNX-m37 (11-07)
11. Disciplinary & Subpoena FNX-134 (10-14)
12. Covered Calls And Protective Puts UTS-3g (3-92)
13. "Market Timing" / "Late Trading" / "Soft Dollar" / "Fees" / Breakpoint Discounts Exclusion FNX-48 (12-07)

14. Extended Reporting Period FNX-10a (2-11)
15. Privacy And Identity Protection FNX-130 (12-13)
16. Representatives FNX-3 (10-19)
17. Representatives Premium FNX-23g (10-19)
18. Diversification UTS-3g (3-92)
19. Allocation FNX-147 (1-21)
20. COLI / BOLI (Key Man) FNX-m136b (11-14)
21. Changes – New York FNS-m87-NY (2-12)
22. Limits Of Liability FNX-13-NY (12-07)
Signature Page UTS-COVPG (3-21)

BFS-D-I (1-21)

Nationwide

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 06/14/2024

LIMITATION OF COVERAGE ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

A.  In consideration of the premium charged, and not withstanding any other provision of this policy, it is understood and agreed that the coverage provided by this policy, including, without limitation, any obligation to pay "damages", indemnify, defend or pay "defense costs", is limited to liability arising out of the following businesses or activities:

The First Named Insured acting as a "broker"-"dealer".
Acting as a "registered representative" of the First Named Insured.

B.  In consideration of the premium charged, it is understood and agreed that Section VI N of the policy is amended to read as follows:

VI N. Certain Investments / Investment Strategies / Tangible Assets / Businesses and Activities. Except as may otherwise be specifically provided by endorsement, it is understood and agreed that there is no coverage under this policy, including no obligation to pay "damages", defend or pay "defense costs", for any insured with respect to any liability or "written claim" based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving actual or alleged advice, offering, sale or servicing of "financial services" with respect to any of the following:

1.  Actual or alleged "financial services" related to any of the following named investments or investment strategies including, without limitation, the sale, servicing or recommendation of any such investments or investment strategies:

- arbitrage;
- short sales (except short against the box);
- derivatives, including, without limitation, interest rate swaps, collateralized mortgage obligations (CMO's), collateralized debt obligations (CDO's), structured notes, commodities, or any type of option or future, or futures option contract (including, without limitation, the purchase, acquisition, sale, holding of or change in value of any "security" or other asset or property obtained as a result of such option or futures contract) or similar investments or investment products including, without limitation, commodity pools or partnerships engaged in the investment in or trading of such "securities";
- charitable gift annuities;
- hedge funds;
- conservation easements;
- micro-captive insurance companies taxed under IRS Section 831(b);
- callable, step-up or step-down Certificates of Deposit (CD's);
- viaticals, viatical settlement contracts, senior settlements, senior settlement contracts, structured cash flows (aka pension viaticals), life settlements, life settlement contracts, "securities" backed directly or indirectly by life settlement, death bonds or similar products or services, regardless of how denominated, involving the purchase, sale, assignment, transfer, devise or bequest of all or any portion of the death benefit or other benefits or ownership interests in a life insurance policy, life insurance contract, or annuity, including, without limitation, sale by an owner of a life insurance policy, or the benefits of a life insurance policy, to another "individual" or "entity" whether directly or indirectly, including without limitation, pursuant to any type of option;
- promissory notes and anything similar, whether a "security" or not; provided, U.S. Treasury and any other government agency notes are not excluded from coverage under this policy;

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                     INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                                  RECEIVED NYSCEF: 06/14/2024

## LIMITATION OF COVERAGE ENDORSEMENT

- high yield investment programs (HYIPS) or similar investment programs involving unregistered securities typically touted by unlicensed "individuals" or "entities" over the internet (as discussed in the FINRA July 2010 investor alert);
- "securities" which are not registered with the SEC (other than federal, state or municipal "securities" exempt from registration);
- like-kind exchanges under Internal Revenue Section 1031, including but not limited to tenants-in-common real estate or other investments utilized or planned to be utilized in the exchange or invested in independent of an exchange;
- private equity investments, including, without limitation, venture capital and leveraged buy-out funds;
- proprietary products;
- day trading;
- tax liens, tax deeds and government secured tax certificates or similar products;
- investments in ATM or pay telephones, including, without limitation, ETS pay phones;
- inverse and leveraged mutual funds and inverse and leveraged Exchange Traded Funds (ETF's) and Exchange Traded Notes (ETN's);
- prepaid variable forward contracts;
- claims arising out of any "trading error" (the failure to buy, sell or otherwise deal with "securities" as requested or intended);
- claims arising out of abusive tax shelters or other tax avoidance schemes which have been disallowed by the IRS, including, without limitation, springing cash value life insurance policies;
- structured settlements;
- options except as otherwise provided by the Covered Calls and Protective Puts Endorsement;
- Corporate Owned Life Insurance policies ("COLI policies") and Bank Owned Life Insurance policies ("BOLI policies") except as otherwise provided by the COLI / BOLI Endorsement; provided, the use of death benefits as collateral for a loan made by a bank to an "individual" is not considered a COLI policy or BOLI policy;
- arising from, or in any way related to financing premium for life insurance policies or annuities or arising from or related to such life insurance policies or annuities that have been financed;
- Limited Partnerships and REITS which are registered but not publicly traded except as otherwise specifically provided by the Diversification Endorsement;
- claims arising out of or in any way related to the actual or alleged sending, transmitting, communicating, or distribution or use of material or information in violation of any law, rule or regulation (whether local, state, federal or non-USA laws, rules or regulations), including, without limitation, those laws, rules or regulations prohibiting unsolicited faxes, text messages, electronic mail, or any other unwanted or unsolicited communications, including, without limitation, The Telephone Consumer Protection Act and The CAN-Spam Act, as amended, and the rules and regulations adopted pursuant to those Acts, as well as any laws, rules or regulations dealing with privacy, cyber stalking and cyber harassment;
- investments in tangible personal property, whether directly or through a "security" conveying ownership or an interest therein, including, without limitation, pay telephones, automatic teller machines ("ATM's"), precious metals, gemstones, stamps, art objects, antiques or other collectibles or any security interest in tangible personal property; however, this exclusion does not apply to claims arising out of transactions involving gold or silver;
- claims arising from, or in any way involving, directly or indirectly, the purchase, sale, trading, investment in (whether directly or through a "security" conveying ownership or an interest therein), use of, or advice regarding Initial Coin Offerings, digital securities, digital assets including cryptocurrency (e. g Bitcoin, Ethereum), Digital Tokens and Digital Coins;
- investments obtained through or the use of crowdfunding, including but not limited to, peer-to-peer lending, initial coin offerings, and equity crowdfunding, whether in compliance or not with Title III of the Jumpstart Our Business Startups Act and its regulations; and
- any other investments or investment strategies excluded elsewhere in this policy, including, without limitation, an endorsement and SECTION VI.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 06/14/2024

## LIMITATION OF COVERAGE ENDORSEMENT

2.  Actual or alleged "financial services" related to any of the following named businesses or activities, or any "written claim" or liability arising out of or in connection with any such businesses or activities:

- acting as a "broker"-"dealer" and "registered representative" except as provided in A. above;

- acting as a "registered investment adviser", "associated person", "financial planner", associated "financial planner" or "life insurance agent";

- providing or arranging for the provision of premium financing for life insurance policies;

- any subsidiary, parent or "affiliate" of an insured which is not specifically named or referred to as an insured on this policy, as well as any claims made by any of them or in any way related to any of their products or services; no insured will be covered while acting as, or with respect to any liability he/she may have as a result of any capacity he/she may have with respect to any of the above, including, without limitation, owner, officer, director, shareholder, member, partner, employee, or independent contractor; and

- those businesses or activities excluded elsewhere in this policy, including, without limitation, an endorsement and SECTION VI.

This policy will be void from inception, and of no force or effect with regard to any terms or conditions that violate any laws or regulations of the United States concerning economic or trade embargos.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
              Authorized Representative

FNX-11 (7-21)                                                                    1. (3/3)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 06/14/2024

## OTHER INSURANCE ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached.  It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including no obligation to defend or pay "defense costs" or indemnify any insured, if there is any other valid and collectible insurance available to the insured, including without limitation, the following named policy, if any, and any insurance under which there is a duty to defend, unless such insurance is written to be excess over this specifically identified policy.  For example, if an insured is a "life insurance agent" and "registered representative", and he/she is also an insured under a policy covering "life insurance agents" for his variable annuity sales, this policy would not apply to that "registered representative" with respect to "written claims" arising out of variable annuity sales.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                  Authorized Representative

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM
INDEX NO. 610488/2024
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 06/14/2024

## SERVICE OF SUIT ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy.

In consideration of the premium charged, it is understood and agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the Court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the Court. In a suit instituted against any one of them under this contract, the Company agrees to abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary arising out of this contract of insurance.

The officer named below is authorized and directed to accept service of process on behalf of the Company:

Superintendent of Insurance
One State Street
New York, NY 10004-1151

Having accepted service of process on behalf of the Company, the officer is authorized to mail the process or a true copy to:

Not Required

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

UTX-m9g (10-07)
3.

CLAIMS EXCLUSION ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
>     First Named Insured:
>     Policy Number:
>     Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including, without limitation, no obligation to pay "damages", defend or pay "defense costs", for any "written claim" actually or allegedly arising out of or related in any way, directly or indirectly, to any of the following:

1. the same or similar circumstances, acts, errors, or omissions as any complaint, claim, or "suit" against an insured, or an "affiliate" of an insured, or other litigation, whether or not identified in the "Application" or any attachments or supplements thereto, which occurred or was pending prior to the effective date of this policy, including, without limitation, the purchase, sale or advice regarding the same "security" or other investment product involved in that complaint, claim, or "suit";

2. any incident or fact situation which occurred prior to the effective date of this policy, which is known to an insured, and which may reasonably be expected to result in a claim or "suit" against an insured;

3. the purchase, sale or advice with regard to "securities" known to be in financial trouble prior to the effective date of this policy;

4. those matters excluded from coverage in Section VI or elsewhere in the policy; or

5. related to, or involving in any way, the "entities", "individuals", acts, activities, claims, claimants, or "securities", if any, listed below, including, without limitation, claims by or involving any such "entities", "individuals", acts, activities, claims, claimants or "securities", or arising out of the same or similar circumstances, acts, errors or omissions as said claims or claimants:

Claims arising out of or in any way related to: Walker "Tony" Young, Acorn Capital Management; or Clelia Flores, Maximum Return Investments Inc.; or Shawn Merriman, Market Street Advisors; or Weizhen Tang; or Edward Stein, Gemini Fund 1 L.P., DISP LLC.; or DBSI products or services; or Bernard Madoff, or Bernard Madoff Investment Services LLC whether directly or via fund of fund originators such as Fairfield Greenwich Advisors; Tremont Capital Management; or Maxam Capital Management; or Robert A. Stanford, Stanford International Bank, Stanford Group Company and Stanford Capital; or Marc Drier, James Nicolson, or Mark Bloom, North Hills Fund; or Paul Greenwood, Stephen Walsh, WG Trading Company, WG Trading Investors Co., Westridge Capital Management, Inc.; or Provident Royalties, Provident Asset Management, LLC, Provident Energy 1, L.P., Provident Resources 1, L.P., Provident Energy 3, L.P. or Provident Operating Company, LLC; Shale Royalties, Inc., Shale Royalties, Inc. LLC or Shale Royalties 3-22; Medical Capital Corporation, Medical Capital Holdings, Inc., Medical Provider Funding Corporation VI or Medical Cap Note Programs; or Black Diamond Programs; or Desert Capital REIT; or Bruce Friedman, Diversified Lending Group, Inc. and Applied Equities, Inc.; or Landmark Capital Partners, LLC; or Bambi Holzer; LandAmerica Financial Group, Inc.; Tomas Petters, Petters Worldwide Group; Edward Oku; Lara Coleman; Ricardo Bonilla; Rojas and Shadai Yire; Paul Burks and Rex Venture Group; Jim Donnan and Gregory Crabtree; Bridge Premium Finance; Mark Feathers; Wayne Pamer; Gurudeo Persaud; John Geringer; George Levin and Frank Preve; David Conolly; Shervin Neman; Ephren Taylor II; Wendell Jacobson and Allen Jacobson: Garfield M. Taylor; Arrowhead Capital Management, LLC; Eric Aronson; Doris E. Nelson; James David Risher and Daniel Joseph Sebastian; Jeffrey A. Lowrance; David Ronald Allen; AIC, Inc.; James Clements and Zeina Smidr; John Scott Clark; Michael Watson and Joshua Escobedo; St. Anselm Exploration Co.; Fair Finance Company; Jason Bo and Alan Beckman; Francisco Illarramendi; Richard Dalton;

4. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

CLAIMS EXCLUSION ENDORSEMENT

Joseph Paul Zada; David Harrold and Bruce Prevost; Robert Anderson; Robert Stinson, Jr.; Daniel Spitzer; Trade-LLC; Matthew Jennings; Chimay Capital Management, Inc.; Merendon Mining, Inc.; Matthew Gagnon; Nevin Shapiro; McGinn Smith & Co.; Douglas Vaughan; Canopy Financial; Trevor Cook; Mantria Corporation; United Development Funding; Puerto Rican bonds including closed end funds and other "securities" based on or containing such bonds unless the holdings of Puerto Rican bonds in such funds or "securities" is de minimis; or any of their parents or "affiliates".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
            Authorized Representative

FNX-17 (7-21)    4. (2/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024
J00219023030070324

NYSCEF DOC. NO. 2                                                 RECEIVED NYSCEF: 06/14/2024

CLAIMS EXCLUSION ENDORSEMENT
(Broad)

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

*Note:* *This endorsement eliminates all coverage, including any duty to pay "damages", defend or pay "defense costs", for an entire "written claim" if any portion of that "written claim" is described below.*

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including, without limitation, no obligation to pay "damages", defend or pay "defense costs", for any "written claim" actually or allegedly arising out of or related in any way, in whole or in part, directly or indirectly, to any of the "entities", "individuals", acts, activities, claims, claimants or "securities", if any, listed below, even if the "written claim" also includes or relates to other matters otherwise covered by this policy:

All products or activities or incidents or Representatives named in any previous FINRA action, claim or complaint. All interrelated claims to Investment Banking.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                Authorized Representative

FNX-17a (6-15)                                                                          5.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                           RECEIVED NYSCEF: 06/14/2024

## TROUBLED SECURITIES ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and not withstanding any other provision of this policy, it is understood and agreed that this policy does not apply to any claim arising out of or in any way related to "financial services" provided in connection with any "security" or other investment issued by or with respect to any "entity" (including, without limitation, a limited partnership, master limited partnership or real estate investment trust) or any organization affiliated in any way with any such "entity", which has, as of the effective date of this policy, actually or allegedly:

1.  admitted in writing its inability to pay its debts, or, in the case of a limited partnership or REIT, ceased or significantly reduced the amount of its distributions due to its financial difficulties;

2.  made a general assignment for the benefit of creditors;

3.  been the subject of any proceeding seeking to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver, trustee or other similar official for it or for any substantial part of its property;

4.  engaged in any business reorganization (including, without limitation, any transfer of all or substantially all of its assets, a "roll up", "roll over" or incorporation);

5.  taken any corporate action to authorize any of the actions set forth above;

6.  been the subject of a class action lawsuit involving its "securities";

7.  been under federal or state regulatory investigation with respect to its "securities"; or

8.  been the subject of complaints or "suits" by "clients" of an "insured" or his/her/its affiliated or his/her/its "representatives".

Claims referred to above shall include, without limitation, any claim alleging the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, or any similar federal or state law, or any common law relating thereto, as well as claims relating to any entities listed below.

Claims arising out of or in any way related to: Walker "Tony" Young, Acorn Capital Management; or Clelia Flores, Maximum Return Investments Inc.; or Shawn Merriman, Market Street Advisors: or Weizhen Tang; or Edward Stein, Gemini Fund 1 L.P., DISP LLC.; or DBSI products or services; or Bernard Madoff, or Bernard Madoff Investment Services LLC whether directly or via fund of fund originators such as Fairfield Greenwich Advisors; Tremont Capital Management; or Maxam Capital Management; or Robert A. Stanford, Stanford International Bank, Stanford Group Company and Stanford Capital; or Marc Drier, James Nicolson, or Mark Bloom, North Hills Fund; or Paul Greenwood, Stephen Walsh, WG Trading Company, WG Trading Investors Co., Westridge Capital Management, Inc.; or Provident Royalties, Provident Asset Management, LLC, Provident Energy 1, L.P., Provident Resources 1, L.P., Provident Energy 3, L.P. or Provident Operating Company, LLC; Shale Royalties, Inc., Shale Royalties, Inc. LLC or Shale Royalties 3-22; Medical Capital Corporation, Medical Capital Holdings, Inc., Medical Provider Funding Corporation VI or Medical Cap Note Programs: or Black Diamond Programs; or Desert Capital REIT; or Bruce Friedman, Diversified Lending Group, Inc. and Applied Equities, Inc.: or Landmark Capital Partners, LLC; or Bambi Holzer; LandAmerica Financial Group, Inc.; Tomas Petters, Petters Worldwide Group; Edward Oku; Lara Coleman; Ricardo Bonilla; Rojas and Shadai Yire; Paul Burks and Rex Venture Group; Jim Donnan and Gregory Crabtree; Bridge Premium Finance; Mark Feathers; Wayne Pamer; Gurudeo Persaud; John Geringer; George Levin and Frank Preve; David Conolly; Shervin Neman; Ephren Taylor II; Wendell Jacobson and Allen Jacobson; Garfield M. Taylor; Arrowhead Capital Management, LLC; Eric Aronson; Doris E. Nelson; James David Risher and Daniel Joseph Sebastian; Jeffrey A. Lowrance; David Ronald Allen; AIC, Inc.; James Clements and Zeina Smidi; John Scott Clark; Michael Watson and Joshua Escobedo; St. Anselm Exploration Co.; Fair Finance Company; Jason Bo and Alan Beckman; Francisco Illarramendi; Richard Dalton; Joseph Paul

6. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

TROUBLED SECURITIES ENDORSEMENT

Zada; David Harrold and Bruce Prevost; Robert Anderson; Robert Stinson, Jr.; Daniel Spitzer; Trade-LLC; Matthew Jennings;Chimay Capital Management, Inc.; Merendon Mining, Inc.; Matthew Gagnon; Nevin Shapiro; McGinn Smith & Co.; Douglas Vaughan; Canopy Financial; Trevor Cook; Mantria Corporation; United Development Funding; Puerto Rican bonds including closed end funds and other "securities" based on or containing such bonds unless the holdings of Puerto Rican bonds in such funds or "securities" is de minimis; Robert H. Shapiro and Woodbridge Group of Companies, LLC (including but not limited to: dba Woodbridge Wealth, RS Protection Trust, WMF Management, LLC, Woodbridge Structured Funding, LLC, Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC Woodbridge Mortgage Investment Fund 3, LLC Woodbridge Mortgage Investment Fund 3A, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, Woodbridge Commercial Bridge Loan Fund 2, LLC, 144 Woodbridge-Affiliated Property Limited Liability Companies, 131 Woodbridge-Affiliated Holding Limited Liability Companies, Jeri Shapiro; Woodbridge Realty of Colorado, LLC dba Woodbridge Realty Unlimited; Woodbridge Luxury Homes of California, Inc. dba Mercer Vine, Inc.; Riverdale Funding, LLC; Schwartz Media Buying Company, LLC; WFS Holding Co., LLC); Future Income Payments LLC, LumpSum Pension Advance, Pension Funding LLC, Pensions Annuities & Settlements LLC, Pension Income LLC, Cash Flow Investment Partners, DFR Pension Funding, Veterans Benefit Leverage, Voyager Financial Group LLC (Pension4Case/Cash Out My Pension/Buy Your Pension); First American Finance Corporation, and Investing Forward (Termbrokers LLC); Kevin Merrill, Jay Ledford and Cameron Jezierski, along with their entities, Global Credit Recovery LLC, Delmarva Capital LLC, Rhino Capital Holdings LLC, Rhino Capital Group LLC, DeVille Asset Management Ltd. and Riverwalk Financial Corp.; 1 Global Capital LLC (aka 1st Global Capital and 1st Global Capital Financial Services), 1 West Capital LLC (aka 1st West Capital), Carl Ruderman and Steven A. Schwartz; GPB Capital Holdings (including but not limited to the following private placements GPB Holdings, GPB Holdings II, GPB Holdings III, GPB Automobile Portfolio, GPB Cold Storage, GPB Holdings Qualified, GPB Waste Management, and GPB NYC Development) and Ascendant Alternative Strategies; Bakken Drilling Fund; syndicated conservation easements sponsored by EcoVest Capital; Hospitality Investors Trust Inc. (HIT), (f.k.a. American Realty Capital Hospitality Trust (ARC)); NP SkyLoft, DST (sponsored by Nelson Partners LLC); Sierra Income Corporation (a.k.a. Sierra Income Fund); FS KKR Capital Corp. II and its predecessor firms (FS Investment Corporation II (FSIC II), FS Investment Corporation III (FSIC III), FS Investment Corporation IV (FSIC IV), Corporate Capital Trust II (CCT II)); Healthcare Trust, Inc. ("HTI"); The Financial Visions Companies (Financial Visions Inc., Financial Visions West LLC, Financial Visions West 1 LLC, FV-2 LLC, The Volcano Fund LLC, Victory Fund LLC, Velocity Fund LLC) and their president/owner Daniel Rudden; Infinity Q Diversified Alpha Fund (IQDNX/IQDAX); Northstar Financial Services Bermuda Ltd. and Greg Lindberg; GWG L Bonds; GWG Holdings Inc.; or any of their parents or "affiliates".

Claims arising out of or in any way related to Auction Rate Securities (ARS).

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of this policy, other than as stated above.

By: _____
Authorized Representative

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

PENNY STOCK ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION VI. WHAT WE DO NOT COVER — EXCLUSIONS, paragraph T. Foreign Trading / Market Specialist / Clearing or Transfer Agencies / "Penny Stocks" is amended by changing "NASDAQ Capital Market Small Cap Market" to its current name, "NASDAQ Capital Market".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
        Authorized Representative

FNX-121 (12-10)    7.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                                  RECEIVED NYSCEF: 06/14/2024

## CHOICE OF LAW ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed by the "insureds" under this policy and us that any dispute concerning the meaning, interpretation and effect of this policy, as well as the parties' rights and obligations under this policy shall be governed by the laws of the State of California.

Any disputes with us shall be subject to SECTION VII — CONDITIONS.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                 Authorized Representative

TNX-148 (1-21)                                                                              8.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 06/14/2024

INCIDENT REPORT ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
>     First Named Insured:
>     Policy Number:
>     Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows:

A. An incident or "client" complaint involving an alleged or possible "wrongful act", occurring on or after the insured's "retroactive date" under this endorsement and otherwise covered by this policy, which is reported to us, as set forth below, during the insured's "policy period" and which subsequently becomes the subject of a "written claim" reported to us following expiration of the insured's "policy period", shall be considered to have been reported to us as set forth in B., below, if:

  1. there is sufficient written documentation, reported to us with the incident or complaint, to allow us to determine that the subsequently reported "written claim" arises from the same facts as said incident or complaint; for coverage to apply, such written documentation must include, at a minimum, the following:
     a. the name(s) of potential claimant(s) and a description of the specific "wrongful act" which forms the basis of a potential "written claim"; and
     b. the identity of the specific insured(s) involved in such "wrongful act"; and
     c. the consequences which have resulted or may result from such "wrongful act"; and
     d. the amount of monetary loss which may be sought as a consequence of such "wrongful act"; and
     e. the circumstances under which the insured first became aware of such "wrongful act; and

  2. the customer complaint is properly recorded in the First Named Insured's complaint log, as required by FINRA rules and regulations; and

  3. there is no other insurance coverage available to said insured that applies to said "written claim", or which would apply in absence of this policy.

B. 1. If coverage for the insured is not renewed by us, and if an incident or complaint, previously reported to us as aforesaid, becomes the subject of a "written claim" reported to us by the insured following expiration of the insured's "policy period", such "written claim" shall be considered to have been reported to us on the date such incident or complaint was previously reported to us during the insured's "policy period" and shall be subject to all the terms and conditions of the insured's coverage in force when such incident or complaint was first reported to us, including without limitation, the applicable Limits of Liability and "retention" applying under that policy.

  2. If coverage for the insured is renewed by us, and if an incident or complaint, previously reported to us as aforesaid, becomes the subject of a "written claim" reported to us by the insured under such renewal policy, or one of a series of continuously renewed policies covering for the insured, such "written claim" shall be considered to have been reported to us on the date the "written claim" is reported to us during the insured's renewal "policy period"; provided, such "written claim" shall be subject to all the terms and conditions of the insured's coverage in force when such incident or complaint was first reported to us under the prior policy, including, without limitation, the applicable Limits of Liability and "retention" applying under that policy.

C. A report made to us by an insured, including without limitation a report for loss control or risk management purposes, shall not be considered a "written claim".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
              Authorized Representative

FNX-129 (5-12)                                                          9.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM        INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                     RECEIVED NYSCEF: 06/14/2024

## INVESTIGATION, SETTLEMENT AND DEFENSE ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION II B. is amended to read as follows:

B.   INVESTIGATION, SETTLEMENT AND DEFENSE

We have the right and duty to defend, as part of and subject to the applicable Limit(s) of Liability hereunder, any "suit" brought against the insured because of a "wrongful act" to which this policy applies and which seeks "damages" which are payable under the terms of this policy, even if any of the allegations of the "suit" are groundless, false or fraudulent. We will choose the lawyer to defend any such "suit." If an arbitration proceeding is brought with respect to a "suit", we will be entitled to exercise all the insured's rights in the choice of arbitrators and the conduct of the proceedings. Subject to the applicable Limit(s) of Liability, we will pay all "defense costs" which are in excess of the applicable "retention".

We may investigate or defend any "written claim" as we deem appropriate.

We have the right, with the First Named Insured's consent, to make any settlement of a "written claim" or "suit" as we deem expedient. The First Named Insured must consent to a settlement of a "written claim" or "suit" which we recommend, and which is acceptable to the claimant(s) (a "settlement opportunity"), within 15 days of the date the First Named Insured is first made aware of the settlement opportunity. In the event the First Named Insured fails or refuses to consent to the settlement within the 15 days, our liability for the "written claim" or "suit" shall not exceed the lesser of (1) the amount, in excess of the applicable "retention", for which we could have settled the "written claim" or "suit", including "defense costs" incurred by us, or with our written consent, up to the date of such failure or refusal to consent or (2) the actual amount for which the "written claim" or "suit" was settled thereafter in excess of the applicable "retention", including applicable "defense costs".

In the event the First Named Insured fails or refuses to consent to a settlement opportunity, we shall have the right, but not the duty, to continue the defense of the "written claim" or "suit" thereafter. If we continue the defense of the "written claim" or "suit", we may, at any time thereafter, withdraw from the further defense of said "written claim" or "suit" by tendering control of the defense to the First Named Insured.

In all events, our duty to defend any "suit", or to pay any settlement or judgment or "defense costs" relating thereto, ends after we have paid our applicable Limit(s) of Liability as set forth in SECTION V. The Limits of Liability set forth in SECTION V include all payments for "defense costs" incurred by us, or incurred by the insured with our written consent, in excess of the applicable "retention" and within the applicable Limits(s) of Liability. All "defense costs" which are in excess of the applicable "retention" shall first be subtracted from the applicable Limit(s) of Liability with the remainder, if any, being the amount available to pay "damages". If the applicable Limit(s) of Liability is/are exhausted by the payment of settlements, judgments, awards and/or "defense costs" prior to the reduction of any pending "suit" against an insured to settlement, final judgment or award, we shall have the right to withdraw from any further defense thereof by tendering control of the defense of said "suit" to the First Named Insured.

The insured(s) shall not admit liability for or settle any "written claim" or "suit" or incur any "defense costs" without our prior written consent. If we withdraw from the defense of a "written claim" or "suit" following the First Named Insured's failure or refusal to consent to a settlement, it will not be necessary for us to consent to any settlement or "defense costs" incurred thereafter. However, our liability with respect to any such "written claim" or "suit" shall be limited as aforesaid.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
        Authorized Representative

FILED: NASSAU COUNTY CLERK 06/14/2022 04:40 PM     INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 06/14/2024

## DISCIPLINARY & SUBPOENA ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject to the "Retention" and Aggregate Sub Limit of Liability set forth below, it is understood and agreed that with respect to the coverage provided to the following named insureds only, the policy is amended as follows:

1. We shall, at the request of the First Named Insured, retain counsel and pay said counsel's reasonable and necessary fees and associated costs to represent the named insured(s) below: (1) with respect to "disciplinary proceedings" arising out of acts committed in rendering or failing to render "financial services", of a type otherwise covered by this policy as set forth in the Limitation of Coverage Endorsement, on or after the insured's applicable "retroactive date" for a "client" of an insured, provided the "disciplinary proceeding" is both initiated against the insured and reported to us in writing during the insured's "policy period" or "extended reporting period" if applicable; and (2) with respect to advice regarding the production of documents and/or to represent the insured during the preparation for and giving of testimony in response to a Subpoena or Subpoena Duces Tecum that involves "financial services" of the type otherwise covered by this policy and that is both served on the insured and reported to us during the insured's "policy period" or "extended reporting period" if applicable.

2. The coverage provided by this endorsement is subject to the Policy Aggregate Sub Limits of Liability set forth below which is the maximum amount payable under this endorsement regardless of the number of "disciplinary proceedings" initiated or the number of subpoenas served or the number of insureds involved in such "disciplinary proceeding" or subpoenas. The Sub Limits shall be part of, and not in addition to, the applicable Policy Limit of Liability set forth in the Declarations or Limits of Liability Endorsement.

   | | |
   |---|---|
   | "Disciplinary Proceeding": | $25,000.00 |
   | Subpoena or Subpoena Duces Tecum: | $25,000.00 |
   | Policy Aggregate Sub Limit: | $25,000.00 |

3. The "retention" applying to the coverage provided by this endorsement is $5,000.00 Each "Disciplinary Proceeding", Subpoena or Subpoena Duces Tecum.

4. The following definition applies to the coverage provided by this endorsement:

   "Disciplinary proceeding" means a proceeding brought by a governmental authority or self-regulatory body to investigate actual or alleged misconduct committed by an insured listed below in providing "financial services" of a type otherwise covered by this policy as set forth in the Limitation Of Coverage Endorsement.

5. Named Insureds: VCS Venture Securities, LLC FKA Primary Capital, LLC

6. The "retroactive date" for the coverage provided by this endorsement is September 10, 2021; this coverage shall not apply to "disciplinary proceedings" or Subpoenas/Subpoenas Duces Tecum arising out of acts committed or occurring prior to the applicable "retroactive date".

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
     Authorized Representative

FNX-134 (10-14)                                                                          11.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 06/14/2024

## COVERED CALLS AND PROTECTIVE PUTS ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and notwithstanding the exclusion for options contained in SECTION VI N, it is understood and agreed that this policy provides coverage with respect to "financial services", otherwise covered by this policy, involving the sale of "covered calls" or purchase of "protective puts" by a "client" of a named insured.

"Covered call" means an exchange-traded short call option on stock, the full amount of which is actually owned throughout the option's life by the named insured's "client" who/which sold the "covered call" option.

"Protective put" means an exchange traded put option purchased for an underlying "security" that is already owned by the holder of the option which defends against a drop in the share price of the underlying "security".

However, the coverage under this endorsement does not include coverage for "collars" in their multiple variations and other option strategies utilizing "covered calls" and "protective puts" in combination.

"Collar", also known as a hedge wrapper or risk-reversal is an option strategy designed to protect against large losses in return for limiting large gains. An investor who is already long in the underlying security creates a collar by buying an out of the money put option while simultaneously writing an out of the money call option. It includes variations of this standard collar, including but not limited to, short collars, reverse collars, synthetic collars, put-spread collars, collar spreads, etc.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                Authorized Representative

UTS-3g (3-92)                                                                    12.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM        INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                      RECEIVED NYSCEF: 06/14/2024

"MARKET TIMING" / "LATE TRADING" / "SOFT DOLLAR" / "FEES" /
BREAKPOINT DISCOUNTS EXCLUSION ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that there is no coverage under this policy, including no obligation to defend or pay "defense costs" or indemnify any insured, with respect to any claim or liability arising out of or related in any way to actual or alleged "market timing", "late trading", "soft dollar activities" or "fees", the failure to provide a discount on volume purchases of mutual funds (i.e., breakpoint discounts), or providing fictitious or collusive bids or the failure to disclosure any compensation as required by law, regulation or agreement with any regulatory body or court, or any other activity which is in violation of federal or state statues or regulations or any mutual fund or life insurance company's policies or procedures or in contravention of or in violation of the terms of any prospectus or other representation made to investors.

This exclusion applies regardless of the form, style or denomination of any such claim of "market timing", "late trading", "soft dollar activities" or "fees", and regardless of whether such claim is criminal, administrative or civil, including, without limitation, claims alleging breach of contract, failure to supervise, negligent supervision or negligence of any kind, controlling person liability, breach of fiduciary duty, personal profiting, criminal activity, market manipulation, violation of any law related to mutual funds or variable life insurance or variable annuities, misrepresentation, estoppels, repudiation of any commitment, the failure to monitor, detect, identify or remediate "market timing", "short-term trading" or "late trading" or any other theory of liability.

"Market timing" means the making of short term purchases or sales of mutual fund shares or the separate accounts or sub accounts of a life insurance company contrary to or in violation of the mutual fund's or life insurance company's prospectus or other representation to investors, or any policy, limitation, agreement or procedure of the mutual fund or life insurance company, or contrary to or in violation of any state or federal statute or regulation; and any conduct associated with any of the above, including, without limitation: (1) the waiver of redemption fees associated with "short-term trading"; (2) the failure to abide by written representations regarding the permissibility of "short-term trading" or the mutual fund's or life insurance company's efforts to monitor or prevent "short-term trading"; (3) the receipt of fees or any other form of compensation from certain investors in exchange for providing such investors with "short-term trading" privileges not available to other investors.

"Short-term trading" means the purchase or sale of shares of a mutual fund or the separate accounts or sub accounts of a life insurance company in a time period less than that provided in the mutual fund's or life insurance company's prospectus or other agreement or in violation of the policies, limitation, agreements or procedures of the mutual fund or life insurance company, or as required by federal or state law or regulation, including, without limitation, any "in-and-out" trading of mutual fund shares or the separate accounts or sub accounts of a life insurance company or any other trade of mutual fund shares or the separate accounts or sub accounts of a life insurance company designed to take advantage of the inefficiencies in the methods used by the mutual fund or life insurance company to price its shares or sub accounts.

"Late trading" means: (1) any transaction involving mutual fund shares or the separate account or sub accounts of a life insurance company (including, without limitation, the placement or confirmation or cancellation of trades or orders for, or the purchase or redemption of mutual fund shares by the mutual fund or an intermediary) made after the mutual fund's or separate account's or sub account's net asset value (as defined in Rule 2a-4 of the Investment Company Act of 1940, as amended, in the case of the mutual fund) for a particular date has been made, or should have been made, but which transaction is made at a price based upon said mutual fund's or account's net asset value for that date; or (2) any transaction defined as late trading by any federal or state statute or regulation, or any prospectus, policy, limitation, agreement or procedure of the mutual fund or life insurance company.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024

NYSCEF DOC. NO. 2   RECEIVED NYSCEF: 06/14/2024

"MARKET TIMING" / "LATE TRADING" / "SOFT DOLLAR" / "FEES" /
BREAKPOINT DISCOUNTS EXCLUSION ENDORSEMENT

"Soft dollar activities", as used in this endorsement, means paying or providing or receiving or accepting fees, commissions, bonuses, gratuities, services or any other form of compensation or benefit in exchange for preferential treatment by or recommendation of or purchase of a particular "security" (including, without limitation, a mutual fund or particular class of mutual fund shares or a particular separate account or sub account of a life insurance company), including, without limitation; (1) the payment of higher commissions for directing "securities" trades to a "broker"-"dealer" in return for investment research, advice, subscriptions, professional development programs, computer hardware or software; or (2) "payment for shelf space" defined to be the payment of monetary or other forms of compensation or other benefits to "broker"-"dealers", "registered representatives", "registered investment advisers", "associated persons" or other solicitors in return for steering their clients to the purchase of particular "securities"; (3) "directed commissions" (sometimes referred to as "directed brokerage") defined to be when a mutual fund or life insurance company or "registered investment adviser" chooses a "broker"-"dealer" to execute its "securities" trades in consideration of the sales volume by the "broker"-"dealer" or its associated "registered investment advisers", "registered representatives" or "associated persons" of the mutual fund's shares or the life insurance company's variable products or other "securities".

"Fees" means fees or any other form of compensation, whether direct or indirect, charged by, or charged to, mutual funds for investment advisory, management, administrative, distribution or other services, including, without limitation, brokerage fees, commissions, sales loads and 12(b)-1 fees.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
     Authorized Representative

FNX-48 (12-07)                                                              13. (2/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM
NYSCEF DOC. NO. 2

INDEX NO. 610488/2024

RECEIVED NYSCEF: 06/14/2024

## EXTENDED REPORTING PERIOD ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
>     First Named Insured:
>     Policy Number:
>     Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION VII K. is amended to read as follows:

SECTION VII K. Extended Reporting Period. If we cancel or fail or refuse to renew this policy, in total or as to any named insured, for any reason other than the failure to pay premium or "retention" or any other amount due under this policy, or the failure to comply with any of the other terms or conditions of this policy, or the concealment or misrepresentation of any material fact on the insured's "Application" or the failure to disclose material changes in the information on that "application", or the revocation, suspension or surrender, at the request of any regulatory authority, of the insured's license or other right to provide "financial services" or practice as a "financial services professional", the First Named Insured has the right to have issued an endorsement providing a one year extended period of time, following the effective date of said cancellation or non renewal, during which the insured(s) affected by said cancellation or non renewal may present to us "written claims" arising out of "wrongful acts" occurring during the "coverage period" for said insured(s) and otherwise covered under the terms of this policy. During this "extended reporting period", any "written claim" presented to us resulting from a "wrongful act" or a series of continuous, repeated or "interrelated wrongful acts" for which a "written claim" had been presented to us under the terms of a predecessor policy issued by us, of which this policy is a renewal or successor, will be treated as if it had been presented to us during the last day of coverage under that predecessor policy and will be covered by that predecessor policy, not this policy, and will be subject to all the terms and conditions applicable to "written claims" presented under that predecessor policy, including, without limitation, the Limits of Liability and "retention" applying to that predecessor policy.

While this policy is in effect, we will continue to cover, without the need to purchase an "extended reporting period endorsement", an insured with respect to his/her/its liability arising out of the "wrongful acts" of an "individual" who was a "representative" of the First Named Insured on or after the First Named Insured's "retroactive date" after said "individual" is no longer such a "representative" of the First Named Insured, with respect to claims arising out of "financial services" which were rendered on or after the First Named Insured's "retroactive date" and which are otherwise covered under the terms of this policy; provided, this continuing coverage shall not apply in the case of a "representative" as to whom we have cancelled coverage or refused to renew coverage or who has been suspended or barred from the "securities" or insurance industry by a regulatory authority. In any of the latter cases, it will be necessary for the First Named Insured to buy an "extended reporting period endorsement" covering that "representative", as otherwise provided herein, for there to be any continuing coverage for any insured with respect to "written claims" arising out of the "wrongful acts" of said "representative". The First Named Insured shall notify us of the termination for cause of any "representative" within 15 days of such termination.

If the First Named Insured purchases an "extended reporting period endorsement" following cancellation or non-renewal of this policy, we will also cover, pursuant to the terms of that "extended reporting period endorsement", each "representative" of the First Named Insured who is an insured as of the date of such cancellation or non-renewal for "written claims" arising out of "financial services", otherwise covered under the terms of this policy, which were rendered during the "coverage period" for that "representative".

To obtain an "extended reporting period endorsement", the First Named Insured must, within 30 days of the effective date of such cancellation or nonrenewal, give us written notice requesting the issuance of such an endorsement and pay an additional premium for that endorsement as determined by our rules, rates, and regulations in effect at that time. If the First Named Insured fails to purchase an "extended reporting period endorsement" within that 30 day period, there will be no further coverage under this policy with respect to any insured affected by said cancellation or nonrenewal, effective as of the effective date of such cancellation or nonrenewal. We have no obligation to offer an "extended reporting period endorsement" to anyone other than the First Named Insured.

14. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

## EXTENDED REPORTING PERIOD ENDORSEMENT

The insurance we provide during an "extended reporting period" will be excess over any other valid and collectible insurance available to the insured. The "extended reporting period" will not reinstate or increase the Limits of Liability or extend the "policy period". All premium paid for an "extended reporting period endorsement" shall be fully earned by us upon issuance of the endorsement and will not be refunded.

If we do not offer to renew this policy at the same premium, limits of liability or "retention(s)" as apply to this policy, this will not be considered a cancellation or nonrenewal by us.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-10a (2-11)                                                                14. (2/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                         RECEIVED NYSCEF: 06/14/2024

## PRIVACY AND IDENTITY PROTECTION ENDORSEMENT

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject of the "Retention" and Sub Limits of Liability set forth below, it is understood and agreed as follows:

1. This policy provides coverage for the below named insured's legal liability for indemnity and "defense costs" as a result of "written claims" first reported to us during the named insured's "policy period" arising out of the negligent violation of a right of privacy or a "privacy regulation" by the named insured in the performance of "financial services" covered by this policy and resulting from:

   a. a breach of the named insured's network security, through hacking, mismanagement, and/or loss or theft of "personal information", computer hardware, software or a personal digital assistant;

   b. the loss or theft of "personal information" or data about a "client" which is in the named insured's care, custody or control, including, without limitation, loss or theft from any computer, computer system, network or website that is in the named insured's care, custody or control;

   c. the named insured's failure to prevent unauthorized access to "personal information" that has been provided to the named insured by a "client" or a "client's" representative;

   d. this endorsement does not apply to "written claims" arising out of or alleging "publication injury".

2. The following additional definitions apply to the coverage provided by this endorsement:

   "Personal information" means an "individual's":

   a. social security number;

   b. medical or healthcare data, or other protected health information;

   c. driver's license number or state identification number;

   d. account number, credit card number or debit card number in combination with any required security code, access code or password that would permit access to that individual's financial account; or

   e. other nonpublic "personal information" as defined in a "privacy regulation".

   "Privacy regulation" means state and federal identity theft and privacy protection legislation, statutes and regulations (including, without limitation, the Health Insurance Portability and Accountability Act, as amended, and the Gramm-Leach-Bliley Act, as amended) associated with the control or use of personally identifiable financial or other sensitive information that requires commercial "entities" that collect "personal information" to post privacy policies, adopt specific privacy controls, or notify "individuals" in the event that "personal information" has potentially been compromised.

3. The following "Retention" applies to the coverage provided by this endorsement: $5,000.00 Each "Wrongful Act".

4. The following Sub Limits of Liability apply to the coverage provided by this endorsement:

   Network Security Aggregate: up to a total of $25,000.00 to reimburse the below named insureds for the costs of investigation, remediation, development and/or improvement of the below named insureds' network security systems to address any network security issues raised by "written claims" covered by this endorsement.

   Legal Liability Aggregate: up to a total of $25,000.00 to reimburse the below named insureds for sums that the named insureds have become legally obligated to pay as a result of "written claims" covered by this endorsement.

15. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO: 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

PRIVACY AND IDENTITY PROTECTION ENDORSEMENT

"Defense Costs" Aggregate: up to a total of $25,000.00 to reimburse the below named insureds for "defense costs" incurred in defending "written claims" covered by this endorsement.

Policy Aggregate: $75,000.00 for all "written claims" covered by this endorsement.

These Sub Limits of Liability are part of, and not in addition to, the Limits of Liability set forth in the Declarations or an endorsement.

5.  The "Retroactive Date" applying to the coverage provided by this endorsement is September 10, 2021.

Named Insured(s): VCS Venture Securities, LLC FKA Primary Capital, LLC

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By _____
        Authorized Representative

FNX-130 (12-13)                                                                          15. (2/2)

REPRESENTATIVES ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that the "representatives" of the First Named Insured on the effective date of this policy and those who become employees or under contract with the First Named Insured during the "policy period" are named insureds under this policy as of the "coverage inception date" and prior to his/her "coverage termination date", but only while acting within the course and scope of his/her duties as such a "registered representative" of the First Named Insured or as a "financial services professional" for which coverage is otherwise provided herein, with respect to "wrongful acts" occurring on or after his/her "retroactive date" and prior to his/her "coverage termination date".

"Coverage inception date" is the later of the effective date of this policy or the first date of continuous employment or contract with the First Named Insured.

"Coverage termination date" is the earlier of the expiration date of this policy or the date the "representative's" employment or contract with the First Named Insured is terminated.

An insured "representative's" "retroactive date" shall be the later of the "retroactive date" of the First Named Insured or his/her first date of continuous employment or contract with the First Named Insured.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By. _____
                Authorized Representative

FNX-3 (10-19)

16.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM        INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 06/14/2024

## REPRESENTATIVE PREMIUM ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

     First Named Insured:
     Policy Number:
     Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that SECTION VII H. of this policy is amended to read as follows:

SECTION VII H.    Representative Premium / Audit

No additional premium shall be charged for a "representative" who is first employed or contracted by the First Named Insured, or a named insured "affiliate" of the First Named Insured, following inception of the First Named Insured's "policy period" except in case of merger or acquisition as set forth in Section VII O. There shall be no return premium with respect to a "representative" whose coverage is terminated during the First Named Insured's "policy period".

We may examine and audit an insured's books and records as they relate to this insurance at any time during the "policy period" and during the eighteen months immediately following the end of the "policy period" for the insured.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
              Authorized Representative

FNX-23g (10-19)                                                                     17.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 06/14/2024

## DIVERSIFICATION ENDORSEMENT

> The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.
>
> First Named Insured:
> Policy Number:
> Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, and subject to the Conditions Precedent to Coverage, "Retention", and Sub Limits of Liability set forth below, it is understood and agreed as follows:

In order for there to be coverage for "written claims" of a "client" of a named insured, which "written claims" would otherwise be covered pursuant to the terms of this policy, each of the following Conditions Precedent to Coverage must apply to that "client", with proof acceptable to us:

Conditions Precedent to Coverage

-   The "Aggregate Value" of the below "Listed Investments" contained in the "client's" "Managed Investment Portfolio" did not, at the time of purchasing, exceeded the lesser of 15% of the "Aggregate Value" of the "client's" "Managed Investment Portfolio" or such lesser amount required by Federal or State law or regulation or the offering documents for said investments; and

-   At the time of purchasing no more than 10% of the "Aggregate Value" of the "client's" "Managed Investment Portfolio" or such lesser amount required by Federal or State law or regulation or the offering documents for said investments may be invested in the "securities" of any one sponsor of the types of "Listed Investments"; and

-   At the time of purchasing no more than 5% of the "Aggregate Value" of the "client's" "Managed Investment Portfolio" or such lesser amount required by Federal or State law or regulation or the offering documents for said investments may be invested in any single "security" of the type of "Listed Investments".

-   The "Listed Investments" contained in the "client's" "Managed Investment Portfolio" must have been on the approved product list of the First Named Insured or its "affiliates" listed on the Additional Insured Endorsement or the "representative's" prior "broker"-"dealers" or otherwise approved in writing by them in advance of any purchase of such "Listed Investments".

If the "Aggregate Value" of the below Listed Investments contained in a "client's" portfolio exceeds, at the time of purchasing, the above applicable listed percentage, there will be no coverage under this policy, either for "damages", defense or "defense costs", for any "written claim" arising out of or in any way related to any "written claims" arising from "listed investments". There is no coverage for any "written claim" arising out of or in any way related to the "Listed Investments" contained in a "client's" portfolio at an "entity" owned or controlled by a named insured "representative" or which such an insured "representative" is an employee. There will be no coverage under this policy, either for "damages", defense or "defense costs", for any "written claim" of a "client" of a named insured arising out of or in any way related to an unregistered "Listed Investment" unless the "Client" is an "Accredited Investor".

"Accredited Investor" means an "individual" or "entity" as defined in SEC Rule 501 of Regulation D.

"Aggregate Value" is determined by the "client's" original cost of the "Listed Investments".

"Managed Investment Portfolio" is all the "client's" investments in stocks, bonds, mutual funds, and other "securities" with the First Named Insured or its "affiliates" listed on the Additional Insured Endorsement, but excludes the "client's" investments in real property and personal property.

18. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

## DIVERSIFICATION ENDORSEMENT

"Listed investments" means, (1) unregistered and publicly registered, but not traded (at time of purchase), real estate, oil and gas and leasing limited partnerships and limited liability companies, (2) unregistered and publicly registered, but not traded (at time of purchase), real estate investment trusts, (3) unregistered and publicly registered, but not traded (at time of purchase), business development companies. Any of these types of investments that are traded on public exchanges (at the time of purchase) are not defined to be "Listed investments" governed by this Endorsement.

"Retention": The "retention" applying to covered "written claims" arising out of or in any way related to "Listed investments" is $50,000.00 each claimant.

Sub Limits of Liability: The Sub Limits of Liability applying to covered "written claims" arising out of or in any way related to "Listed investments" is:

Each "Wrongful Act" Aggregate:    $500,000.00
"Representative" Aggregate:    $500,000.00
Policy Aggregate:    $500,000.00

These sub limits of liability are part of and not in addition to the Limits of Liability set forth in the Declarations or Limits of Liability Endorsement.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By _____
Authorized Representative

UTS-3g (3-92)    18. (2/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 06/14/2024

ALLOCATION ENDORSEMENT

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed that:

If a "written claim" made against an "insured" includes both covered and uncovered "wrongful acts" or is made both against an "insured" and an "individual" or "entity" which is not an "insured" under the policy, then it is acknowledged and agreed that the "insured" and we will allocate the "defense costs" and any "damages" arising from this "written claim" between the "insured" and us. We and the "insured" shall use our best efforts to reach a fair and proper allocation based on the relative legal and financial exposures of the covered and uncovered "wrongful acts", "individuals" and entities" and in the case of a settlement of the "written claim" the relative benefits of the parties to such settlement.

If we and the "insured" agree upon the allocation, we shall pay our share of the "defense costs" and "damages" and the remaining amount shall remain uncovered.

If we and the "insured" cannot agree upon an allocation, we will advance "defense costs" and pay those "damages" we believe to be covered under the policy until a different allocation is agreed to, arbitrated or otherwise determined. The allocation or advancement of "defense costs" shall not apply to or create any presumption with respect to the allocation of "damages". The agreed to, arbitrated or otherwise determined allocation shall be applied retroactively to "defense costs" and "damages" already advanced by us.

Absent an agreement on allocation, we and the "insured" agree to submit this dispute to arbitration according to the arbitration procedures set forth in Section VII,D of the policy. Any allocation or advancement of "defense costs" or "damages" by us shall not create a presumption with respect to this dispute over the final allocation to be determined in the arbitration or other proceeding.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
                Authorized Representative

FNX-147 (1-21)                                                                    19.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

COLI / BOLI ENDORSEMENT
(Key Man)

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows:

A. There is no coverage under this policy for "written claims" that arise out of or are in any way related to the purchase, sale or servicing of Corporate Owned Life Insurance policies ("COLI policies") and Bank Owned Life Insurance policies ("BOLI policies"); provided, this exclusion shall not apply to the following if, but only if, such insurance is purchased, sold and serviced in full compliance with all state and federal laws and regulations including, without limitation, the safe harbors established by the IRS: purchase, sale or servicing of "key person insurance".

B. The following definition is added to the policy:

"Key person insurance", often referred to as "key man insurance" or "business succession insurance", means an insurance policy taken out by and owned by a business "entity" to compensate the business "entity" for financial losses that may arise from the death or extended incapacity of an important member of the business. It includes standard life insurance, TDP insurance or trauma insurance policies used for business succession or business protection purposes. The policy term of such insurance does not extend beyond the period of the key person's usefulness to the business.

C. The use of death benefits as collateral for a loan made by a bank to an "individual" is not considered a COLI policy or BOLI policy.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-m136b (11-14)    20.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 06/14/2024

CHANGES – NEW YORK

---

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

    First Named Insured:
    Policy Number:
    Effective Date Of This Endorsement:

---

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless stated otherwise above.

In consideration of the premium charged, it is understood and agreed as follows:

1. SECTION VII B is deleted in its entirety and replaced by the following:

    B. Duties In The Event Of Error, Omission, Claim Or Suit. As soon as an insured knows of an actual or alleged "wrongful act" which may result in a "written claim" covered by this policy, the insured must give us written notice as soon as practicable of the details of the "wrongful act", including the circumstances giving rise to the "wrongful act", a description of the services provided or that should have been provided, the name and address of any potential claimant and the type and amount of injury suffered by said claimant. Include as many details as possible.

    If a "written claim" is made or "suit" is brought against an insured, the insured, as a condition precedent to our obligations under this policy, must immediately send us every demand, notice, summons or other process relating to said claim or "suit"; no "written claim" reported to us by an insured, the injured person or other claimant will be invalidated because it was not reported to us as provided herein if it shall be shown not to have been reasonably possible to timely report such "written claim", and that such "written claim" was reported to us as soon as was reasonably possible thereafter; provided, except as provided in SECTION II A. 3., in no event shall such "written claim" or "suit" be reported to and accepted by us later than the last day of the insured's "policy period" or, if this policy is renewed by us, during that renewal or, if applicable, during the "extended reporting period" of an "extended reporting period endorsement" issued pursuant to SECTION VII K.

    All notices called for in this paragraph must be provided to us by a separate document, and not just as part of a renewal application for insurance. The insured shall authorize us to obtain all records and other information we deem necessary for the settlement, negotiation or defense of a "written claim" or "suit".

    The insured must cooperate with us in the investigation and defense of a "written claim" or "suit". At our request, the insured must: submit to examination under oath; assist us in making settlements or conducting "suits"; and attend and assist in obtaining the attendance of witnesses at hearings, depositions, arbitration proceedings, trials and other proceedings. The insured must cooperate with us in enforcing any right the insured may have against any "individual" or "entity" for contribution or indemnity. The insured must not, except at the insured's own cost, voluntarily pay any money, assume any obligation or incur any expense without our prior written consent.

    Written notice given by an insured or on an insured's behalf, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be written notice to us.

2. SECTION VII C is deleted in its entirety and is replaced by the following:

    C. Suits Against Us. No "suit" or other action may be brought against us, unless, as a condition precedent thereto, there has been full compliance with all the terms and conditions of this policy and the obligation of the insured to pay "damages" has been determined either by judgment against the insured or arbitration or by written agreement signed by the insured, the claimant and us. Anyone who has obtained such a judgment or written agreement will be entitled to recover under this policy to the extent of the insurance then available to the insured under this policy. No one has the right to make us a party to a "suit" to determine the liability of any insured; nor shall we be impleaded by an insured or his/her/its legal representative(s). A person or organization may sue us to recover on any agreed settlement against an insured, but we will not be liable for losses that are not payable under the terms of this policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's representative(s).

21. (1/2)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

CHANGES – NEW YORK

3. SECTION VII H is deleted in its entirety and is replaced by the following:

   H. Audit. We may examine an insured's books and records as they relate to this insurance at any time during the "policy period", and any audit to determine the final premium due or to be refunded will be completed within one hundred eighty (180) days after the expiration date of the policy.

4. SECTION VII I is deleted in its entirety and is replaced by the following:

   I. Change In This Policy. The terms of this policy may not be changed or waived except by an "endorsement" issued by us and made a part of this policy. If a change in the policy requires a premium adjustment, we will adjust the premium as of the effective date of the change.

5. SECTION VII M is deleted in its entirety and is replaced by the following:

   M. Transfer of Insured's Rights and Duties. An insured may not transfer or assign any rights or duties under this policy unless we give our written consent to that transfer or assignment by "endorsement" to this policy except in the case of the death of an individual insured. If an insured dies or is adjudicated mentally incompetent, the insured's rights and duties will be transferred to the insured's legal representative but only while acting with the scope of duties as the insured's legal representative.

6. The following Condition is added to SECTION VII and supersedes any other provision to the contrary:

   Transfer of Duties When A Limit Of Liability Is Used Up.

   1. If we conclude, based on "wrongful acts", "written claims" or "suits" which have been reported to us and to which this insurance may apply, that an applicable Limit of Liability is likely to be used up in the payment of judgments or settlements, we will notify the First Named Insured in writing to that effect.

   2. When an applicable Limit of Liability has actually been used up in the payment of judgments or settlements and related "defense costs":

      a. We will also notify the First Named Insured, in writing, as soon as practicable, that our duty to defend "suits" seeking "damages" subject to that Limit of Liability has also ended.

      b. We will initiate, and cooperate in, the transfer of control, to the First Named Insured or other appropriate insured, of all "written claims" and "suits" seeking "damages" which are subject to that Limit of Liability and which have been reported to us before that Limit of Liability has been used up, that insured must cooperate in the transfer of control of said "written claims" and "suits"; we will take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, any such "suits" until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

      c. Any insured involved in a "suit" seeking "damages" subject to that Limit of Liability must arrange for the defense of such "suit" within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such "suit" must be made as soon as practicable.

         We will take no action whatsoever with respect to any "written claim" or "suit" seeking "damages" that would have been subject to that Limit of Liability, had it not been used up. if the "written claim" or "suit" is reported to us after that Limit of Liability has been used up.

   3. The First Named Insured or other appropriate insured(s) will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph 2.b. above.

      The duty of such insured to reimburse us will begin on:

      a. the date on which the applicable Limit of Liability is used up, if we have sent notice in accordance with paragraph 1. above; or

      b. the date on which we sent notice in accordance with paragraph 2.a. above, if we did not send notice in accordance with paragraph 1. above.

   4. The exhaustion of any Limit of Liability by the payment of judgments or settlements and related "defense costs", and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this condition.

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 06/14/2024

## LIMITS OF LIABILITY ENDORSEMENT
(New York)

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy.

First Named Insured:
Policy Number:
Effective Date Of This Endorsement:

This endorsement forms a part of the policy to which it is attached. It is effective on the inception date of the policy unless otherwise stated above.

In consideration of the premium charged, Item 5 of the Declarations is amended to read as follows:

Item 5.   Our Limits of Liability under this policy shall be as follows, subject to all of the terms of this policy having reference thereto.

| | |
|---|---|
| Each "Wrongful Act" Aggregate: | $1,000,000.00 |
| "Representative" Aggregate[1]: | $1,000,000.00 |
| Policy Aggregate[1]: | $1,000,000.00 |

[1] Provided, with respect to any independent contractor of the First Named Insured who is a resident of the State of New York and who is a named insured on this policy, and subject to the Each "Wrongful Act" Aggregate, in the event the policy aggregate is exhausted said insured's "Representative" Aggregate shall be the "Representative" Aggregate above less the amount already used on covered "written claims" arising out of his/her "wrongful acts" subject to a maximum amount of $50,000.00; furthermore, this policy will not apply, or will not apply further, to any "class action claim" (a claim under which one party, or a group of parties, sue as representatives of a larger class).

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By. _____
                Authorized Representative

FNX-13-NY (12-07)                                                                    22.

INDEX NO. 610488/2024

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 06/14/2024

**BROKER-DEALER**
**FINANCIAL SERVICES PROFESSIONAL LIABILITY INSURANCE POLICY**
Underwritten By The Insurance
Company Shown In The Declarations

**IMPORTANT NOTICE**

THIS IS A "CLAIMS-MADE AND REPORTED" POLICY. EXCEPT TO THE EXTENT AS MAY BE PROVIDED HEREIN, THIS POLICY COVERS ONLY "WRITTEN CLAIMS" FIRST MADE AGAINST THE INSURED AND PRESENTED TO US DURING THE "POLICY PERIOD" FOR THE INSURED ARISING FROM COVERED "WRONGFUL ACTS" OCCURRING SUBSEQUENT TO THE "RETROACTIVE DATE" APPLICABLE TO THE INSURED. EACH "WRITTEN CLAIM" MUST BE MADE BY OR ON BEHALF OF A "CLIENT" OF A NAMED INSURED OR A "CLIENT" OF A "REPRESENTATIVE" AND ARISE OUT OF OR IN CONNECTION WITH COVERED "FINANCIAL SERVICES" PERFORMED FOR SAID "CLIENT" BY A NAMED INSURED OR A "REPRESENTATIVE". THIS POLICY INCLUDES "DEFENSE COSTS" IN THE LIMITS OF LIABILITY. THE PAYMENT OF "DEFENSE COSTS" WILL REDUCE THE AMOUNTS AVAILABLE TO PAY "DAMAGES". VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE AND THE AMOUNTS AVAILABLE TO PAY "WRITTEN CLAIMS", INCLUDING, WITHOUT LIMITATION, THE AGGREGATE LIMITS OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.

In consideration of the payment of the premium and any other amounts due pursuant to the terms of this policy, in reliance upon the information, representations and warranties contained in the "Application", and subject to all of the terms and conditions of this policy, including, without limitation, the Limits of Liability and Exclusions of this policy, we agree to provide the insureds with the insurance coverage described in this policy. In return, the First Named Insured agrees to pay the premium and any other amounts due pursuant to the terms of this policy, and each insured agrees: (1) to perform each duty the insured has under this policy; and (2) that this policy contains all agreements relating to this insurance that exist between the insureds and us, our agents and representatives.

**SECTION I — DEFINITIONS**

Throughout this policy, certain words have special meanings. The words "First Named Insured" mean the "individual" or "entity" specifically identified by name or reference as the First Named Insured in Item 1 of the Declarations or an endorsement. The words "named insured" mean an "individual" or "entity" specifically identified by name or by reference as a named insured in the Declarations or an endorsement. The word "insured" means any "individual" or "entity" qualifying as such under the provisions of SECTION IV. The words "Limit of Liability" mean the applicable Limit of Liability as set forth in SECTION V or an endorsement. The words "we", "us," and "our" mean the insurance company providing this insurance. The word "policy" means the Declarations, this policy form, and any endorsements which are made a part hereof. The word "endorsement" means a written agreement, issued by us at the time of issuance of this policy or thereafter, amending the wording or meaning of this policy. An endorsement is the only means by which this policy may be altered or amended.

Other words and phrases that appear in quotation marks in this policy have the special meanings set forth below.

"Affiliate" of a specified "individual" or "entity" means an "individual" or "entity" that directly, or indirectly though one or more intermediaries, controls or is controlled by, or is under common control with, the specified "individual" or "entity"; it includes, without limitation, any "entity" of which an insured is an owner, officer, director, shareholder, partner or member.

"Application" means the Application for Insurance or Renewal Application for Insurance submitted in connection with this policy, and any Applications for Insurance or Renewal Applications submitted in connection with any prior financial services insurance policy issued by us or by any "affiliate" insurer of ours, which this policy succeeds in time, including any materials and information submitted in connection therewith, which Application(s), material and information shall be on file with us and deemed a part of and attached hereto as if physically attached hereto.

"Associated person" has the same meaning as the term "affiliated person" or "person associated with an investment advisor" as those terms are defined in the Investment Company Act of 1940, the Investment Advisor Act of 1940, or any similar state statutes or regulations.

"Broker" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, and the Investment Company Act of 1940, as amended; but "broker" does not mean an "individual" who is a "registered representative".

"Client" means an "individual" or "entity" which is a member of the general public and which, as the direct or ultimate consumer, uses the "financial services" of a named insured "entity" or a "representative". It does not include, without limitation, any "individual" or "entity" who/which buys with the intent of selling to others or sells with the intent that the buyer sell to others or which provides services as part of a chain of services to the ultimate consumer.

"Coverage period" with respect to an insured under this policy means the period of time beginning with the applicable "retroactive date" for that insured, as stated in this policy, and ending with the expiration of that insured's "policy period".

"Damages" means a monetary judgment, award or settlement. "Damages" do not include: civil or criminal fines, sanctions or penalties imposed on any insured, whether imposed pursuant to statute or otherwise, punitive or exemplary damages, including double or treble damages or any damages in excess of actual damages; judgments or awards arising from acts or omissions deemed uninsurable by the law under which this policy shall be construed or fees, commissions or other compensation for any "financial services" rendered or required to be rendered by an insured or by a "representative" or that portion of any settlement, judgment or award in an amount equal to such fees, commissions or other compensation. However, "damages" shall include taxes, fines and penalties incurred by a "client" of a named insured or "representative" solely as a result of covered "wrongful acts" by a named insured or by a "representative" and included in such "client"'s "written claim" against the insured

"Dealer" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, and the Investment Company Act of 1940, as amended; but "dealer" does not mean an "individual" who is a "registered representative".

"Defense costs" means the costs to investigate, defend or appeal a "written claim" or "suit" incurred by us or by an insured at our request and with our prior written consent. It includes attorneys' fees, expert fees and all other costs and expenses related to the investigation, settlement, defense or appeal of a "written claim" or "suit", including, without limitation, those payments set forth in SECTION II C. 1.; but it does not include the loss of earnings, wages, salaries, overhead or benefit expense of the insured or the insured's employees, officers or independent contractors, or our officers, directors or employees, or any hourly or fixed fees paid to a claims administrator we may use to administer claims under this policy in place of our officers or employees. "Defense costs" do not include, and we will not pay, any fees or costs incurred by an insured without our prior written consent, including, without limitation, any fees and costs incurred prior to the date the "written claim", out of which such fees or costs arise, is first presented to us.

"Discretionary account agreement" means an agreement, actual or implied, under the terms of which an "individual" or "entity" has "investment discretion" in buying or selling or otherwise handling the "securities" or other investments of a third party; it does include, without limitation, a power of attorney, but it does not include: (1) a "Limited Mutual Fund Market Timing/Asset Allocation Agreement;" or (2) any other "investment management contract" under the terms of which an insured "registered investment advisor" is given, or exclusively exercises, "investment discretion" only with respect to buying, selling or otherwise handling mutual fund investments and/or investments in variable life or variable annuity sub accounts, which investments are otherwise covered under the terms of this policy, and where said insured does not retain custody or otherwise have access to any "client" funds other than for the limited purpose of paying fees earned pursuant to the explicit terms of that agreement.

"Entity" means a partnership, corporation, Limited Liability Company, trust, association or other form of business, social or charitable organization.

"Entity insured" means an insured that is not a natural person.

"Extended reporting period" means the period of time, following expiration of an insured's "policy period", which is specified in an "extended reporting period endorsement" and during which said insured may present "written claims" for any arising out of "wrongful acts" occurring during said insured's "coverage period" and which claims would otherwise have been covered under the terms of this policy if they had been presented to us during said insured's "policy period". An "extended reporting period" shall be provided only by a separate endorsement issued by us pursuant to SECTION VII K.

"Extended reporting period endorsement" means an endorsement providing an "extended reporting period" pursuant to SECTION VII K.

"Financial planner" means anyone who is in the business of providing "financial planning services" to others.

"Financial planning services" means the provision of financial or investment advice to "individuals" or families or their owned business entities based upon an analysis of their individual needs, financial circumstances and objectives. Generally, it includes preparing a financial plan, comprehensive or modular, which could include: personal financial statements; and advice relating to personal risk management, insurance, savings and investments, estate planning, retirement planning and taxes.

"Financial services" means the provision of: services by a "broker"-"dealer" to its "clients" and the "clients" of its "registered representatives"; "financial planning services" by a "financial planner"; "investment management services" by a "registered investment adviser" or an "associated person" of a "registered investment advisor"; the purchase or sale of "securities" or the provision of "investment advice" by a "registered representative"; and the proposed sale or sale of products authorized to be sold by a properly licensed "life insurance agent", including, without limitation, life, health, disability and accident insurance products and annuities; provided, "financial services" does not include any advice with respect to or the sale of viatical products

"Financial services professional" means any "individual" who is a "financial planner", "registered investment adviser", "associated person", "life insurance agent" and/or "registered representative".

"Individual" means a natural person.

"Interrelated wrongful acts" means "wrongful acts" which are connected by a common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions. For example, if an insured recommends or sells an unsuitable investment to a "client", any subsequent dealings with that "client" with respect to that investment would be part of a series of "interrelated wrongful acts" as would the claims against an insured under a class action "suit".

"Investment advice" means advice with respect to "securities" provided by a "registered representative" which is solely incidental to his/her conduct as a "registered representative" and for which he/she receives no special compensation, all pursuant to the provisions of the Investment Advisors Act of 1940, as amended.

"Investment discretion" means the making of one or more investment decisions (buy, sell or otherwise handle) by an "individual" or "entity" with respect to the assets, "securities" or other investments belonging to a third party without that third party's prior approval of each such decision.

"Investment management contract" means a written contract between a "registered investment adviser" and his/her/its "client", contained in a single document or a series of related documents, setting forth the "registered investment adviser's" duties and responsibilities with respect to the investment of the "client's" money; it includes, without limitation, a "Limited Mutual Fund Market Timing / Asset Allocation Agreement" but it does not include a "discretionary account agreement"

"Investment management services" means advising with respect to and/or supervising the purchase or sale of securities or other investments for a "client" by a "registered investment adviser" or "associated person" pursuant to an investment management contract

"Life insurance agent" means an "individual" or "entity" who/which is licensed, as required by law, to sell life, health, disability and accident insurance and annuity products and who / which is selling or providing advise with respect to such products which, if required to be authorized or approved for sale by a regulatory authority, have been so authorized or approved; however, it does not include, without limitation, anyone while acting as a general agent or in any similar capacity for a life insurance company if he/she has or supervises any sub agents.

"Limited Mutual Fund Market Timing / Asset Allocation Agreement" means an "investment management contract" (1) under the terms of which a "registered investment adviser" is given authority to shift the assets of his/her/its "clients" between various mutual funds and (2) where the "registered investment adviser" does not retain custody or otherwise have access to any "client" funds other than for the limited purpose of paying fees earned pursuant to the explicit terms of that agreement.

"Policy period" means the period of time between the inception date shown in the Declarations of this policy and the date this policy expires or is canceled, whichever occurs first; provided, in the case of a particular insured, "policy period" shall mean the period of time between the inception of coverage under this policy with respect to that insured and the date this policy expires, is canceled or coverage otherwise terminates with respect to that insured, whichever occurs first. "Policy period" specifically excludes any "extended reporting period" provided under the terms of an "extended reporting period endorsement".

"Policy territory" means the United States, its territories or possessions, Puerto Rico or Canada.

"Private securities transaction" means the selling by a "registered representative" of "securities" or other investment products, or life, health, disability or accident insurance products or annuities, which are not on the approved product list of, or which are not otherwise authorized or approved for sale by, the First Named Insured.

"Publication injury" means injury, other than bodily injury, caused by oral or written publication of material by an insured as part of or in conjunction with the provision of covered "financial services" to a "client" of a named insured or a "representative" that: slanders or libels the "client" or disparages the "client's" goods, products, or services; or discloses, without authorization and in violation of an "individual's" right of privacy, confidential information obtained in conjunction with the provision of "financial services".

"Registered investment adviser" has the meaning assigned to that term by the Investment Advisers Act of 1940, as amended, or applicable state securities laws or regulations.

"Registered representative" means an "individual" who: (1) is registered with the National Association of Securities Dealers, Inc. as a "registered representative" of a "broker"-"dealer" pursuant to the provisions of the Securities Exchange Act of 1934; and (2) is in the business of buying and selling "securities" for the account of others. It includes, without limitation, any "individual" while acting in the capacity of a principal of the First Named Insured, including, without limitation, a General Securities Principal and Limited Principal - General Securities Sales Supervisor.

"Related individual" means an "individual" related by blood, or by marriage or civil union (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) to another "individual", including, without limitation, the "spouse" or former "spouse" of an insured, or the child, grandchild, parent, sibling, aunt, uncle, grandparent or cousin of an insured or an insured's "spouse" or former "spouse", and any trust or estate of which any of them is a beneficiary. With respect to any "entity insured", "related individual" includes a "related individual" of each officer, director, shareholder, partner, member, employee or independent contractor of such "entity".

"Representative" means a "financial services professional" providing the type of "financial services" covered by this policy, as set forth in the Limitation Of Coverage Endorsement, who is or was associated with the First Named Insured on or after the First Named Insured's "retroactive date".

"Representative company" means an "entity" which is owned or controlled by, or which employs a "representative", and which is in the business of providing the type of "financial services" covered by this policy.

"Retention" means the sum of money which the insured agrees to maintain as self insurance with respect to all "written claims" arising out of each "wrongful act" otherwise covered by this policy. The applicable each "wrongful act" "retention" applies on a first dollar basis and up to its stated amount, to all sums incurred in the investigation, settlement and/or defense of all "written claims" arising out of a "wrongful act". The Each "Wrongful Act" Aggregate Limit of Liability of this policy applies in excess of the "retention" which must be exhausted by the payment of indemnity and/or "defense costs" before we have any duty to pay indemnity or "defense costs". The amount of the applicable "retention" is specified as the Each "Wrongful Act" "Retention" in the Declarations or an endorsement.

"Retroactive date" means the date on or after which insurance coverage is provided under this policy to a particular insured with respect to the insured's covered "wrongful acts" or the insured's liability for the covered "wrongful acts" of others. The "retroactive date" applicable to a particular insured is as follows: (1) with respect to an insured "financial services professional", the "retroactive date" specified as applying to said insured in the Declarations or the endorsement identifying him/her as a named insured; (2) with respect to the First Named Insured or any "entity" named insured, or any insured under SECTION IV C. or D., the later of (a) the "retroactive date" specified in the Declarations or an endorsement as applying to said insured, or (b) the date the "individual" became a partner, member, officer, director or employee of the First Named Insured or other "entity" named insured, or (c) with respect "wrongful acts" arising out of or in conjunction with the provision of "financial services" to "clients" of a particular "individual" named insured, the "retroactive date" specified in this policy as applying to that "individual"; (3) with respect to the "spouse" of a named insured, the later of the date he/she became the "spouse" of said named insured or the "retroactive date" of said named insured, (4) with respect to insureds under SECTION IV G., the "retroactive date" of the deceased, incompetent or bankrupt insured. For example, the "retroactive date" for the First Named Insured with respect to its vicarious liability arising out of the "wrongful acts" of an insured "financial services professional" would be the later of the "retroactive date" for the First Named Insured specified in the Declarations or an endorsement or the "retroactive date" of said "financial services professional". There is no coverage under this policy with respect to any "wrongful act" or series of continuous, repeated or "interrelated wrongful acts", where the "wrongful act set" or the first "wrongful act" in a series of continuous, repeated or "interrelated wrongful acts", is committed prior to the applicable "retroactive date".

BFX-P-60a (12-07)    Page 3 of 12    ©ProSurance Group Inc 2007

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM
NYSCEF DOC. NO. 2

INDEX NO. 610488/2024
RECEIVED NYSCEF: 06/14/2024

"Securities" has the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, or any applicable state statute, and any rules or regulations issued pursuant thereto.

"Spouse" means the lawful "spouse" of an "individual" whether such status is derived by reason of marriage, civil union or otherwise pursuant to the statutory law, common law or otherwise of any jurisdiction of the world.

"Suit" means a civil legal proceeding, including arbitration, brought against the insured seeking monetary "damages". It does not include: criminal legal proceedings; legal proceedings, or that part of legal proceeding, seeking equitable relief (including, without limitation, injunctions or specific performance); or legal proceedings brought by a governmental or regulatory entity including, without limitation, those seeking fines, penalties, taxes or suspension or revocation of license, registration, membership or other operating authority.

"Written claim" means a written notice or demand, including "suit", signed by or on behalf of a "client" of a named insured or a "representative" who is alleged to have suffered monetary loss as a result of or in conjunction with the provision of "financial services" by a named insured or "representative", and asserting that the insured is liable for said monetary loss. A report made to us by an insured for any reason, including, without limitation, loss control or risk management purposes, shall not be considered a "written claim".

"Wrongful act" means any negligent breach of duty, error, misstatement, misrepresentation, omission, "publication injury", or other negligent act done or attempted by an insured, or by any "individual" for whose acts the insured is legally responsible, in conjunction with the provision of covered "financial services", as set forth in the Limitation of Coverage Endorsement, for the "client" of a named insured or "representative". Any such "wrongful act", together with any related "wrongful acts" or series of continuous, repeated or "interrelated wrongful acts", shall be considered one "wrongful act" for purposes of the application of our Limits of Liability and the applicable "retention". A "wrongful act" which is continuing in nature shall be deemed, for all purposes of this policy, to occur only on the date on which such "wrongful act" commences and not on any subsequent date. A series of continuous, repeated or "interrelated wrongful acts" shall be deemed to have occurred on the date on which the earliest of such "wrongful acts" commences. If a continuing "wrongful act" or a series of repeated or "interrelated wrongful acts" is committed by an insured, or by any "individual(s)" for whose acts such insured is legally responsible, prior to such insured's applicable "retroactive date", there shall be no coverage under this policy for any insured for any of those "wrongful acts" even if some of those acts occur during the "policy period".

## SECTION II --- COVERAGE AGREEMENTS

### A. COVERAGE

We will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the insured shall become legally obligated to pay as money "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible, but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":

1. arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative";
2. occurs during the "coverage period" for the insured; and
3. results in a "written claim" which is first made against the insured and presented to us during the insured's "policy period"; provided, in case of cancellation or non renewal of this policy with respect to an insured, if a "written claim" is first made against that insured during the last fifteen days of that insured's "policy period", that "written claim" may be presented to us no later than fifteen days immediately following the effective date of such cancellation or non renewal if, as a condition precedent to that right, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply in the absence of this policy.

### B. INVESTIGATION, SETTLEMENT AND DEFENSE

We have the right and duty to defend, as part of and subject to the applicable Limit of Liability hereunder, any "suit" brought against the insured because of a "wrongful act" to which this policy applies and which seeks "damages" which are payable under the terms of this policy, even if any of the allegations of the "suit" are groundless, false or fraudulent. We will choose the lawyer to defend any such "suit." If an arbitration proceeding is brought with respect to a "suit", we will be entitled to exercise all the insured's rights in the choice of arbitrators and the conduct of the proceedings. Subject to the applicable Limit of Liability, we will pay all "defense costs" which are in excess of the applicable "retention".

We may investigate and settle any "written claim" or "suit" as we deem appropriate.

Our duty to defend any "suit", or to pay any settlement or judgment or "defense costs" relating thereto, ends after we have paid our applicable Limit of Liability as set forth in SECTION V. The Limits of Liability set forth SECTION V include all payments for "defense costs" incurred by us, or incurred by the insured with our written consent. All "defense costs", which are in excess of the applicable "retention", shall first be subtracted from the applicable Limit of Liability with the remainder, if any, being the amount available to pay "damages". If the applicable Limit of Liability is exhausted by the payment of settlements, judgments, awards and/or "defense costs" prior to the reduction of any pending "suit" against an insured to settlement, final judgment or award, we shall have the right to withdraw from any further defense thereof by tendering control of the defense of said "suit" to the insured.

### C. OTHER PAYMENTS

1 With respect to such insurance as is afforded by this policy, we will pay, as part of the applicable Limit of Liability, the following

a. all costs taxed against the insured in any "suit" defended by us and all interest required to be paid on the entire amount of any judgment therein which does not exceed the applicable Limit of Liability hereunder and which accrues after judgment is entered in said "suit" and before we have paid, or deposited in court, such part of such judgment as does not exceed the applicable Limit of Liability;

b. premiums on bonds to release attachments in any such "suit" for an amount not in excess of the applicable Limit of Liability of this policy, but we shall have no obligation to apply for or furnish or provide collateral for any such bonds;

c. premiums on appeals bonds which may be required, in our sole judgment, in any such "suit" defended by us, but we shall have no obligation to apply for or furnish or provide collateral for any such bonds; and

d. reasonable expenses, other than loss of earnings, wages, salaries, overhead or benefit expense of the insured, or employees, officers or independent contractors of the insured, incurred by the insured at our request in assisting us in the investigation, settlement, defense or appeal of any "written claim" or "suit".

2. With respect to such insurance as is afforded by this policy, we will pay, in addition to the applicable Limit of Liability, all costs and expenses incurred by us other than "defense costs".

### SECTION III --- APPLICATION OF POLICY

This policy applies to liability for "damages" caused by "wrongful acts" committed anywhere in the world provided any "suit" for such "damages" is brought within the "policy territory". However, we may elect at any time, at our sole discretion, to investigate, settle or defend any "written claim" or "suit" brought anywhere outside the "policy territory". A "written claim" is "presented to us" when we receive the "written claim" or a copy thereof.

If this policy applies to a "written claim" arising out of a "wrongful act" (the first "written claim"), an "individual" or "entity" which is an insured under both this policy and a renewal, or one of a series of continuous renewals, of this policy, may present to us, during his/her/its "policy period" under such renewal policy, additional "written claims" arising out of that same "wrongful act", or series of continuous, repeated or "interrelated wrongful acts". Any such additional "written claims" will then be considered to have been presented to us under this policy as part of the first "written claim" and shall be covered by this policy subject to all of the terms and conditions of this policy, including, without limitation, the Limits of Liability and "retention".

### SECTION IV --- WHO IS INSURED UNDER THIS POLICY

Each of the following is an insured under this policy to the extent set forth below:

A. The First Named Insured.

B. Each "financial services professional" who is a named insured on this policy.

C. If a named insured "entity" is a partnership, association, corporation or limited liability company, each of that insured's present, former and future partners, members, officers and directors, but each is covered only for his/her vicarious liability as a result of such status and arising out of the provision of covered "financial services" by a named insured or a "representative"; provided, no such partner, member, officer or director is an insured under this policy with respect to liability arising out of or in conjunction with his/her own acts or omissions as a "financial services professional" unless he/she is a named insured on this policy.

D. If a named insured is an "entity", each of that "entity's" present, former or future employees who is not a "financial services professional", but only while acting within the course and scope of his/her duties as an employee of the said insured in connection with the provision of covered "financial services" by a named insured or a "representative".

E. Each other named insured.

F. The "spouse" of a named insured, but solely with respect to his/her vicarious liability, arising out of his/her status as the "spouse" of said named insured, as a result of covered "wrongful acts" of said named insured, including, without limitation, "written claims" seeking "damages" recoverable from marital community property, property jointly held by the insured and his/her "spouse" or property transferred from an insured to his/her "spouse", provided, there is no coverage under this policy for "written claims" arising out of any actual or alleged "wrongful acts" of said "spouse".

G. The executor, administrator, guardian or other legal representative of an insured who dies, becomes incompetent, or bankrupt, but only while acting in his/her capacity as such and with respect to "wrongful acts" for which said deceased, incompetent or bankrupt insured would otherwise be covered under this policy.

### SECTION V --- LIMITATIONS ON OUR LIABILITY AND RETENTION

A. LIMITS OF LIABILITY

This policy may provide coverage for a number of insureds. Regardless of the number of insureds under this policy, the number of "wrongful acts", the number of claimants or "written claims" presented to us or "suits" brought or the amount of "defense costs" incurred, the most we will pay under this policy is as follows:

1. Policy Aggregate. The applicable Policy Aggregate Limit of Liability shown in Item 5 of the Declarations or an endorsement is the most we will pay for or on behalf of all insureds under this policy for all "damages" and "defense costs" combined because of all "wrongful acts" to which this policy applies.

2. "Representative" Aggregate. Subject to the above provision with respect to Policy Aggregate, the most we will pay for all "damages" and "defense costs" combined for, on behalf of, or arising out of or as a result of all "wrongful acts" to which this policy applies committed by an insured "representative", or by any "individual" for whose acts said "representative" is legally responsible, or by any "affiliate" of said "representative" which is a named insured, is the Limit of Liability shown in Item 5. of the Declarations or an endorsement as "Representative" Aggregate.

3. Each "Wrongful Act" Aggregate. Subject to the above provisions with respect to Policy Aggregate and "Representative" Aggregate, the most we will pay for or on behalf of all insureds under this policy for all "damages" and "defense costs" combined because of a "wrongful act" or a series of continuous, repeated or "interrelated wrongful acts" to which this policy applies, is the applicable Each "Wrongful Act" Aggregate Limit of Liability shown in Item 5 of the Declarations and an endorsement.

All "written claims" for "damages" and related "defense costs" which arise out of a "wrongful act", or a series of continuous, repeated or "interrelated wrongful acts", will be considered to have arisen out of a single "wrongful act" for these purposes, and such claims will be subject to the applicable Each "Wrongful Act" Aggregate Limit of Liability. For example, and without limiting the foregoing, all claims arising out of the failure to adequately disclose the risks associated with the same "security", or the failure of a "broker-'dealer' to perform adequate due diligence on the same "security", would be considered to have arisen out of a single "wrongful act" and would be subject to the Each "Wrongful Act" Aggregate Limit of Liability.

4. If any "written claim" covered by this policy is also covered by one or more other policies issued by us, or by any insurer "affiliate" of ours, then with respect to such claim: (a) we shall not be liable under this policy for a greater proportion of the "damages" and "defense costs" than the applicable Limit of Liability under this policy bears to the total applicable Limits of Liability of all such policies; and (b) the maximum amount payable under all such policies shall not exceed the applicable Limit of Liability of that policy referred to above which has the highest applicable Limit of Liability.

B. "DAMAGES" AND "DEFENSE COSTS" INCLUDED IN LIMITS OF LIABILITY

All amounts paid with respect to a "wrongful act", including amounts paid as "damages" and amounts paid as "defense costs", are subject to the applicable Limit of Liability. All "defense costs" with respect to "written claims" or "suits" arising out of a covered "wrongful act" shall be paid and applied first to the applicable Limit of Liability, and the difference between such Limit of Liability and the "defense costs", if any, shall be the amount available to pay "damages" incurred in connection with such "written claims" or "suits". The Each "Wrongful Act" Aggregate Limit of Liability shall be excess over the applicable "retention".

C. RETENTION

The First Named Insured shall pay all "damages" and "defense costs" incurred with respect to each "wrongful act" for which "written claims" are presented to us, up to the amount of the applicable "retention". The "retention" shall apply to each "wrongful act" and shall be borne by the insured and remain uninsured. The "retention" amount shall first be applied to the payment of "defense costs". If we so request, the First Named Insured shall make direct payment within the "retention" amount to appropriate other parties. We will only be liable for and will only pay "damages" and "defense costs" with respect to each "wrongful act" which exceed the applicable "retention" and which do not exceed the applicable Limit of Liability. We may, at our sole option, advance the payment of such "retention" in order to facilitate the settlement or defense of a "written claim" or "suit". In this event, the First Named Insured shall reimburse us for such advance within ten days of receipt of our statement therefor.

SECTION VI — WHAT WE DO NOT COVER - EXCLUSIONS

The insurance afforded by this policy, including any obligation to defend or pay "defense costs", does not apply to the following.

A. Other Types of Insurance Coverage. This policy is intended to provide coverage for professional liability arising out of negligence in the performance of "financial services" for "clients" of named insureds. It is not intended to provide coverage for those types of claims or liability which are typically covered by other types of insurance policies or coverage such as comprehensive general liability policies, homeowners policies, automobile policies, workers compensation or employers liability policies, directors and officers liability policies, employment practices liability policies, or financial institutions or other forms of fidelity or other types of bond coverage or their equivalent, whether or not the insured has, or is covered by any such insurance or bonds, and whether or not the coverage provided by such insurance or bonds has been exhausted by the payment of loss, excludes coverage for such claims or is otherwise insufficient to cover any such claims. Therefore, we will not cover, either on a direct insurance basis or as excess insurance, claims arising out of or in connection with actual or alleged: (1) bodily injury to or sickness, disease, mental illness or death of any "individual", including, without limitation, any claim for mental or emotional distress or humiliation or any claim arising out of sexual harassment; provided, this exclusion does not apply to mental illness, emotional distress or humiliation arising out of "publication injury"; (2) owning, entrusting, using, taking care of, loading or unloading of any automobile, mobile equipment, watercraft or aircraft or any claim with respect to physical damage to or loss of use of tangible property, (3) theft, embezzlement, forgery, alteration, computer systems fraud, or any other dishonest or fraudulent act of the type intended to be covered by a financial institution bond or other form of fidelity bond or its equivalent; (4) injury to an "individual" arising out of or related to his/her employment or application for unemployment, or injury which arises out of acts of discrimination which are prohibited by any law, order or regulation, including, without limitation, discrimination based on age, color, race, sex, sexual preference, creed, national origin, ancestry, physical or mental handicap, marital status or pregnancy, (5) claims made by or on behalf of present, past or future partners, members, stockholders or employees, as such, of an insured against the partners, members, directors, officers or employees of said insured

B. Dishonesty Or Fraud / Personal Advantage / Non Public Information. We do not cover claims which arise out of or are contributed to by an act committed by or at the direction of an insured or ratified by an insured, or which the insured knew was being committed but failed to take any action to stop, and which act

is dishonest, fraudulent, criminal, malicious or knowingly wrongful, including, without limitation, the willful violation of any laws, orders, rules or regulations of the United States, or any state, commonwealth, territory, subdivision or municipality thereof, or the Securities Exchange Commission, the National Association of Securities Dealers, Inc. or any state insurance department or other regulatory authority, including, without limitation, laws, orders, rules and regulations prohibiting churning or twisting. We do not cover claims arising out of any insured's actual or alleged gaining of any profit or advantage to which the insured was not legally entitled, including, without limitation, any profit or advantage as a result of the commingling of funds or accounts. We do not cover any claims arising out of the actual or alleged use by any insured of, or the aiding or abetting by any insured in the use of, or the participation after the fact by any insured in the use of non-public information in a manner prohibited by applicable law, rule or regulation.

C. Assumed Liability / Guaranteed Performance / Tax Deductions / Fees For Services. We do not cover any liability which any insured assumes under any contract or agreement, whether written or oral; but this does not apply to liability the insured would have with respect to the provision of "financial services" even in the absence of such contract or agreement and which liability is otherwise covered under the terms of this policy. We do not cover claims which arise out of: the failure of "securities" or other investments to perform according to any insured's warranty, guarantee or contractual agreement, whether written or oral; or a disallowed tax deduction, credit or other item on a tax return which the insured's "client" would owe, or would not be entitled to, even in the absence of any negligence on the part of an insured. We do not cover claims, or that portion of any claim, arising out of disputes over the amount of, or for the return of or reimbursement of fees, commissions or other forms of compensation paid to any insured in connection with the provision of "financial services", including, without limitation, any "suit" or counter claim filed by an "individual" or "entity" subsequent to the institution of "suit" against such "individual" or "entity", or an "affiliate" by an insured for payment of professional fees, commissions or other sums.

D. Other Named Professions Liability. Except as may otherwise be specifically provided by endorsement, we do not cover claims arising out of any actual or alleged liability an insured may have as a result of an insured's activities with respect to, or an insured's provision of services normally provided by, any type of business or professional, other than as a "broker"-"dealer" or "financial services professional", including, without limitation, an insured's activities, whether or not licensed or otherwise authorized to act as such, as an: accountant; actuary; enrolled agent authorized to practice before the Internal Revenue Service, lawyer, mortgage broker; property or casualty insurance agent, broker or solicitor; third party administrator; real estate agent or broker; tax preparer; general agent of a life insurance company, unless he/she has no subagents and is not supervising any other agents; managing general agent, underwriting manager, program manager or similar designation of a life insurance or property and casualty insurance company; or securities analyst. This exclusion applies regardless of whether the insured has other insurance to cover such activities or whether such activities are excluded under such other insurance. But this exclusion does not apply to advice given by an insured on property and casualty insurance, personal risk management, investment management, estate planning or taxes as part of the insured's activities as a "financial services professional".

E. Fiduciary Under ERISA. Except as may otherwise be specifically provided by endorsement, we do not cover claims which arise out of actual or alleged services an insured performs as a trustee, plan administrator or fiduciary under the Employee Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act or the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), including any amendment, regulation or enabling statue pursuant thereto, or any other similar federal, state, or provincial statute, regulation or order issued pursuant thereto. But this exclusion does not apply to retirement plan design, investment advice and related "securities" or insurance purchases or sales by the insured within the normal scope of retirement or benefit planning services performed by a "financial services professional".

F. Discretionary Accounts / Investment Discretion. Except as may otherwise be specifically provided by endorsement, we do not cover claims which arise out of or in conjunction with services any insured performs under a "discretionary account agreement"; or the exercise of "investment discretion" whether pursuant to a "discretionary account agreement" or otherwise.

G. Other Businesses, Organizations Or Funds. We do not cover claims: (1) made against an insured and which arise out of or in conjunction with or which are in any way related to the actual or alleged operation, management or ownership of any business or "entity" which is not a named insured on this policy, including, without limitation, any business (including, without limitation, the ownership, maintenance or care of any property in connection therewith) which, in whole or in part, is or was owned, controlled, operated or managed, directly or indirectly, by an insured, by an insured's parent company, by an "affiliate" or subsidiary of an insured, by any "related individual" of an insured, or of which an insured is or was a sponsor, administrator, officer, director, stockholder, partner, member, trustee or employee; or (2)which are made by or in the right of any business or "entity" which is or was owned, controlled, operated or managed, directly or indirectly, in whole or in part, by an insured or by a "related individual" or "affiliate" of an insured or in which an insured or any "related individual" of an insured is or was an officer, trustee, director, manager, partner, shareholder, employee or independent contractor, or (3) which arise out of or in connection with the actual or alleged operation or administration of any pension, welfare, profit sharing, mutual or investment fund or trust, or employee benefit plan or trust of which an insured is or was a sponsor officer, trustee, director, manager, partner, shareholder, employee or independent contractor.

H. General Or Limited Partnership Or Syndicate / Asset Management / Charitable Entities / Proprietary Products. We do not cover claims which arise out of or are in any way related to the actual or alleged forming, syndicating, operating, administering or managing of the assets of a general or limited partnership, real estate investment trust, joint venture or any other type of venture or syndicate, or any type of charitable enterprise or "entity", by an insured or an "affiliate" or "related individual" or an insured. We do not cover claims which arise out of or are in any way related to the actual or alleged forming, syndicating, operating, administering, managing or sale of any proprietary product of an insured, or an "affiliate" or "related individual" of an insured, including without limitation, any mutual fund or other investment product developed or managed by an insured.

I. Insolvency Or Bankruptcy We do not cover claims which arise out of the actual or alleged insolvency, receivership, bankruptcy, liquidation, reorganization or financial inability to pay of any insured; bank or banking firm; trust, title or escrow company; law firm; "broker" or "dealer", clearing agency, insurance company or reinsurer, or pool, syndicate, association or other combination formed for the purpose of providing insurance, self-insurance or reinsurance.

J. Fines, Penalties, Sanctions, Taxes, Punitive Or Exemplary Damages, Or Public Policy. We do not cover claims for any amounts the insured may be required to pay as civil or criminal fines, penalties, or sanctions; taxes, punitive or exemplary "damages", including, without limitation, double or treble "damages" or any "damages" in excess of actual "damages"; or claims with respect to any matter deemed uninsurable under the law pursuant to which this policy shall be construed. however this exclusion shall not apply to civil fines, penalties or taxes which an insured is legally obligated to pay to a "client" of a named insured

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

or a "representative" and which were incurred solely as a direct result of covered "wrongful acts" committed in connection with the provision of covered "financial services" for said "client" by a named insured or a "representative" and which fines, penalties or taxes would not have been owed by the "client" in the absence of such "wrongful acts".

K    Investment And Financial Product Approval By First Named Insured. Except as otherwise provided by endorsement, we do not cover that part of any claim which arises out of or in connection with any "private securities transaction".

L.    Non Clients / Dual Registration. We do not cover claims of a claimant who is neither a "client" of a named insured or "representative" nor the executor, administrator, guardian or other legal representative of such a "client". This includes, without limitation, any "individual" or "entity" who/which buys with the intent of selling to others or sells with the intent that the buyer sell to others or which provides services as part of a chain of services to the ultimate consumer including, without limitation: a "broker"-"dealer" which is not buying, selling or trading as a principal for its own account; investment bankers; mutual funds; limited partnerships; banks, savings and loan companies and other financial institutions; transfer agents; clearing agencies; the SPIC, custodians; and investment adviser entities, such as companies providing asset allocation models or services to "registered investment advisers". Except with respect to "prior acts" coverage, if any, which is provided to a named insured "financial services professional" as a result of his/her having a "retroactive date" under this policy which precedes his/her becoming a "registered representative" of the First Named Insured, we do not cover any claims arising out of or in connection with an insured's registration as a "registered representative" of any "broker"-"dealer" other than the First Named Insured.

M.    Economic Forecasts / Products. We do not cover claims which arise as a result of any actual or alleged economic forecast provided by an insured as a separate service and not provided, without additional charge, as part of the insured's "financial services" to a "client". We do not cover claims arising out of the actual or alleged manufacture, leasing, distribution, preparation, design or sale of any non "securities" or non insurance product by an insured, including, without limitation, any computer hardware or software. We do not cover any claim arising out of any actual or alleged infringement of trademark, patent or copyright.

N.    Exotic Investments / Tangible Assets. We do not cover claims which arise out of or are in any way related to actual or alleged arbitrage, short sales (except short against the box), trading or failure to trade derivatives, including, without limitation, interest rate swaps, collateralized mortgage obligations, structured notes, commodities, commodities futures contracts or any type of option, or future, or futures option contract or similar investments or investment products including, without limitation, commodity pools or partnerships engaged in the investment in or trading of such "securities", or the sale of viaticals. We do not cover claims arising out of the actual or alleged trading or failure to trade hedge funds. We do not cover claims which arise out of any actual or alleged transaction involving tangible personal property, directly or through a "security" conveying ownership or an interest therein, including, without limitation, precious metals, gemstones, stamps, art objects, antiques or other collectibles or any security interest in tangible personal property; however, this exclusion does not apply to claims arising out of transactions involving gold or silver.

O.    Prior Acts / Known Claims or Incidents / Troubled Securities. We do not cover claims arising out of any actual or alleged "wrongful act", or series of continuous, repeated or "interrelated wrongful acts"; which occurred, or the first of which occurred, prior to the insured's applicable "retroactive date"; or with respect to which a "written claim" has previously been presented to us, or to any other insurer, prior to the inception of this policy; or committed by or involving an insured and occurring, or the first of which acts occurred, prior to the effective date of coverage for said insured under this policy, or any predecessor policy issued by us of which this policy is a renewal, replacement or successor in time, if the insured knew or should have known, by consulting his/her/its records or otherwise, that said "wrongful act" was likely to result in a claim; or arising out of or involving the same or similar circumstances, acts, errors, or omissions as any claim or "suit" against an insured, or other litigation which occurred or was pending prior to the effective date of coverage for the insured under this policy, including, without limitation, the purchase, sale or advice regarding the same "security" as that involved in said litigation; or the purchase, sale or advice with regard to "securities" known to be in financial trouble prior to the effective date of this policy.

P    Claims Between Insureds / Affiliates / Related Individuals. We do not cover claims made by or on behalf of: one insured under this policy against another insured under this policy, including, without limitation, any claim by an insured against a partner, officer, director, member, employee or independent contractor of such insured; or an "entity" or enterprise which one or more insureds do or did wholly or partly own, operate, control, or manage, directly or indirectly, or of which an insured or any "related individual" is or was a sponsor, administrator, officer, director, stockholder, partner, member, trustee, employee or independent contractor, or which wholly or partly does or did own, operate, control, or manage, directly or indirectly, or which is or was a subsidiary or "affiliate" of an insured; or by a present, former or prospective employer, proprietor, partner, officer, principal, director, member, owner, shareholder, employee, independent contractor or "related individual" of an insured.

Q    Underwriting, Syndicating Or Investment Banking. We do not cover claims arising out of or in connection with any actual or alleged underwriting, syndicating, or investment banking work, or associated counseling, advising or investment activities, including, without limitation, any aspect of any actual, attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization, consolidation, capital restructuring, recapitalization, spin-off, primary or secondary offering of "securities" (regardless or whether the offering is a public offering or a private placement), business valuation, or other efforts to advise, raise or furnish capital or financing for any enterprise or "entity", or any disclosure requirements in connection with any of the foregoing.

R    Destruction Of Documents / Machine Or System Failure / Computer Related And Other Electronic Problems / Data Processing. We do not cover claims arising directly or indirectly out of actual or alleged loss of, damage to, destruction of, or the inability to utilize or access any machines or systems (including without limitation, telephonic, data processing and computer systems, equipment or component parts), records, papers, accounts, data or other information from any cause, including, without limitation, mechanical or electronic failure or malfunction or "computer-related and other electronic problems". "Computer-related and other electronic problems" means the inability of computer hardware, computer software, computer microprocessors or other computer system component parts to recognize, distinguish, interpret, accept or process data (including, without limitation, calculating, comparing, storing, inputting, manipulating, updating, recording, displaying, outputting, transferring, or sequencing data). We do not cover claims arising indirectly or indirectly out of data processing services performed for others

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 06/14/2024

S  Nuclear Reaction / Pollution. We do not cover any claims alleging, based upon or arising out of nuclear reaction, radiation or radioactive contamination. We do not cover claims alleging, arising out of, based upon, attributable to or in any way involving, directly or indirectly, pollution, regardless of cause, including, without limitation, (1) the actual, alleged or threatened discharge, dispersal, release or escape of "pollutants", or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "pollutants". "Pollutants" includes, without limitation, any solid, liquid, gaseous or thermal irritant or contaminant, infectious or otherwise, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste". "Waste" includes, without limitation, materials to be recycled, reconditioned or reclaimed.

T.  Foreign Trading / Market Specialist / Clearing or Transfer Agencies / "Penny Stocks". We do not cover claims arising out of the actual or alleged: (1) trading or failure to trade any "security" traded exclusively outside of the United States of America, its territories and possessions and Canada; (2) function of any insured as a specialist or market maker for any "security" or arising out of failure to make a market for any "security"; or (3) activities in connection with any equity "security" priced under $5.00; however, this exclusion shall not apply if the equity "security" is (a) registered, or approved for registration upon notice of issuance, on a national securities exchange in the United States, or (b) authorized, or approved for authorization upon notice of issuance, for quotation in the NASDAQ National Market System or Small Cap Market; or (c) issued by an investment company registered under the Investment Company Act of 1940 (as amended). We do not cover claims brought by or on behalf of any clearing agency or transfer agent or arising out of any actual or alleged function of any insured as a clearing agency or transfer agent. We do not cover claims of any "individual" or "entity" through which an insured sold any investment or insurance product.

U  Trust Or Estates / Trustees And Fiduciary Services. We do not cover claims arising out of any loss sustained by an insured as a beneficiary or distributee of any trust or estate. We do not cover claims arising out of an insured's actual or alleged services or capacity as a trustee or fiduciary (other than his/her liability as a fiduciary solely by reason of his/her acts as a "financial services professional"), including, without limitation, the insured's services or capacity as (1) a trustee for any "individual", business or charitable undertaking or enterprise, (2) a trustee of a testamentary or intervivos trust, (3) a member of a protective committee of security holders in connection with any bankruptcy, reorganization or similar proceeding, (4) a trustee of the debtor in any bankruptcy, reorganization or similar proceeding, (5) a receiver or assignee for the benefit of creditors in any judicial or non-judicial receivership or similar proceedings, or (6) an administrator, conservator, executor or guardian for others. We do not cover claims against any insured arising out of his/her actual or alleged acts as a "registered investment adviser" or "associated person" with respect to any "individual", "entity" or activity when he/she is also acting as a trustee, administrator, conservator, executor or guardian with respect to that "individual", "entity" or activity.

V.  Life Agent Additional Exclusions. We do not cover claims arising out of or in connection with any actual or alleged: (1) financial inability to pay, insolvency, receivership, bankruptcy or liquidation of (a) any insurer, reinsurer, pool, syndicate, association or other combination formed for the purpose of providing insurance or reinsurance, or (b) any Multiple Employer Trust or Welfare Arrangement or any pool, syndicate, association or other combination formed for the purpose of providing insurance or benefits when they are not fully funded by an insurance company; (2) promise, indication or guarantee as to the effect of fluctuations of interest rates with respect to future premium payments or market values (e.g., with respect to variable premium policies); (3) liability arising out of duties or activities assumed under contract by an insured as a plan administrator or fiduciary under the Employment Retirement Income Security Act of 1974 (ERISA), the Pension Benefits Act and the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), including any amendment, regulation or enabling statue pursuant thereto, or any other similar federal, state, or provincial statute or regulation; (4) failure of an HMO or PPO to pay the salaries or fees of any practitioner, or the insolvency, receivership or liquidation of an HMO or PPO or the quality of care rendered by, or the alleged malpractice of a participating provider of services of any HMO or PPO; (5) insurance product which is not approved for sale in the state in which the product was sold; (6) churning of life insurance policies; (7) sale or advice with respect to viaticals.

## SECTION VII — CONDITIONS

A.  Premium. All premiums for this policy shall be computed in accordance with our rules, rates, rating plans and procedures applicable to the insurance afforded herein, including, without limitation, the Premium per "Representative", if any, specified in the Declarations. The premium specified in the Declarations as Minimum Annual Premium is the minimum premium due on this policy for coverage for the full "policy period" specified in the Declarations. The premium specified in the Declarations as Minimum Policy Premium is the minimum premium for this policy regardless of the actual "policy period". Any premium paid on this policy which relates to a prior policy period for the insured shall be fully earned as of the date of payment and shall not be included as part of the Minimum Annual Premium or Minimum Policy Premium due for this policy nor shall it be considered when setting the premium to be paid for an "extended reporting period endorsement".

The First Named Insured shall maintain records of such information as is necessary for premium computation and shall send to us, at our request, copies of such records at the end of the "policy period" and at such times during the "policy period" as we may request.

B  Duties In The Event Of Error, Omission, Claim Or Suit. As soon as an insured knows of an alleged "wrongful act" which may result in a "written claim" covered by this policy, the insured must give us written notice as soon as practicable of the details of the "wrongful act", including the circumstances giving rise to the "wrongful act", a description of the services provided or that should have been provided, the name and address of any potential claimant and the type and amount of injury suffered by said claimant. Include as many details as possible. If a "written claim" is made or "suit" is brought against an insured, the insured, as a condition precedent to our obligations under this policy, must immediately send us every demand, notice, summons or other process relating to said claim or "suit", provided, except as provided in SECTION II A. 3. or SECTION VII K., in no event shall such "written claim" or "suit" be accepted by us later than the last day of the insured's "policy period". All notices called for in this paragraph must be provided to us by a separate document, and not just as part of a renewal application for insurance. The insured shall authorize us to obtain all records and other information we deem necessary for the settlement, negotiation or defense of a "written claim" or "suit".

The insured must cooperate with us in the investigation and defense of a "written claim" or "suit". At our request, the insured must submit to examination under oath, assist us in making settlements or conducting "suits", and attend and assist in obtaining the attendance of witnesses at hearings, depositions, arbitration proceedings, trials and other proceedings. The insured must cooperate with us in enforcing any right the insured may have against any "individual"

or "entity" for contribution or indemnity. The insured must not, except at the insured's own cost, voluntarily pay any money, assume any obligation or incur any expense without our prior written consent.

C. Suits Against Us. No suit or other action may be brought against us unless, as a condition precedent thereto, there has been full compliance with all the terms and conditions of this policy and the obligation of the insured to pay "damages" has been finally determined either by judgment against the insured after actual trial or arbitration or by written agreement signed by the insured, the claimant and us. Anyone who has obtained such a judgment or written agreement will be entitled to recover under this policy to the extent of the insurance then available to the insured under this policy. No one has the right to make us a party to a suit to determine the liability of an insured; nor shall we be impleaded by an insured or his/her/its legal representative(s).

D. Disputes With Us / Arbitration. By accepting the coverage provided by this policy, the insured agrees to be bound by the following arbitration rules in the event that a dispute arises between the insured and us, our employees, agents or representatives with respect to coverage, liability for premiums or "relations", any item or condition of this policy, or any other matter arising out of or related to this policy or the relationship between us, our employees, agents or representatives and the insured under this policy.

    1  By this arbitration agreement (1) the parties intend to simplify the dispute process by the non-judicial resolution of any dispute concerning their relationship, and (2) make it possible for us to reduce our litigation costs by resolving all disputes through arbitration in Mountain View, California.

    2  In the event of any such dispute, the matter shall be resolved by binding arbitration before three privately selected arbitrators acting pursuant to the arbitration provisions of the California Arbitration Act, Sections 1280 through 1294.2 of the Code of Civil Procedure. If a dispute subject to arbitration hereunder should arise, either party may make a demand for arbitration by filing a demand in writing with the other party. There shall be three arbitrators, one named in writing by each of the parties within ten days after demand for arbitration is given and a third chosen by the two appointed arbitrators. The arbitrators appointed by the insured and us need not be independent, and may be lawyers for the parties. The third arbitrator must be an "individual" with experience in the financial services professional liability insurance industry. Should either party refuse or neglect to join in the appointment of the arbitrator(s) or to furnish the arbitrator(s) with any papers or information demanded, the appointed arbitrator(s) is/are empowered by both parties to proceed ex parte. Arbitration shall take place in Mountain View, California, and the hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within said city as is selected by the arbitrator(s). The arbitrator(s) shall select such time and place promptly after his/her (or their) appointment and shall give written notice thereof to each party at least 20 days prior to the date so fixed.

    3.  The arbitrators shall apply the law of the State of California.

    4.  At the hearing, either party may present any relevant evidence and the formal rules of evidence applicable to judicial proceedings shall not govern. Evidence may be admitted or excluded in the sole discretion of the arbitrator(s). Said arbitrator(s) shall hear and determine the matter and shall execute and acknowledge their award in writing and cause a copy thereof to be delivered to each of the parties. The decision of any two arbitrators shall be final, binding and conclusive, and not subject to court review except as provided under California law. The submission of a dispute to the arbitrator(s) may be rendered by any Superior Court having jurisdiction; or such Court may vacate, modify, or correct the award in accordance with the prevailing sections of the California Arbitration Act. If three arbitrators are selected under the foregoing procedure but two of the three fail to reach an agreement in the determination of the matter in question, the matter shall be decided by three new arbitrators who shall be appointed and shall proceed in the same manner, and the process shall be repeated until a decision is finally reached by two of the three arbitrators selected. The costs of such arbitration shall be borne equally by the parties or in such proportions as the arbitrator(s) shall determine.

    5  If any party seeks to avoid these arbitration provisions, and any court shall be asked by either party to make any order concerning any dispute or controversy in any way concerning the matters set forth above, the parties agree that the court shall apply California law. The parties also agree to request the court to abate any such proceeding pending transfer to the courts of California for determination of the validity of these arbitration provisions.

    6.  Each party shall appoint and pay for any counsel appointed to represent it in such arbitration, unless otherwise provided by law.

    This Section is not to be construed to give a right of action against us, our employees, agents or representatives by any one who is not an insured under this policy.

E  Bankruptcy, Death, Incompetence Or Insolvency. The bankruptcy, death, incompetence or insolvency of an insured will not relieve us of any of our obligations under this policy, in such event, this policy shall inure to the benefit of the legal representative of such insured, but only to the extent said insured was insured under this policy.

F  Other Insurance  If there is other valid and collectible insurance which would apply to a "written claim" in the absence of this policy, this policy will apply as excess insurance over that other insurance whether such insurance is stated to be primary, contributory, excess, contingent, self insurance or otherwise unless such other insurance is written solely as excess insurance over this specifically identified policy; provided, with respect to any "written claim" first presented to an insured within the last fifteen days of said insured's "policy period" and then presented to us within fifteen days immediately following the effective date of cancellation or non-renewal of coverage with respect to such insured, there shall be no coverage under this policy unless, as condition precedent thereto, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply to said "written claim" in the absence of this policy

G  Our Right To Recover From Others  If we make any payment under this policy, the insured's right to recover from anyone else for the acts giving rise to that payment becomes ours to the extent of our payment  The insured must sign any required documents and take any steps necessary to help us secure these rights  The insured must do nothing to impair any of our rights.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024

NYSCEF DOC. NO. 2                                                 RECEIVED NYSCEF: 06/14/2024

The insured may have a right to recover from another insured under this policy relating to claims paid by us. We will not exercise our rights against such other insured except with respect to a "written claim" which arises from or is contributed to by an intentional, dishonest, fraudulent, criminal or malicious act, error or omission of such other insured

If we recover any amounts from another party relating to a "written claim" under this policy, after we deduct an amount equal to the "damages" and "defense costs" we have paid or incurred and the costs of making the recovery, we will share the rest of the recovery with the following parties: first, we will pay to an insured up to the amount the insured has paid relating to the "written claim" which is in excess of this policy's applicable Limit of Liability; second, we will pay the First Named Insured the amount of the "retention" which the First Named Insured has paid on that "written claim".

H. Audit. We may examine and audit an insured's books and records as they relate to this insurance at any time during the "policy period" and during the three years immediately following the end of the "policy period" for the insured.

I. Change In This Policy  Notice to any agent or knowledge possessed by any agent or other "individual" or "entity" acting on our behalf shall not effect a waiver of or a modification of any form of this policy or stop us from asserting any rights under the terms of this policy, nor shall the terms of this policy be changed or waived except by an endorsement issued by us and made a part of this policy. If a change in the policy requires a premium adjustment, we will adjust the premium as of the effective date of the change.

J. Cancellation. The First Named Insured may cancel this policy entirely, or as to any insured under this policy, at any time by giving us written notice stating when, thereafter, the cancellation is to take effect.

We may cancel this policy at any time in its entirety, or as to any insured, by sending to the First Named Insured written notice at least thirty days prior to the date cancellation is to be effective; provided, if the First Named Insured fails to pay premium when due or to reimburse us for our payment of any portion of a "retention", we may cancel this policy at any time by sending to the First Named Insured written notice at least ten days prior to the date cancellation is to be effective. In either case, we will give the First Named Insured written notice of cancellation by mailing it to the last mailing address known to us for the First Named Insured. Proof of mailing thirty days or ten days, respectively, before the effective date of such cancellation will be sufficient proof of notice of cancellation

This policy shall automatically be cancelled as to any insured as of the effective date said insured's license, registration or other right to provide "financial services", act as a "broker"-"dealer" or practice as a "financial services professional" is non renewed by the insured or revoked, suspended by or surrendered at the request of any regulatory authority.

In case of cancellation by the First Named Insured, or by the insured's premium finance company, we will refund unearned premium on the usual short rate basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy. For those purposes, automatic cancellation as per the above sub paragraph or cancellation as a result of the First Named Insured's failure to pay premium or "retentions", or due to the failure of an insured to comply with any of the other terms or conditions of this policy, or the concealment or misrepresentation of any material fact on the insured's "Application" or the failure to disclose material changes in the information on that "Application", shall be deemed cancellation by the First Named Insured.

In case of cancellation by us, we will refund any unearned premium on a pro rata basis, subject to retention by us of the Minimum Policy Premium specified in the Declarations and less any sums due us under this policy. If we do not refund the unearned premium with the notice of cancellation, we will refund it within a reasonable time after the date cancellation is effective; but refund or tender of the unearned premium is not required to make a valid cancellation of this policy.

K. Extended Reporting Period. If we cancel or fail or refuse to renew this policy, in total or as to any named insured, for any reason other than the failure to pay premium due or any part of any "retention" which we have advanced, or the failure to comply with any of the other terms or conditions of this policy, or the concealment or misrepresentation of any material fact on the insured's "Application" or the failure to disclose material changes in the information on that "Application", or the revocation, suspension or surrender, at the request of any regulatory authority, of the insured's license or other right to provide "financial services" or practice as a "financial services professional" or act as a "broker"-"dealer", the First Named Insured has the right to have issued an endorsement providing a one year extended period of time, following the effective date of said cancellation or non-renewal, during which an "individual" or "entity" who/which was an insured immediately prior to the effective date of said cancellation or non renewal may present to us "written claims" arising out of "wrongful acts" occurring during the "coverage period" for said insured and otherwise covered under the terms of this policy. During this "extended reporting period", any "written claim" presented to us by an insured resulting from a "wrongful act," or a series of continuous, repeated or interrelated wrongful acts", for which a "written claim" had been presented to us under the terms of a predecessor policy issued by us or by an "affiliate" insurer of ours, of which this policy is a renewal or one of a series of continuous renewals or successor policies, will be treated as if it had been presented to us during the last day of coverage under that predecessor policy and will be covered by that predecessor policy, not this policy, subject to all the terms and conditions of that predecessor policy, including, without limitation, its applicable Limit of Liability.

Except as may otherwise be specifically provided by endorsement, while this policy, or any policy which is a renewal of this policy or one of a series of continuous renewals of this policy, is in effect, we will continue to cover all remaining insureds, without the need to purchase an "extended reporting period endorsement", with respect to "written claims", otherwise covered under the terms of this policy or said renewal policy, as applicable, arising out of "wrongful acts" committed by a "representative" who has ceased to be associated with the First Named Insured, provided, this continuing coverage shall not apply in the case of a departed "financial services professional" as to whom we have canceled coverage or refused to renew coverage or who has been terminated for cause by the First Named Insured or by any other insured "entity". In any of the latter cases, it will be necessary for the First Named Insured to buy an "extended reporting period endorsement" covering that "financial services professional", as otherwise provided in this subsection for there to be any continuing coverage for any insured with respect to "written claims" arising out of the "wrongful acts" of said ' financial services professional"

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                                            RECEIVED NYSCEF: 06/14/2024

If the First Named Insured purchases an "extended reporting period endorsement" following cancellation or non-renewal of this policy, we will also cover, pursuant to the terms of that endorsement, each "financial services professional" who was a named insured on this policy, as of such cancellation or non-renewal date, for "written claims" arising out of "financial services", otherwise covered under the terms of this policy, which were rendered during the "coverage period" for that "financial services professional"

To obtain an "extended reporting period endorsement", the First Named Insured must, within thirty days of the effective date of such cancellation or non-renewal, give us written notice requesting the issuance of such an endorsement and pay an additional premium for that endorsement as determined by our rules, rates, and regulations in effect at that time. If the First Named Insured fails to purchase an "extended reporting period endorsement" within that thirty day period, there will be no further coverage under this policy with respect to any insured affected by said cancellation or non-renewal, effective as of the effective date of such cancellation or non-renewal. We have no obligation to offer an "extended reporting period endorsement" to anyone other than the First Named Insured. The insurance we provide during an "extended reporting period" will be excess over any other valid and collectible insurance available to the insured. The "extended reporting period" will not reinstate or increase the Limits of Liability or extend the "policy period". All premium paid for an "extended reporting period endorsement" shall be fully earned by us upon issuance of the endorsement and will not be refunded.

If we do not offer to renew this policy at the same premium, Limits of Liability or "retention" as apply to this policy, this will not be considered a cancellation or non-renewal by us.

L. Concealment, Misrepresentation, Fraud Or Material Change. We will not provide any coverage under this policy to an insured who intentionally conceals or misrepresents any material fact or circumstance relating to this insurance, including, without limitation, any misstatement of fact, material misrepresentations or failure to disclose material facts on the "Application", or who fails to tell us during the "policy period" of material changes in the information provided to us on said "Application". In the case of concealment or misrepresentation of any material fact or circumstance relating to this insurance, we shall have the right, at our sole option, to deny any coverage under this policy for any claim relating to such material fact or circumstance, or to rescind coverage under this policy with respect to the insured involved, or rescind this policy in its entirety, thereby voiding all coverage under this policy. In the later case, the Minimum Policy Premium stated on the Declarations shall be reduced by fifty percent, and all other premium paid with respect to this policy shall be returned to the First Named Insured. In all other cases, there shall be no change in premium.

M. Transfer Of Insured's Rights And Duties. An insured may not transfer or assign any rights or duties under this policy unless we give our written consent to that transfer or assignment by endorsement to this policy.

N. Multiple Insureds. More than one "individual" or "entity" may be named as an insured under this policy. The inclusion of multiple insureds under this policy will not increase our liability beyond the Limits of Liability set forth in SECTION V.

By accepting this policy, the insureds agree that the First Named Insured is authorized to act on behalf of all other insureds with respect to: giving and receiving notices of cancellation or non-renewal; accepting any endorsement issued to be a part of this policy; paying premiums and "retentions"; receiving any return premium which may become due; giving notices to insureds that they have been added to or deleted from this policy; informing other insureds of the policy terms and conditions; requesting an "extended reporting period endorsement"; and keeping us informed of any material changes in the type or composition of the business or organization of the insureds under this policy.

O. Merger. If, during the "policy period", any insured shall acquire or be acquired or merged, consolidated or otherwise combined with any other "entity", immediate written notice of that fact must be give to us. There shall be no coverage under this policy with respect to any "wrongful acts" committed by an insured, or any of its employees, agents or representatives, subsequent to the date of said acquisition, merger, consolidation or other combination unless this policy is endorsed by us to provide such coverage. There shall be no coverage under this policy with respect to the merged, consolidated or combined "entity" unless we issue an endorsement to provide such coverage.

P. Claims, Notices And Requests. All "suit" papers and other "written claims" under this policy shall be sent to us c/o ProSurance Group, Inc. at 2685 Marine Way, Suite 1408, Mountain View, CA 94043. All other notices, demands or requests provided for in this policy shall be in writing and sent to us c/o ProSurance Group, Inc., at 2685 Marine Way, Suite 1408, Mountain View, CA 94043.

This policy shall not be valid unless countersigned below by our authorized agent or representative.

Countersigned by our authorized agent / representative

John V Wagner

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 2                                                RECEIVED NYSCEF: 06/14/2024

 Nationwide°

Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road • Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                                    President

The information contained herein replaces any similar information contained elsewhere in the policy.

UTS-COVPG (3-21)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM

NYSCEF DOC. NO. 2

INDEX NO. 610488/2024

RECEIVED NYSCEF: 06/14/2024

POLICY PERIOD EXTENSION ENDORSEMENT

INTERIM ENDORSEMENT
#1

The following information, and signature by an authorized representative, is required only when this endorsement is issued subsequent to the preparation of this policy:

First Named Insured:  VCS Venture Securities, LLC FKA Primary Capital, LLC
Policy Number:  BFS0003062-NY-09-01
Effective Date Of This Endorsement:  September 10, 2023

This endorsement forms a part of the policy to which it is attached.

In consideration of the additional premium paid, as set forth below, it is understood and agreed that the "policy period" for this policy is extended to expire at 12:01 a.m. on October 10, 2023.

Additional Premium:     $2,460.00

Nothing herein contained shall vary, alter, waive or extend any of the terms, conditions, provisions, agreements, limitations or exclusions of this policy, other than as stated above.

By: _____
Authorized Representative

FNX-46 (10-07)

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

# EXHIBIT B

# EXHIBIT B

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 06/14/2024

FINRA DISPUTE RESOLUTION

-------------------------------------------------------------x

In the Matter of the Arbitration Between

JAMES A. STAMULIS                                    FINRA Arb. No.

                                  Claimant,

            -against-

JOSEPH STONE CAPITAL L.L.C.,
VCS VENTURE SECURITIES,
ROCCO MICHAEL MASELLI,
DAMIAN MAGGIO, and
ADAM MAGGIO,

                            Respondents.

-------------------------------------------------------------x

## AMENDED STATEMENT OF CLAIM

        Claimant James A. Stamulis, individually and on behalf of his individual retirement account

("IRA") and Roth individual retirement account ("Roth IRA"), (hereinafter referred to as

"Claimant") files this Statement of Claim ("SOC") against Joseph Stone Capital L.L.C.

("Respondent JSC"), VCS Venture Securities ("Respondent VCS"), Rocco Michael Maselli

("Respondent Maselli"), Damian Maggio ("Respondent Damian Maggio"), and Adam Maggio

("Respondent Adam Maggio") (Damian Maggio and Adam Maggio believed to be brothers) and

alleges the following:

## FACTUAL ALLEGATIONS

### Claimant James A. Stamulis

        1.      Claimant is a retired and disabled 65-year-old former business owner and resides in

Floral Park, New York.  He sold his business in 2016 as he became consumed by health issues

related to degenerative spinal stenosis. Although he has been investing for years, he has no formal training and lacks sophistication in doing so. Prior to investing with the Respondents, Claimant had an account with Charles Schwab and engaged one of Charles Schwab's recommended money managers, Baxter Brothers, to manage Claimant's accounts with blue-chip large capitalization stocks paying dividends, such as FedEx, JP Morgan, and Texas Instruments.

**Registered Representative Respondent Rocco Maselli**

2.     In 2019, Claimant's then-attorney introduced Claimant to Respondent Maselli. Respondent Maselli told Claimant that he didn't even have to move his account from Charles Schwab for him to prove to Claimant that his approach to investing was better than Baxter Brothers'. Respondent Maselli called Baxter Brothers' account performance "lackluster," "cookie-cutter," nothing but an "asset-gatherer." Respondent Maselli would have Claimant log on to his Schwab account and then Respondent Maselli would direct the trades. In or about October 2019 Respondent Maselli directed Claimant to sell call options on an existing position in Cara Therapeutics that Claimant held since 2014.[1] Respondent Maselli also started directing Claimant to purchase low-price, speculative stocks such as Milestone Scientific at $1.34 per share, Aytu BioSciences at $1.77 per share, and Fuel Cell at $1.37 per share.

3.     Initially, with Respondent Maselli directing the trading, Claimant's Schwab account was profitable. Impressed, Claimant closed his managed account with Baxter Brothers and then opened an account with Respondent JSC, where Respondent Maselli was registered.

---

[1] Claimant learned about Cara Therapeutics and its development of a non-addictive, non-opioid pain management delivery system when Claimant was investigating pain relief alternatives from his spinal stenosis.

FILED: NASSAU COUNTY CLERK 06/14/2022 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

## Respondent Joseph Stone Capital – The Maggio Brothers

4.      Respondent JSC is a notorious Long Island-based boiler room run by the Maggio brothers.  Prior to owning Respondent JSC, Respondent Damian Maggio worked in 14 brokerage firms in 16 years, all of which went out of business for regulatory transgressions.  His brother, Respondent Adam Maggio, became registered in 2000 and joined six firms in 11 years, following his brother.  Both brothers have multiple customer complaints for unsuitable recommendations, excessive trading, excessive commissions, and failure to supervise.  Not surprisingly, the Maggio brothers recruited the brokers from the fly-by-night firms that they were registered with over the years to form Respondent JSC.  According to a study conducted by Reuters in conjunction with Columbia Law School, Respondent JSC had the second most brokers in the country with marks on their licenses (71.20%).  More than half of the firm's brokers and supervisors were previously with a firm that FINRA barred from the securities business.  And more than a third of their brokers have been or are involved in arbitrations alleging excessive trading, churning, or unauthorized trading.  Respondent JSC is the quintessential boiler room operation, and no doubt not long for this world.

5.      On September 8, 2022, Respondent JSC signed a Letter of Acceptance, Waiver, and Consent ("AWC") accepting and consenting to the following findings by FINRA:

- From January 2015 to June 2020 (a period that included Claimant maintaining an account there), the firm did not provide reasonable guidance to identify accounts that were being excessively traded.

- The firm's procedures and systems to identify and respond to red flags for churning and excessive trading were deficient.

- The firm had to pay restitution to 25 customers of $825,607.59 for excessive commissions.

- The firm violated FINRA's supervision rules (Rule 3110(a)), suitability rules (Rule 2111), and just and equitable principles of business (Rule 2010). ***Claimant alleges the same rule violations in this case.*** A copy of the AWC signed and accepted by Respondent JSC is attached hereto as Exhibit 1.

- In connection with the events described in the Exhibit 1 AWC, three Respondent JCS principals, including Respondent Adam Maggio, were suspended for failure to supervise for periods ranging from two to five months each. Eight Respondent JSC representatives were also suspended three to eight months, and two Respondent JCS representatives were barred from the securities industry.

6.     Both Respondents Damian Maggio and Adam Maggio, along with Respondent JSC, are currently named in a FINRA arbitration demanding $2,807,633.24 in damages alleging that they failed to supervise their brokers who engaged in excessive trading, unsuitable recommendations, and other acts of account mismanagement. Together with the restitution payments required under the Exhibit 1 FINRA AWC, the arbitration alleged above in this ¶ 6, other pending arbitrations against Respondent JSC, and the Claimant's case seeking damages of $500,000, Respondent JSC has a going concern issue.

**Respondent Venture Capital Securities – Keeping the Scam Alive**

7.     Respondents Damian and Adam Maggio, however, opened their back door. They entered into an agreement with Respondent VCS to effectively act as the successor to Respondent

4

FILED: NASSAU COUNTY CLERK 06/14/2022 07:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

JSC. Respondent Adam Maggio became dually registered with Respondent VCS to open a branch office literally down the road from Respondent JSC and manage that office while remaining registered with Respondent JSC. To hide their connection, they called the branch office operation New Age Venture Capital, LLC and New Age Capital Partners LLC. Respondent Maselli hurriedly joined Respondent VCS in September, 2021, and transferred Claimant's account to the new firm.[2] Claimant was not informed of the regulatory issues surrounding the old firm, that the branch office manager is one of the principals of the old firm or the brokers joining Respondent VCS's branch office are doing so to avoid the "Taping Rule."

8.    FINRA Rule 4111 was announced in September 2021 according to which firms like Respondent JSC would be designated as "Restricted Firms" because of the number or disciplined persons it employed or who came from FINRA expelled firms. One of the consequences of being designated a Restricted Firm" was the imposition of the Taping Rule in which conversations with brokers and customers were require to be tape-recorded so FINRA and arbitration panels could listen to the recordings during examinations and hearings. Another consequence of FINRA Rule 4111 was that "Restricted Firms" like Respondent JSC would have to terminate many of its disciplined brokers. Respondent JSC, however, avoided the the "Restricted Firm" designation by shipping off a bunch of registered representatives with marks on their licenses to Respondent VCS, including Respondent Maselli. That helped Respondent JSC get by on the numerical analysis of the percentage of disciplined brokers registered with Respondent JSC. None of the customers, including Claimant, were informed of any of these shenanigans.

---

[2] Both Respondent JSC and Respondent VCS clear through Axos Clearing LLC, and discovery will reveal the manner in which Respondents transferred Claimant's account.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                           RECEIVED NYSCEF: 06/14/2024

9.     All of the compliance officers at Respondent JSC and at the branch office of
Respondent VCS had disciplinary histories for failure to supervise, regulatory violations and
suspensions, making it unlikely that they could find employment with legitimate firms.  In effect,
they became indentured servants to the Maggio brothers to continue the illicit type of business
promoted by them and highlighted in the Exhibit 1 AWC.  So the so-called "supervisors" became
nothing more than facilitators of excessive trading and unsuitable recommendations promoted by
rogue brokers with marked licenses.

10.     After Claimant's account at Respondents JSC and VCS showed significant losses,
Respondent Maselli induced Claimant into opening a new type of account at E*TRADE.
Respondent Maselli told Claimant that he could provide him with an income of $2,000 per week,
and called his E*TRADE account his "ATM," even though Respondent Maselli was not registered
with E*TRADE.  Respondent Maselli's new game was to trade financial and commodities futures
and options for the Claimant.   A sample E*TRADE statement for the month of April 2023 is
attached hereto as Exhibit 2.  *Respondent Maselli traded crude oil futures, and stock index
options and futures, in the E\*TRADE account for a disabled, retired investor, who Respondent
Maselli had just lost the majority of his investment capital.*

11.     The SEC defines "recommendation" as a communication from a licensed registered
representative which "reasonably could be viewed as a 'call to action'" and "reasonably would
influence an investor to trade a particular security or group of securities."  *See* both FINRA
Regulatory Notice 12-25 at pp. 4-5 (May 2012) and NASD Notice to Members 01-23, Online
Suitability – Suitability Rules and Online Communications (April 2001).  Clearly, Respondent
Maselli made recommendations which Claimant followed in his Charles Schwab and E*TRADE

accounts, for which Respondent Maselli is liable as well as the Respondent firms and their

principals as control persons.

12.    Respondents, acting through their registered representative, Respondent Maselli,

engaged in excessive and unsuitable securities trading on margin in Claimant's accounts and

concentrated those accounts in high-risk stocks. Often, Claimant's accounts were turned over 50%

during the month. Respondent failed to conduct a reasonable due diligence on these investments,

the risks of these investments and this investment strategy were not disclosed to Claimant, and

these recommendations were unsuitable for Claimant given his financial situation, needs and

investment objectives. Moreover, since the adoption of SEC Regulation Best Interest in June 2020,

Respondents failed to act in the best interest of the Claimant and, in fact, never acted in the best

interest of the Claimant. What is evident here is a pattern of self-dealing and deceit to manipulate

the Claimant into opening an account with Respondent JSC, and transfer that account to

Respondent VCS. Inducing the Claimant to trade at the direction of Respondent Maselli at both

Charles Schwab and E*TRADE is depraved indifference to the needs of a retired and disabled

person. Claimant specifically told Respondent Maselli that he was "needy, not greedy."

### Respondents JCS and VCS Negligently Failed to
### Research Maselli's Background, Negligently Hired Maselli and
### Negligently Failed to Subject Maselli to Special Supervisory Measures

13.    FINRA Rule 3010(e) provides that "[e]ach member shall have the responsibility and

duty to ascertain by investigation the good character, business repute, qualifications and experience

of any person prior to making such a certification in the application of such person for registration

with this association." In FINRA Notice to Members 88-67, dated September 1988, FINRA

reminded Respondent and all other brokerage firms that "member firms have an obligation to

thoroughly research a potential employee's background before hiring such person," and that

"[FINRA] has brought disciplinary actions against member firms who have failed to properly

research a potential employee's background prior to hiring such person."

14.     The SEC and FINRA "have emphasized the need for heightened supervision when a

firm chooses to have associated with it a person who has known regulatory problems or customer

complaints." Robert J. Prager, Exchange Act Release No. 51,974, 85 S.E.C. Docket 2584, 2005

WL 1584983, at *11 (July 6, 2005).  "The Commission has repeatedly emphasized the need for

heightened supervision when a firm employs a broker with known regulatory problems or customer

complaints." Signal Sec., Inc., Exchange Act Release No. 43,350, 73 S.E.C. Docket 928, 2000

WL 1423891, at *6 (Sept. 26, 2000).

> We have stated, however, that any indication of irregularity brought to a
> supervisor's attention must be treated with the utmost vigilance.  A registered
> representative who has previously evidenced misconduct can be retained only if he
> subsequently is subjected to a commensurately higher level of supervision.  Here,
> . . . [respondents'] failure to institute any supervisory system – let alone a
> heightened system – demonstrates a failure to supervise. . . .

Consolidated Inv. Serv., Inc., Exchange Act Release No. 36,687, 61 S.E.C. Docket 19, 1996 WL

20829, at *5 (Jan. 5, 1996).

15.     Everyone at Respondent JSC and the branch office at Respondent VCS was in need

of heightened supervision.  *But there was no one there who had a clean record to provide it.*  The

very opening of the Respondent VCS branch office where Respondent Maselli worked was done to

avoid heightened supervision and continue to practice of no supervision.

16.     By May 2023 Claimant's accounts were decimated.  The following snapshot of

Claimant's May 31, 2023 of Claimant's IRA statement while Respondent Maselli was working as a

8

registered representative with Respondent VCS is incomprehensible when these funds were

designed for retirement.

**PORTFOLIO ASSETS**

| EQUITIES | Symbol | Quantity | Current price* | Average unit cost | Current value | Cost | Unrealized gain/-/loss* | Anticipated annualized income | Current yield % |
|---|---|---|---|---|---|---|---|---|---|
| AULT ALLIANCE INC NEW | AULT | 400 | 11.1400 | 322.9162 | 4,456.00 | 129,166.50 | -124,710.50 | N/A | |
| CALL FISKER INC CL A $5 EXP 06/16/23 CORP CL A | | 50 | 1.3500 | 1.6638 | 6,750.00 | 8,319.00 | -1,569.00 | N/A | |
| CAMBER ENERGY INC PAR $0.001 2022 NEW | CEI | 4,000 | 1.0700 | 40.0627 | 4,280.00 | 160,250.82 | -155,970.82 | N/A | |
| CONFORMIS INC NEW | CFMS | 7,800 | 1.1100 | 4.3443 | 8,658.00 | 33,885.82 | -25,227.82 | N/A | |
| KOPIN CORP | KOPN | 33,598 | 2.1700 | 1.6673 | 72,907.66 | 56,018.18 | 16,889.48 | N/A | |
| LOGICMARK INC COMPARS NEW | LGMK | 345 | 2.7800 | 277.8666 | 959.10 | 95,870.86 | -94,911.76 | N/A | |
| MILESTONE SCIENTIFIC INC NEW | MLSS | 30,100 | 1.0200 | 1.5453 | 30,702.00 | 46,602.34 | -15,900.34 | N/A | |
| ORGANOVO HOLDINGS INC. NEW | ONVO | 5,000 | 1.7000 | 15.5800 | 8,500.00 | 77,900.00 | -69,400.00 | N/A | |
| PURPLE BIOTECH LTD SPONS ADR LEVEL 3 | PPBT | 1,000 | 1.7500 | 8.5880 | 1,750.00 | 8,588.00 | -6,838.00 | N/A | |
| **Total Equities** | | | | | $138,962.76 | $616,601.52 | -$477,638.76 | $0.00 | 0.000% |
| **Total Portfolio Assets** | | | | | $138,962.76 | $616,601.52 | -$477,638.76 | $0.00 | 0.000% |
| **Total Net Portfolio Value** | | | | | $139,238.24 | $616,601.51 | -$477,638.76 | $0.02 | 0.000% |

The arbitration Panel should take note of the preponderance of low-priced securities with no

current yield and no anticipated annualized income. Not one supervisor or compliance officer at

either Respondent firm reached out to the Claimant to ascertain whether this portfolio composition

that Claimant ended up with was compatible with the needs of a retired and disabled investor.

## RESPONDENTS' SALE OF UNSUITABLE AND HIGH-RISK INVESTMENTS TO CLAIMANT

17.    Respondents agreed to perform and undertook the duties of a securities broker,

financial consultant, and a brokerage firm relative to recommending and supervising the

recommendations of the transactions at issue with Claimant.

18.    The acts committed by Respondent, as alleged herein, were done by it personally

through the use of the mails or other instrumentalities of interstate commerce. The acts of

Respondents are deemed to be the acts of and are chargeable to and binding upon Respondents JCS

and VCS under principles of agency law, duties to supervise, controlling person, doctrine of

*respondeat superior*, and successor liability.  The Respondent firms are jointly and severally liable for constructing and operating an enterprise to defraud investors.

19.    Respondents knew that Claimant trusted them to disclose all material facts concerning the investments and investment strategy recommended to him and to comply with all SEC, FINRA and each state's licensing requirements rules and Administrative Codes.  Throughout the course of their investment relationship, Respondents sought to and did engender Claimant's trust and confidence in their ability and willingness to do anything in their power to properly advance all of Claimant's investment objectives and needs.  A fiduciary relationship existed between Claimant and Respondents.

20.    Due to FINRA's concerns about aggressive sales practices targeting seniors, FINRA issued Regulatory Notice 07-43, *Senior Investors* which provides special guidance to stockbrokers when advising seniors, including:

(a)    As investors age, their investment time horizons, goals, risk tolerance and tax status may change.  Liquidity often takes on added importance.

(b)    Investors whose investment time horizons afford less time or opportunity to recover investment losses may be disproportionately affected by market fluctuations.

(c)    Over reliance on net worth is particularly problematic where an investor meets the accredited investor standard based largely on home values, which may represent the largest asset of many senior investors.  Simply put, eligibility does not equal suitability.

21.     Consistent with the above industry rules, notices and guidelines, Respondents knew or should have known that these investments and this investment strategy were unsuitable for Claimant's accounts and that Claimant did not fully understand the risks involved.

22.     In that regard, it should also be pointed out that Respondents had complete and total control of Claimant's accounts from their inception, even while with Charles Schwab, through the life of the accounts and during the incomprehensible futures trading debacle at E*TRADE. Claimant acquiesced to all of Respondents' recommendations, and Respondents offered *no investment alternatives* to Claimant other than the transactions that were ultimately affected. Respondent Maselli told Claimant his recommendations had "exponential upside" "and limited downside." Respondent Maselli told Claimant that he followed "charts" and could call the "bottoms"- presumably the bottom of a stock's decline. Respondents knew that Claimant trusted them and relied upon them to act in his best interests and promoted this trust and confidence. *Claimant made clear and Respondents knew full well that he totally relied upon them to make all the investment recommendations.*

23.     FINRA has made clear, as have the SEC and state regulators, that broker-dealers and financial advisors cannot delegate their obligation to make suitable recommendations to the investor.  In other words, a broker-dealer cannot recommend unsuitable investments and avoid liability by having the client sign account paperwork that lists the primary investment objective as speculation. *If a broker-dealer's suitability obligation could thus be shifted to the client, the suitability rule would be essentially nullified.  Respondents were required at all times to make recommendations consistent with the financial needs of a retired and disabled investor.* Presenting a customer with a pre-populated new account form with "speculation" already written into it with a Post-it at the end of the document to "sign here" does not confirm or give the

FILED: NASSAU COUNTY CLERK 06/14/2024 08:00 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                           RECEIVED NYSCEF: 06/14/2024

Respondents the license to speculate. Moreover, it is absurd when Respondents assert their defense

that their customer should be allowed to speculate with all of his money and then assert that the

customer knew what he was doing. Obviously, no investor who knew what he was doing would

engage in the activity that Respondent Maselli recommended, including gambling his life savings

on trading options and futures, and banking his retirement on Respondent Maselli's ability to read

stock charts.

      24.      Respondent failed to comply with FINRA's suitability rules, including but not

limited to *Conduct Rules* 2111 and 2090. FINRA Rule 2111(a) *Suitability* reads as follows:

> A member or an associated person must have a reasonable basis to believe that a
> recommended transaction or investment strategy involving a security or securities is
> suitable for the customer, based on the information obtained through the reasonable
> diligence of the member or associated person to ascertain the customer's investment
> profile. A customer's investment profile includes, but is not limited to, the
> customer's age, other investments, financial situation and needs, tax status,
> investment objectives, investment experience, investment time horizon, liquidity
> needs, risk tolerance, and any other information the customer may disclose to the
> member or associated person in connections with such recommendation.

FINRA Rule 2090 ("Know Your Customer") reads as follows:

> Every member shall use reasonable diligence, in regard to the opening and
> maintenance of every account, to know (and retain) the essential facts concerning
> every customer and concerning the authority of each person acting on behalf of such
> customer.

      25.      The Supplementary Material to FINRA Rule 2111 (the FINRA Suitability Rule)

states:

> .01      General Principles. Implicit in all member and associated person
> relationships with customers and others is the fundamental responsibility for fair
> dealing. Sales efforts must therefore be undertaken only on a basis that can be
> judged as being within the ethical standards of FINRA rules, with particular
> emphasis on the requirement to deal fairly with the public. The suitability rule is
> fundamental to fair dealing and is intended to promote ethical sales practices and
> high standards of professional conduct.

.02    Disclaimers.  A member or associated person cannot disclaim any responsibilities under the suitability rule.

(*See* Exhibit "E.")

26.    The FINRA suitability rule required JCS to make only those recommendations that were consistent with Claimant's financial situation.  "[I]n blatant disregard of the customer's financial situation, [the broker] recommended and effected transactions which were excessive and unsuitable.  The duty to deal fairly with one's customer is well-established in this industry."  *Gordon James Mahedy*, 1994 WL 650117, at *1 (NYSE Board of Directors Oct. 6, 1994).

27.    Even if Claimant had said that he was comfortable with speculative investments, Respondent nevertheless could only recommend investments that were compatible with Claimant's actual financial circumstances.

> [W]hether or not the . . . committee considered Reynold's transactions appropriate is not the test for determining the propriety of his conduct.  As a fiduciary, a broker is charged with making recommendations in the best interests of his customer even when such recommendations contradict the customer's wishes.  Thus, even if the committee suggested that Reynolds engage in aggressive and speculative trading, Reynolds was obligated to counsel them in a manner consistent with the fund's financial situation.  Reynolds failed to fulfill that obligation and thereby violated the NASD's suitability rule.

*John M. Reynolds*, Exchange Act Release No. 30,036, 50 S.E.C.  Docket 504, 1991 WL 288500, at *3 (Dec. 4, 1991).

28.    Simply put, the FINRA suitability rule required Respondent to take account of Claimant's financial needs.  "Pellegrino failed to take reasonable steps to monitor and have [the firm] perform appropriate individual suitability determinations based on each investor's personal financial needs . . ." *Ronald Pellegrino*, Exchange Act Release No.  59,125, 94 S.E.C. Docket 2912 & 2926, 2008 WL 5328765, at *16 (Dec. 19, 2008).  "[The broker's] recommendations . . . were unsuitable because they were inconsistent with [his] customers' financial needs." *Joel Dean*

13

*Moore*, Complaint No. C01970001, 1999 WL 1022136, at *5 (NASD Nat'l Adj. Council Aug. 9, 1999).

29.     Even if Claimant had said he wanted speculative and illiquid investments, or if he was sophisticated, Respondent was still required to make suitable recommendations in accordance with Claimant's needs. Pre-populated account documents cannot legitimately justify trading strategies recommended to a customer for him to commit financial suicide.

> The evidence . . . demonstrates that FPG was a speculative investor who was willing "to bet the ranch" on an extremely risky trading strategy.
>
> . . .
>
> Even though FPG was a speculative investor, this did not relieve [his broker] of the obligation to ensure that his recommendations were suitable for the client given the client's financial situation, needs, and other security holdings. NASD Conduct Rule 2310 requires that a registered representative, when recommending investments, determine that such investments are suitable for the customer. . . .
>
> "A broker must make a customer-specific determination of suitability, and he or she must recommend only those securities that fit the customer's financial profile and investment objective "
>
> [E]ven a purported sophisticated investor, who enjoys and encourages trading in speculative securities, is entitled to the protections of NASD Conduct Rule 2310. . . . "[A] customer's prior transactions . . . are not relevant in a suitability determination, and [a] history of risky trading [does not] mitigate [respondent's] conduct." . . .
>
> Even if [respondent] had explained the risk to [the customer], the securities he recommended for her account would still have been unsuitable. The SEC has made clear that even in those situations where a customer seeks to engage in highly speculative or otherwise aggressive trading, a representative is under a duty to refrain from making recommendations that are incompatible with the customer's financial profile.

*Robert Joseph Kermweis*, Case No. C02980024, 2000 WL 33299605, at *6-7 (NASDR Office Hrg. Officers Feb. 16, 2000).

> The fact that a customer . . .may be wealthy does not provide a basis for recommending risky investments. As the NASD points out, its suitability rule is

grounded in "the fundamental responsibility for fair dealing" implicit in the relationship between a broker and his or her customers. For a broker to recommend risky or speculative investments, he must be satisfied that they are appropriate for the particular customer.

*Arthur Joseph Lewis*, Exchange Act Release No. 29,794, 49 S.E.C. Docket 1487, 1991 WL 294317, at *2 (Oct. 8, 1991) (footnotes omitted). "Even if we conclude that [the client] understood [the stockbroker's] recommendations and decided to follow them, that does not relieve [the stockbroker] of his obligation to make reasonable recommendations." *Clinton Hugh Holland, Jr.*, Exchange Act Release No. 36,621, 60 S.E.C. Docket 2507, 1995 WL 757806, at *3 (Dec. 21, 1995).

30.    Finally, as part of the "customer specific" suitability obligation, ***Respondents were required to ensure that Claimant understood what he was doing.*** The broker must "be satisfied that the customer fully understands the risks involved and is not only able but willing to take those risks. That was not the situation here." *Arthur Joseph Lewis*, Exchange Act Release No. 29,794, 49 S.E.C. Docket 1487, 1991 WL 294317, at *2 (Oct. 8, 1991). "A BD also must be satisfied that the customer 'fully understands the risks involved and is . . . able . . . to take those risks.'" FINRA Notice to Members 10-22, 2010 WL 1625161, at *3 (footnote omitted). That Respondents may have believed in the soundness of the investments and investment strategy at issue was insufficient. "A salesman's honest belief in an issuer's prospects does not warrant his making exaggerated and unfounded representations and predictions to others." *James E. Cavallo*, Exchange Act Release No. 26,639, 43 S.E.C. Docket 779, 1989 WL 991979, at *3 (Mar. 17, 1989).

31.    Claimant did not understand the investment strategies recommended by Respondents, including directing trades for the Claimant at Charles Schwab and E*TRADE. Allowing himself to be manipulated in this way demonstrates the unsophistication and naivete of

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 06/14/2024

the Claimant, and the degree of full trust and confidence that Claimant placed in Respondent Maselli

32.     Rule 2111 also imposes a "quantitative suitability" obligation that focuses on whether the number of transactions within a given timeframe is suitable in light of the customer's investment profile. Excessive trading occurs, and is unsuitable, when a registered representative, while exercising actual or de facto control over a customer's account, recommends a level of trading activity that is inconsistent with the customer's underlined investment needs and objectives.

33.     The Supplementary Material to FINRA Rule 2111 at Rule 2111.05(c) states that "[n]o single test defines excessive activity, but factors such as the turnover rate, cost- equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding that a member or associated person has violated the quantitative suitability obligation." Turnover rate represents the number of times that a portfolio of securities is exchanged for another portfolio of securities. The cost-to-equity ratio measures the amount an account must appreciate just to cover commissions and other expenses; in other words, it is the break-even point where a customer may begin to see a return. A turnover rate of six and cost-to-equity ratio above 20% are indicators that excessive trading may have occurred. Claimant's accounts often exceeded those levels.

34.     Respondents also failed to comply with FINRA Rule 2090 *Know Your Customer*, which reads as follows:

> Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer.

35.     Respondents failed to review the material terms and risk factors of these investments and this investment strategy with Claimant. Respondents failed to disclose to

INDEX NO. 610488/2024
RECEIVED NYSCEF: 06/14/2024

Claimant that these investments and this investment strategy were high risk and high commission and were unsuitable for Claimant in view of his financial situation, needs and investment objectives.

36.    Respondents' conduct was clearly in violation of FINRA rules governing suitability, due diligence and risk disclosure (including but not limited to Rules 2310, 2090, and 2111).

37.    Respondents misrepresented and omitted to disclose numerous material facts to Claimant concerning these investments and this investment strategy, and the risks involved in these investments and this investment strategy. These misrepresentations and non-disclosures continued after the initial investment and were never corrected.

38.    It is well-settled that a brokerage firm which recommends securities has a duty to ensure that its representations have a reasonable basis:

> In summary, the standards . . . are strict. [A salesman] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. *By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.* Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

*Hanley v. SEC*, 415 F.2d 589, 595-97 (2nd Cir. 1969) (emphasis added).[3]  In short, a broker-dealer must not only "know the customer," but the broker-dealer must also know the "security."

---

[3] *See also Mac Robbins & Co.*, 41 S.E.C. 116-119 (1962), *Aff'd. Sub. Nom. Berko v. S.E.C.*, 316 F.2d (2d Cir. 1963) ("The making of recommendations to prospective purchasers without a reasonable basis, couched in terms of either opinion or fact, designed to induce purchases, is contrary to the basis obligation of fair dealing borne by those who engage in the sale of securities to the public."); *Alexander Reid & Co.*, 40 S.E.C. 986-990 (1962) (A broker's recommendation must be "responsibly made on the basis of actual knowledge and careful consideration."); *Securities Exchange Act Release No. 6721 (February 2, 1962)* ("the making of recommendations for the purchase of a security implies that the dealer has a reasonable basis for such recommendations, which in turn, requires that, as a prerequisite, he shall have made a

Respondents did not "know" these investments and this investment strategy because it failed to conduct a reasonable investigation ("due diligence") into these high-risk and high commission investments and this investment strategy before recommending these securities and this investment strategy to Claimant.

39.    Respondents failed to disclose to Claimant that Respondents had not conducted a proper due diligence on these investments.

40.    Respondents violated their fiduciary duty to Claimant by handling Claimant's accounts in a manner that benefitted Respondents the most, *i.e.*, maximization of commissions by purchasing high-risk, high-commission and unsuitable investments rather than acting in the best interest of Claimant, making material misrepresentations, failing to disclose material facts, failure to conduct a proper due diligence, and causing transactions and effectuating an investment strategy that were inappropriate for Claimant given his financial position, needs, and investment objectives. Also, the excessive trading was quantitatively unsuitable for Claimant.

41.    FINRA Rule 3010 requires that each member establish and maintain a system to supervise the activities of each registered representative that is reasonably designed to achieve compliance with applicable securities laws and regulations and with the rules of FINRA. It must include written procedures that are established, maintained, and enforced. Respondents did not have an adequate system of supervision, for which Respondent JSC has already been sanctioned by FINRA. There was no system for on-site or off-site supervisory review of representations,

---

reasonable investigation:); *Rice, Recommendations by a Broker-Dealer; the Requirement for a Reasonable Basis*, 25 Mercer L.Rev. 537 (1974) (A broker that does not have a reasonable basis for recommending a particular security cannot satisfy the suitability rule, "since a broker-dealer would have difficulty contending that a recommendation was suitable for a given customer when you lack adequate information about the security involved.")

FILED: NASSAU COUNTY CLERK 06/14/2024 09:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

recommendations, and actions by its registered representatives such as Respondent Maselli, who often worked from home.

42.    Respondents committed numerous violations of FINRA *Rules of Conduct* in handling these transactions with Claimant, including:

A.    FINRA Rules 2010, 2020, 2090, 2111, 2210, 2310 and 2510(b), by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending securities that Respondent did not "know," by recommending transactions that were unsuitable and excessive in view of Claimant's financial situation, needs and investment objectives, by engaging in discretionary trading and using deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

B.    FINRA Rule 3110, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

43.    Respondents' violations of FINRA rules and SEC Regulation Best Interest constituted negligence. As the Fifth Circuit observed in *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. *See Mihara v. Dean Witter & Company, Inc.*, 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.").

FILED: NASSAU COUNTY CLERK 06/14/2024 09:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

44.    Respondents also violated, among others, the following New York statutory provisions, which prohibit:

(a)  Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b)  Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c)  Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, . . . regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

New York General Business Law § 352-c(1).

45.    Respondents' violations of SEC Regulation Best Interest, FINRA rules, New York Administrative Codes constitute negligence *per se* because these rules were enacted for the protection of investors such as Claimant.  See *Baldwin v. GTE South, Inc.*, 439 S.E.2d 108 (N.C. 1994) (wherein the Supreme Court of North Carolina held that "a safety statute or a safety regulation having the force and effect of a statute creates a specific duty for protection of others.  A member of the class intended to be protected by a statute or regulation who suffers harm proximately caused by its violation has a claim against the violator.")  (The Court also cited case law "applying negligence per se analysis used for statutes to regulations having the force and effect of a statute.") Also see *Moss v. J.C. Bradford & Co.*, 446 S.E. 2d 799, 805 (N.C. 1994) (wherein the Supreme Court of North Carolina held that: "The rules of the various exchanges, promulgated as they are with the express Congressional authorization . . . possess the force of law.");

[B]ased on my finding that Plaintiffs are members of the class the Florida securities acts were designed to protect and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their

20

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM        INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                      RECEIVED NYSCEF: 06/14/2024

sixth claim based on negligence *per se*. *See [Palmer v. Shearson Lehman Hutton, Inc.*, 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); *accord [Twiss v. Kury*, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

Prymak v. Contemporary Financial Solutions, Inc., 2007 WL 4250020, at Durando10 (D. Colo. Nov. 29, 2007).

46.    Further, the contracts between Respondents and Claimant include not only securities industry rules and regulations, but also the internal rules and regulations established to govern the conduct of the Respondent firms' agent (Respondent Maselli), such as the internal supervisory procedures and compliance manuals. (*See, e.g.*, *Miller v. Johnston Barney*, Fed. Sec. L. Rpts. CCH ¶ 92,498 (1986) at 93,031.) For example, in *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its Standard Practice Instructions Manual, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. *Montgomery v. Balt. & Ohio R.R.*, 22 F.2d 359 (6th Cir. 1927). *See also* Prosser, The Law of Torts § 33 (4th Ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

*Id.* at 820.

47.    Respondents violated numerous written supervisory procedures and policies in connection with these high-risk and high commission investment recommendations to Claimant.

FILED: NASSAU COUNTY CLERK 06/14/2024 09:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

48.     The acts committed by Respondents as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce. The acts of Respondents and their employees, agents, or representatives as alleged herein are deemed to be the acts of and are chargeable to and binding upon the Respondent firms.

49.     Respondents are directly liable because they participated in, aided, and/or supervised the transactions heretofore mentioned, as well as creating a common enterprise to permit registered representatives to continue to engage in securities fraud. Respondents are also liable under the doctrine of *respondeat superior* and duties to supervise, controlling person, and agency principles for the negligent actions and breach of duty by their agents while in the scope of their employment with the Respondent firms.

50.     Claimant has been greatly damaged as a result of this misconduct. Claimant was saddled with high-risk investments, an improper recommendation to purchase investments on margin that led to thousands of dollars in margin interest, and an unsound investment strategy involving quantitatively unsuitable transactions and commissions and other fees paid totaling almost one million dollars. Claimant seeks the recovery of damages in an amount to be determined by the arbitration panel against Respondent, as well as undisturbed portfolio damages, benefit of the bargain damages, lost opportunity costs, model portfolio damages, and prejudgment interest from Respondent. Claimant's claims include all investments wrongfully sold to Claimant.

51.     Prejudgment interest is an element of damages which is mathematically computed from the date of the purchase. *In re MetLife Demutualization Litigation*. 624 F. Supp. 2d 232, 271 (E.D.N.Y. 2009) (Damages under the securities laws include prejudgment interest.); *Weft, Inc. v. G.C. Investment Assoc.*, 630 F. Supp. 1138, 1144 (E.D.N.C. 1986) ("Plaintiffs are also entitled to interest on the amount paid in exchange for the partnership units from the date of purchase.");

FILED: NASSAU COUNTY CLERK 06/14/2024 09:40 AM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

*Henson v. Morgan Stanley DW Inc.*, 2005 WL 1806426, at Durando6 (M.D. Tenn. 2005) (vacating securities arbitration award that was not issued in accordance with the "mathematical calculation of damages," including prejudgment interest). ***Pre-judgment interest in New York is mandatory at the statutory rate of 9% per annum.*** Under New York law, the application of pre-judgment interest is set forth in CPLR § 5001(a), a copy of which is attached hereto as Exhibit 3, which provides that such interest "shall be recovered" by a prevailing plaintiff in a breach of contract action or in an action involving "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." This latter provision has been interpreted by courts to allow for pre-judgment interest in cases involving malpractice, conversion, breach of fiduciary duty, fraud, and other claims. The legislature's use of the term "shall" in the statute has been found by the courts to make pre-judgment interest mandatory, not discretionary. *See, Spodek v. Park Prop. Dev. Assoc.,* 96 N.Y.2d 577, 581, 733 N.Y.S.2d 674, 676 (2001).

52.    Respondents' failure to conduct a proper due diligence, misrepresentations, omissions and unsuitable recommendations to Claimant were egregious, as were the Respondent firms' supervisory omissions. These acts by the Respondent firms and their agents constituted independent torts for which Claimant seeks recovery. In addition, these acts were done with wanton, reckless disregard of the rights and property of Claimant and Claimant is also entitled to punitive damages in an amount to be determined by the arbitration panel.

53.    Punitive damages are further warranted due to Respondents' *fraudulent concealment* of its misconduct, which constituted independent torts for which Claimant seeks recovery. Respondents failed to disclose the inaccurate and incomplete nature of Maselli's representations, failed to conduct a proper due diligence, and failed to disclose that these securities and this investment strategy were unsuitable for Claimant. ***The Respondent firms and their principals***

*conspired to construct a purported branch office of Respondent VCS which instead was nothing*

*more than a branch office of Respondent JSC.*

54.     Respondents' failure to disclose the inaccurate and incomplete nature of Maselli's

representations, its lack of due diligence, the unsuitable nature of these investment

recommendations and the resulting concentration of Claimant's accounts in high-risk and

unsuitable investments and the Respondent firms' failure to supervise not only warrant punitive

damages but tolls all statutes of limitation periods in view of Respondents' fiduciary relationship

with Claimant and constitutes independent torts for which Claimant seeks recovery.  The Southern

District of Florida made the following statement on the issue of fraudulent concealment in a

fiduciary relationship:

> . . . [T]he law of fraud 'does not require that an aggrieved party have proceeded
> from the outset as though he were dealing with thieves.' *First Federal Savings &
> Loan Assoc. v. Dade Federal Savings & Loan Assoc.*, 403 So.2d 1097, 1100 (5th
> DCA 1981).
>
> The existence of a fiduciary relationship between the Plaintiff and the Defendant,
> and silence on the part of the Defendant when there is a duty to disclose facts, can
> constitute a fraudulent withholding of facts.  Less than full disclosure on the part of
> a Defendant in a fiduciary relationship lawsuit, can be sufficient to establish
> fraudulent concealment.

*Wilder v. Meyer*, 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).  In short, whether a fiduciary

relationship exists, acts of omission (failure to disclose material facts) can constitute fraudulent

concealment.  In short, where a fiduciary relationship exists, acts of omission (failure to disclose

material facts) can constitute fraudulent concealment.  "A breach of a fiduciary duty of disclosure

is tantamount to concealment for limitations purposes." *Dernick Resources, Inc. v. Wilstein*, 312

S.W.3d 864, 878 (Tex.  App.-Houston [1 Dist.] 2009).  Further, the fraudulent concealment cannot

be mitigated by the mere forwarding of a prospectus containing information that contradicts

material representations made orally to investors. *See In Re Robert A. Foster*, Sec. Ex. Rel. No. 34408 (July 20, 1994) ("Broker/dealers and their registered representatives 'owe a special duty of fair dealing to their clients.' The making of misrepresentations runs directly contrary to those fiduciary duties" and can render a broker/dealer liable in private actions "even where the investor has access to a prospectus providing full disclosure.").

55.    A fiduciary relationship of trust and confidence exists between securities brokers and their customers.

> The jury in this case concluded that [the brokerage firm] had . . . violat[ed] . . . both the federal securities law and the Texas common law of fiduciary duty of investment brokers. [T]here is sufficient evidence in the record . . . to support a finding that [the brokerage firm] breached its Texas common law fiduciary duty.

*Miley v. Oppenheimer & Co.*, 637 F.2d 319, 325 (5th Cir. 1981).

> The relationship between a securities broker and its customer is that of principal and agent, and the relationship between agent and principal is a fiduciary relationship. . . . The law imposes upon the broker the duty to disclose to the customer information that is material and relevant to the order.

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir. 1986) (Texas case) (citations and quotation marks omitted).

> [A]    fiduciary relationship existed between the broker-Defendant and Mrs. Spence during her lifetime . . . .
>
> . . . .
>
> What the Defendant overlooks, however, is the fiduciary relation then existing between the parties whereby the Defendant consented as a matter of law to have his conduct measured by the standards of the finer loyalties exacted by Courts of Equity.

*Pace v. McEwen*, 574 S.W.2d 792, 796, 798 (Tex. Ct. Civ. App. 1978).

56.    This can also be seen in *Vucinich v. PaineWebber Jackson & Curtis, Inc. et al*, 803 F.2d 454 (9th Cir. 1986), whether the court held that the fiduciary relationship that exists between

a broker and his customer imposes upon the broker the duty to monitor the customer's accounts and affirmatively advise the client as to any changed circumstances. The Court found that the broker's representations regarding monitoring of a customer's accounts tolled the running of the statute of limitations [e.g., the prescription period] until such time as the broker fulfilled his obligation to advise the customer regarding matters relevant to possible misrepresentations. (Citing *Twomey v. Mitchum, Jones, & Templeton, Inc.*, 262 Cal. App. 2d 690 727-729, 69 Cal. Rptr. 222 (1968). Further, the fraudulent concealment cannot be mitigated by the mere forwarding of a prospectus containing information that contradicts material representations made orally to investors. *Luksch et al. v. Latham*, 675 F. Supp. 1168 (N.D. Cal. 1987).

57.     Numerous other courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. *See Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); *Moholt v. Dean Witter Reynolds, Inc.*, 478 F. Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); *Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 444 F. Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); *Jaksich v. Thomson*

FILED: NASSAU COUNTY CLERK 06/14/2024 09:50 AM          INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                        RECEIVED NYSCEF: 06/14/2024

*McKinnon Securities, Inc.*, 582 F. Supp. 485 (S.D.N.Y. 1984) (under New York law, securities

brokers maintain fiduciary duties to their customers, and relationship between the two parties is one

of principal and agent); *Utah State University of Agriculture and Applied Science v. Sutro & Co.*,

646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the

authority of a trustee dealing with public funds); *E.F. Hutton & Co. v. Weeks*, 166 Ga.App. 443,

304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in

obligation to exercise the utmost good faith).

58.     All limitations periods are tolled under the legal doctrines of accrual, continuous

treatment, continuous representation, and continuing wrong.[4]  *See, e.g., Keller v. Reed*, 603 So.2d

717, 719 (Fla. 2d DCA 1992) (accrual); *Hall v. Steiner*, 543 N.Y.S.2d 190 (N.Y. App. Div.

1989) (continuous treatment); *Wilder v. Meyer*, 779 F. Supp. 164 (S.D. Fla. 1991) (continuous

representation); and *Newport Largo, Inc. v. Monroe County*, 706 F. Supp. 1507 (S.D. Fla. 1988)

(continuing wrong). Further, all limitations periods are tolled under the doctrine of "blameless

ignorance" or "*contra non valentem agere nulla currit praescriptio*." This doctrine stops the

running of the limitations period when the cause of action is not known or reasonably knowable by

Claimant even if his ignorance was not induced by Respondent. Stated simply, Claimant did not

comprehend that he had been sold high-risk and unsuitable investments as part of an unsound

investment strategy and that his legal rights had thus been violated.

59.     In *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 332 (5th Cir. 1981), the Fifth

Circuit cited the following passage from Goldberg's book entitled *Fraudulent-Dealer Practices* in

support of awarding punitive damages that is very appropriate in this case:

---

[4] Statutes of limitation of course only apply in civil actions, not arbitration proceedings.

FILED: NASSAU COUNTY CLERK 06/14/2024 03:07 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage. And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty. If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even. No wonder one commentator saw fit to term the average recovery in trading cases as creating for the broker-dealer a "low risk larceny."

. . . [T]he only sure way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable, and well within the public interest.

*The Arbitrator's Manual* states the following in a quote from Aristotle:

Equity is justice in that it goes beyond the written law. And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reason why arbitrators were appointed was that equity might prevail.

Claimant seeks relief in equity, including restitution, rescission, specific performance, and any other equitable relief which this Panel deems appropriate.

## COUNT I

## VIOLATIONS OF FEDERAL SECURITIES LAWS

60.    Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 59 above, as if fully contained herein.

61.    The investments sold to Claimant and described in paragraphs 1 through 61 above were securities as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

62.    Under Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, Respondent was a controlling person over the conduct described in paragraphs 1 through 62 above.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM     INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                        RECEIVED NYSCEF: 06/14/2024

**Fraud in Offer or Sale of Securities**

63.     Respondents, by engaging in the conduct described in paragraphs 1 through 62 above, directly, indirectly, or through persons it controlled, offered to sell or sold securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

64.     By reason of the foregoing, Respondents directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(2), 77*o*.

**Fraud in Connection With the Purchase or Sale of Securities**

65.     Respondents, by engaging in the conduct described in paragraphs 1 through 64 above, directly, indirectly, or through persons they controlled, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

(a)     Employed devices, schemes. or artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.    By reason of the foregoing, Respondents directly, indirectly, or through persons they controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (based on their intentional scheme to defraud), as well as Section 17(a) of the Exchange Act Based on their negligent scheme to defraud).

**WHEREFORE,** Claimant requests this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, attorneys' fees, costs, punitive damages, and such other relief as is deemed proper and necessary.

<u>COUNT II</u>

**VIOLATION OF NEW YORK CONSUMER
PROTECTION ACT -- N.Y. GEN. BUS. LAW § 349**

67.    Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 66 above, as if fully contained herein.

68.    Respondent, by engaging in the conduct previously described, was engaged in a deceptive practice that affected the public interest and had a broad impact on consumers at large. These material deceptive acts or practices were consumer-oriented and directed to consumers and caused actual harm.

69.    The deceptive conduct engaged in by Respondents as previously described, was misleading in material respects and from which conduct Claimant was injured.

70.    Claimant has a private right of action to redress the deceptive act or practices

outlined above pursuant to N.Y. Gen. Bus. Law § 349. (*See Scalp & Blade, Inc., et al. v. Advest,*

*Inc.*, 722 N.Y.S.2d 639, 640-41 (March 21, 2001), wherein the court held:

> Given the statute's explicit prohibition of "deceptive acts or practices in the
> furnishing of any service" (General Business Law § 349[a]), and given the Court of
> Appeals' characterization of the statute as "applying to virtually all economic
> activity" (*Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55), we see no basis for
> invoking any blanket exception under the statute for securities transactions (*see,*
> *Breakwaters Town Homes Assn. of Buffalo v. Breakwaters of Buffalo*, 207 A.D.2d
> 963, 616 N.Y.S.2d 829) or for limiting the statute's applicability to the sale of
> "goods."

71.    More recently, both the New York Court of Appeals and the Second Circuit both

supported the reasoning of the Court in *Scalp & Blade, supra,* to uphold the expansive applicability

of GBL § 349 to insurance companies despite pervasive regulation of insurance by the Department

of Financial Services. *In Riordan v. Nationwide Mut. Fire Inc. Co.,* 977 F.2d 47, 51 (2d Cir.

1992), the Court held that not applying GBL § 349 "ignores the plain language of GBL § 349(g),

which states that '[t]his section shall apply to all deceptive acts or practices declared to be unlawful,

whether or not subject to any other law of this state.'" The Court of Appeals also agreed with this

holding in *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308,321 (1995). Recently, in *Hobish v.*

*AXA Equit. Life Ins. Co.,* 2018 N.Y. Slip Op. 3153 1 (U), the Court denied a defendant's motion to

dismiss a GBL § 349 claim. The product in question was a universal life policy – a security. Both

the plain language of the statute and the holdings of the highest courts in New York State, the New

York Court of Appeals and the Second Circuit, confirm that GBL § 349 does indeed apply to

deceptive acts and practices in securities transactions, and deceptive trade practices engaged in by

the Respondents as described above that affect a wide class of investors, including the Claimant in

this arbitration.

72.     Claimant has been obligated to pay reasonable attorneys' fees in conjunction with

this litigation and is entitled to an award of reasonable attorneys' fees pursuant to N.Y. Gen. Bus.

Law § 349(h) and for recovery of damages.

**WHEREFORE**, Claimant prays for statutory recovery of damages plus interest plus

reasonable attorneys' fees and punitive damages in an amount to be determined by the arbitrators.

## COUNT III

## BREACH OF CONTRACT

73.     Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 72 above as

if fully contained herein.

74.     The contractual relationships which were entered into between Claimant and

Respondents incorporate by reference a brokerage house's duty to comply with all laws, rules, and

regulations governing the transactions between Respondents and Claimant.  It must be emphasized

that Respondents fraudulently induced Claimant to enter into this contractual relationship by,

among other things, the false representations and non-disclosures of material facts by Durando that

are itemized in this Statement of Claim.

75.     Respondents committed numerous violations of FINRA Rules of Conduct in

handling these transactions with Claimant, including:

A.     FINRA Rules 2010, 2020, 2090, 2111. 2210, 2310 and 2510(b), by engaging
       in conduct inconsistent with high standards of commercial honor and just
       and equitable principles of trade, by failing to conduct a reasonable and
       proper due diligence investigation, by recommending securities that
       Respondents did not "know," by recommending transactions that were
       unsuitable and excessive in view of Claimant's financial situation, needs and
       investment objectives, by engaging in discretionary trading and using

deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

B.     FINRA Rule 3110, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

76.     These infractions breached the contractual relationship between Claimant and Respondent, which incorporated a brokerage firm's duty to comply with the industry rules, customs and procedures governing the transactions with Claimant. "[W]e note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker." *Brumm v. McDonald & Co. Sec.*, 603 N.E.2d 1141, 1147 (Ohio Ct. App. 1992) (citations omitted); *Iowa Grain v. Farmers Grain and Feed*, 293 N.W.2d 22 (Iowa 1980); *White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 218 A.2d 655 (N.J. Super. Ct. 1966). *See also Midwest Television v. Scott, Lancaster, Mills & Atha*, 252 Cal. Rptr. 573, 579 (Cal. Ct. App. 1988) ("The industry practice becomes a part of the contract, and the evidence of such custom is admissible. . . .")

77.     Respondents also violated Regulation Best Interest which went into effect June 30, 2020:

- Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account;

- Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the dealer.

- Effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or fraudulent device, practice, plan, program, design or contrivance.

33

FILED: NASSAU COUNTY CLERK 06/14/2024 10:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

- Using any advertising or sales presentation in such a fashion as to be deceptive or misleading. An example of such practice would be a distribution of any non-factual data, material or presentation based on conjecture, unfounded or unrealistic claims or assertions in any brochure, flyer, or display by words, pictures, graphs or otherwise designed to supplement, detract from, supersede or defeat the purpose or effect of any prospectus or disclosure.

91.    Respondents also violated, among others, the following New York statutory provisions, which prohibit:

(a)    Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b)    Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c)    Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or

(iv) did not have knowledge concerning the representation or statement made;

where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, . . . regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

New York General Business Law § 352-c(1).

78.    The contracts between Respondents and Claimant are further defined by the internal rules and regulations established to govern the conduct of Respondents' own employees, such as internal supervisory procedures and compliance manuals. (*See, e.g., Miller v. Smith Barney*, Fed. Sec. L. Rpts. CCH ¶92,498 (1986) at 93,031.) ("The relations between [brokerage firm and customer] were not defined solely in terms of the joint agreement, but also . . . by the internal rules and regulations established to 'govern the conduct of [the firm's] own employees'"). For example, in *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F. 2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied

FILED: NASSAU COUNTY CLERK 06/14/2024 10:30 PM       INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

on Bache's internal rules, as codified in its *Standard Practice Instructions Manual*, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. *Montgomery v. Balt & Ohio R.R.*, 22 F.2d 359 (6th Cir. 1927). *See also* Prosser, *The Law of Torts* §33 (4th ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

*Id.* at 820.

79.     Respondents violated many of their own internal rules and procedures in handling these transactions with Claimant.

80.     Respondents also violated the duty of commercial reasonableness, fair dealing, and good faith, required of all parties to a contract. "Hornbook Law implies a covenant of good faith and fair dealing into the performance and enforcement of every contract.  [G]ood faith is part of every contract " *First Texas Sav. Ass'n v. Comprop Inv. Properties*, 752 F. Supp. 1568, 1573 (M.D. Fla. 1990); *Burger King Corp. v. Austin*, 805 F. Supp. 1007 (S.D. Fla. 1992). This covenant of fair dealing is particularly demanding for stockbrokers and brokerage firms, who are expert fiduciaries of their customers, who obtain their commissions only after advising and inducing customer investments, and who are thereby subject to an inherent conflict of interest.

> [P]etitioner acted simultaneously in the dual capacity of investment advisor and of broker and dealer. In such capacity, conflicting interests must necessarily arise. When they arise, the law has consistently stepped in to provide safeguards in the form of prescribed and stringent standards of conduct on the part of the fiduciary.

*Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949).

81.     The duty of good faith and fair dealing required Respondents to do what the contract presupposed would be done to accomplish their purpose and to protect the contracting parties'

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                        RECEIVED NYSCEF: 06/14/2024

reasonable expectations. It presupposed that Respondents would comply with applicable industry and governmental rules, provide all necessary information to Claimant, and act reasonably and in good faith to recommend suitable investments for Claimant in light of Claimant's financial circumstances and needs. Respondents violated this duty by putting their own interests first, not complying with industry rules, recommending wholly unsuitable investments to Claimant, and misrepresenting, concealing and not supplying material information. Claimant suffered damages from these breaches of duty and is entitled to recompense.

82.    Respondents' infractions breached their written contracts with FINRA to follow securities laws and FINRA rules. As a condition of Respondents' FINRA membership applications pursuant to Article III, Section 1 of FINRA By-Laws, Respondents contracted with FINRA to comply with all FINRA rules, federal securities laws, and federal securities rules and regulations in the handling of customer accounts.

83.    Defrauded customers such as Claimant are intended third-party beneficiaries of Respondents' agreements with FINRA to comply with securities laws and regulations and FINRA rules. Claimant is entitled to redress for Respondents' breaches of these contracts. *Oppenheimer & Co. v. Neidhardt*, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶98,224 (S.D.N.Y. May 4, 1994) (customers are third-party beneficiaries of brokerage firm's obligation to follow FINRA rules); *Creative Sec. v. Bear Stearns & Co.*, 671 F. Supp. 961, 966 (S.D.N.Y. 1987) ("Many courts recognize that securities exchange members are contractually bound by the regulations of their organizations."); *Axelrod & Co. v. Kordich, Victor & Neufeld*, 451 F.2d 828, 841 (2d Cir. 1971) ("Each member firm, by virtue of its admission, agrees to be governed by the Exchange's constitution and rules. When a transaction of purchase and sale of any security is effected, the

FILED: NASSAU COUNTY CLERK 06/14/2024 04:10 PM   INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                                      RECEIVED NYSCEF: 06/14/2024

contract is subject to all the provisions of the Exchange's constitution and rules. . . . These provisions are binding on exchange members.")

84.     Respondents' failure to comply with the contracts between the parties and with the laws, rules, and regulations governing the contracts between the parties, was intentional or reckless and was done in willful and wanton disregard of Claimant's rights. All of Respondents' actions and omissions were done solely for the purpose of generating commissions, and as such is conduct for which the Respondents should be punished.

**WHEREFORE**, Claimant requests this panel to enter an award for actual and rescissionary damages together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT IV

## COMMON LAW FRAUD

85.     Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 84 above, as if fully contained herein.

86.     All of the misrepresentations and omissions of Respondents were done with the intent to mislead Claimant and with the specific intent to have Claimant rely on said misrepresentations and omissions. At a minimum, the misrepresentations were done recklessly, without knowledge of their truth or falsity. Claimant did rely thereon and made investments to his detriment causing substantial losses.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                           RECEIVED NYSCEF: 06/14/2024

87. Further, Respondents' misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

88. The fraud, the misrepresentations, and the omissions claims are quasi-contractual in re and arose from and are implied from the contractual relationship between Claimant and Respondents. This claim also arose independently from the contractual relationship between Claimant and Respondents.

**WHEREFORE**, Claimant requests this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT V

## BREACH OF FIDUCIARY DUTY

89. Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 88 above, as if fully contained herein.

90. At all times relevant hereto, there existed between the Respondents and Claimant a fiduciary relationship by reason that:

(a) The Respondents at all times possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to Claimant's lack of meaningful knowledge and understanding in that Claimant could not fully appreciate the substantial risk to which his monies were exposed; and

38

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                                     RECEIVED NYSCEF: 06/14/2024

    (b)    The Respondents at all times had access to the books, records, and other sources of information concerning the financial and operating condition, rules, and policies of the Respondent, FINRA, and the State Statutes and Administrative Codes. This information was not readily accessible to Claimant; and

    (c)    Maselli, at all times while handling Claimant's monies, was an experienced account executive acting within the scope of his employment and authority and apparent authority with Respondents.

91.    This fiduciary duty arose from and is implied from the contractual relationship between Claimant and Respondents. This fiduciary duty also arose independently from the contractual relationship between Claimant and Respondents.

92.    Because of the Respondents' superior knowledge, skill, judgment, and experience in the securities market, the Respondents owed to Claimant a duty to recommend suitable investments, to disclose all material facts, and to refrain from misleading Claimant. Further, the Respondents owed this fiduciary duty to protect and further Claimant's interests over and above their desire to generate commissions through the transactions with Claimant and to promote their own interests. Respondents specifically had a duty by virtue of this fiduciary relationship with Claimant to conduct a proper due diligence, to supervise Respondents' recommendations and representations, and to disclose to Claimant that Respondents' representations to Claimant concerning these investments were incomplete and inaccurate and that JCS was not properly supervising Maselli.

93.    A special relationship of trust and confidence exists between a securities salesman and his customer. Numerous courts around the country have recognized the fiduciary duty that

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                              RECEIVED NYSCEF: 06/14/2024

stockbrokers owe to their clients. *See Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes his customer a high degree of care in transacting business); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); *Moholt v. Dean Witter Reynolds, Inc.*, 478 F. Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); *Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 444 F. Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker whether broker, for all practical purposes, controls the account); *Jaksich v. Thomson McKinnon Securities, Inc.*, 582 F. Supp. 485 (S.D.N.Y. 1984) (under Georgia law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); *Utah State University of Agriculture and Applied Science v. Sutro & Co.*, 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); *E.F. Hutton & Co. v. Weeks*, 166 Ga.App. 443, 304 S.E. 2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

94.     Because of the fiduciary relationship between Claimant and the Respondent, Claimant reasonably relied to his detriment on the Respondents' superior knowledge, skill, judgment, and experience in handling his monies.

95.    Respondents knowingly and deliberately breached their fiduciary duty to Claimant by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and investing in high-risk securities in total disregard for Claimant's best interests, solely for the purpose of enriching and protecting the Respondent, and concealing the unsuitable nature of these transactions by not making the requisite disclosures to Claimant. The Respondents' disregard and violation of the rules of the SEC and FINRA governing their conduct and the conduct of Respondents' agents and employees constitutes a breach of fiduciary duty to Claimant.

96.    Respondents also breached their fiduciary duty by failing to ensure compliance with all applicable state statutes and rules, including those relating to misrepresentations and omissions in the sale of a security and suitability.

97.    The acts committed by Respondent, as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce. Respondents are jointly and severally liable because they participated in, supervised, or approved the previously noted transactions. In addition, the Respondent firms are jointly and severally liable under the principles of supervisory duties, agency, controlling person and *respondeat superior* for the damage caused to Claimant by its breach of fiduciary duty. The acts of the Respondent firms, and each employee, agent, or representative are deemed to be the acts of and are chargeable to and binding upon Respondents.

> a brokerage firm owes a high duty to its customers than to other employers. The implicit reasoning . . . that brokers have a higher duty public duty under the securities laws than do other persons leads to imposition of a duty to exercise a high standard of supervision. This duty is enforceable through imposition of secondary liability based on respondeat superior.

*Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 (3d Cir. 1981).

98.     Respondents' breach of their fiduciary duty to Claimant constitutes conduct for which the Respondents deserves to be punished to deter Respondents from engaging in the same or similar conduct in the future.

**WHEREFORE**, Claimant requests this panel to enter an award for actual damages together with benefit of the bargain damages, rescissionary damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT VI

## NEGLIGENCE AND GROSS NEGLIGENCE

99.     Claimant realleges, reaffirms, and reincorporates paragraphs 1 through 98 above, as if fully contained herein.

Respondent, by virtue of their position as Claimant's broker-dealer and agent, their professional skill and ability, the level of confidence and care imposed upon other broker dealers and brokers in similar positions, and their fiduciary obligations owed to Claimant due care. The industry standard of care is set forth by FINRA, the SEC rules, the State Acts and Administrative Codes, and the firm's own internal guidelines. The Respondents' violations of FINRA Rules constitute negligence. As the Fifth Circuit observed in *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. *See Mihara v. Dean Witter & Company, Inc.*, 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of

42

testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules

and regulations to some sort of standard. The admission of testimony relating to those rules was

proper precisely because the rules reflect the standard to which all brokers are held.")

    100.    Respondents also violated, among others, the following New York statutory

provisions, which prohibit:

> (a)    Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (b)    Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (c)    Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or
>
> (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, . . . regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

New York General Business Law § 352-c(1).

    101.    Respondents' violations of New York statutes and rules constitute negligence *per se*

because these states and rules were enacted for the protection of investors such as Claimant.

> [B]    ased on my finding that Plaintiffs are members of the class the Florida securities acts were designed to protect and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. *See [Palmer v. Shearson Lehman Hutton, Inc.*, 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); *accord [Twiss v. Kury*, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

*Prymak v. Contemporary Financial Solutions, Inc.,* 2007 WL 4250020, at Durando10 (D. Colo. Nov. 29. 2007).

102.    The Respondent firms had supervisory duties over Maselli, and failed to diligently and properly supervise their officers, employees, and agents.

103.    Maselli was at all times material hereto acting within the scope of his employment with Respondents and Respondents are also liable under principles of *respondeat superior*, as a licensing, controlling person and agency.

104.    Respondents' conduct, as set forth in previous Counts, is a breach of their duty to Claimant.

105.    The Respondent firms breached their duty to Claimant by failing to provide sufficient control and supervision over their officers, employees, agents, and registered representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-regulatory organization policies, and procedures.

106.    Respondents' actions as set forth above constitute both negligence and gross negligence.

107.    As a result of the Respondents' conduct as set forth above, Claimant has suffered damages.

108.    The Respondents' conduct as set forth above proximately caused Claimant's damages.

**WHEREFORE**, Claimant has been greatly damaged as a result of Respondents' misconduct. Instead of receiving reasonable recommendations consistent with the needs and circumstances of a retired and disabled investor, Claimant was saddled with high risk, unsuitable

FILED: NASSAU COUNTY CLERK 06/14/2024 04:30 PM          INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                        RECEIVED NYSCEF: 06/14/2024

investments, and shenanigans described hereinbefore that could only be characterized as depravity. Claimant seeks the recovery of damages in an amount to be determined by the arbitration Panel, believed to be approximately $500,000,[5] as well as bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, and punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

Dated:  September 12, 2023

Respectfully submitted,

Charles M. O'Rourke, Esq.
Attorney for Claimant
2 Swenson Drive
Woodbury, NY 11797
cor@corlawyer.com
516-677-9785

---

[5] Claimant reserves the right to adjust the damages sought after he has received a full set of monthly account statements, trade confirmations, and commission statements in discovery.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 06/14/2024

# EXHIBIT 1

FILED: NASSAU COUNTY CLERK 06/14/2024 11:57 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                                    RECEIVED NYSCEF: 06/14/2024

# FINANCIAL INDUSTRY REGULATORY AUTHORITY
## LETTER OF ACCEPTANCE, WAIVER, AND CONSENT
### NO. 2019063821607

TO:    Department of Enforcement
        Financial Industry Regulatory Authority (FINRA)

RE:    Joseph Stone Capital L.L.C. (Respondent)
        Member Firm
        CRD No. 159744

Pursuant to FINRA Rule 9216, Respondent Joseph Stone Capital, L.L.C. submits this Letter of Acceptance, Waiver, and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondent alleging violations based on the same factual findings described in this AWC.

## I.

## ACCEPTANCE AND CONSENT

A.    Respondent accepts and consents to the following findings by FINRA without admitting or denying them:

### BACKGROUND

Joseph Stone has been a FINRA member since February 2013. The firm, which has its headquarters in Mineola, New York, has 35 registered representatives working out of four branch offices, primarily in the New York metropolitan area.[1]

### OVERVIEW

From January 2015 through June 2020, Joseph Stone failed to establish, maintain, and enforce a supervisory system, including written supervisory procedures (WSPs), reasonably designed to achieve compliance with the suitability requirements of FINRA Rule 2111 as they pertain to excessive trading. As a result, Joseph Stone failed to identify or reasonably respond to red flags of excessive trading in 25 customer accounts that caused the customers to pay more than $1,037,000 in commissions, fees, and margin interest. By this conduct, Joseph Stone violated FINRA Rules 3110(a) and (b) and FINRA Rule 2010.

---

[1] For more information about the firm, including prior regulatory events, visit BrokerCheck® at www.finra.org/brokercheck.

## FACTS AND VIOLATIVE CONDUCT

### A.    The Applicable Rules

FINRA Rule 3110(a) requires that member firms "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." FINRA Rule 3110(b) requires that each FINRA member "establish, maintain, and enforce written procedures to supervise the types of business in which it engages, and the activities of its associated persons that are reasonably designed to achieve compliance with the applicable securities laws and regulations, and with applicable FINRA Rules." To comply with these obligations, a firm must reasonably investigate red flags of potential misconduct and take appropriate action when misconduct has occurred. A violation of FINRA Rule 3110 also constitutes a violation of FINRA Rule 2010, which requires that member firms "observe high standards of commercial honor and just and equitable principles of trade" in the conduct of their business.

FINRA Rule 2111 requires that member firms and their associated persons "have a reasonable basis to believe that a recommended securities transaction or investment strategy involving a security or securities is suitable for the customer, based on information obtained through the reasonable diligence of the firm or associated person to ascertain the customer's investment profile." The rule imposes a "quantitative suitability" obligation that requires a member or associated person who has actual or de facto control over a customer account to have a reasonable basis for believing that a series of recommended securities transactions are not excessive and unsuitable for the customer when taken together in light of the customer's investment profile.

FINRA Rule 2111 Supplementary Material .05 (Rule 2111.05) states that "[n]o single test defines excessive activity, but factors such as the turnover rate, the cost-to-equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding that a member or associated person has violated the quantitative suitability obligation."

Turnover rate represents the number of times that a portfolio of securities is exchanged for another portfolio of securities. The cost-to-equity ratio measures the amount an account must appreciate just to cover commissions and other expenses. In other words, it is the break-even point where a customer may begin to see a return. A turnover rate above six or a cost-to-equity ratio above 20 percent generally indicates that an account has been excessively traded.

### B.    Joseph Stone failed to establish and maintain a supervisory system, and failed to establish, maintain, and enforce WSPs, that were reasonably designed to achieve compliance with FINRA's suitability rule.

From January 2015 through June 2020, Joseph Stone's WSPs did not provide reasonable guidance about how to identify accounts that were being excessively traded. The WSPs directed that one of the firm's principals review "actively traded accounts" by

2

considering "a calculation of Year to Date Cost Over Equity Ratio [in a customer's account] . . . as well as the number of trades in a time period (quarterly & Year to Date) and the client's [investment] objectives, risk tolerance, [and] experience as well as any other criteria deemed applicable by the reviewer." However, the WSPs did not provide guidance about how to apply those factors to identify accounts that were being excessively traded. For example, the WSPs did not identify what cost-to-equity ratio or turnover rate should trigger a further review until May 2019, when the firm revised its WSPs to reflect that a cost-to-equity ratio of greater than 20 percent or a turnover rate of six or more would be considered red flags of excessive trading that might require further action as the facts and circumstances dictate. Moreover, the WSPs did not provide reasonable guidance about what steps supervisors should take after identifying an account that was being excessively traded. For example, although the WSPs stated that supervisors should consider contacting customers with actively traded accounts, the WSPs did not provide guidance on when such contact was recommended. The WSPs also did not specify whether, or in what circumstances, supervisors at the firm should consider restricting the commissions that could be charged in a customer's account.

Additionally, during the same period, Joseph Stone's system for identifying excessively traded accounts was not reasonably designed. During the relevant period, Joseph Stone received exception reports through an online portal created by the firm's clearing firm, including an "active account report" that flagged accounts with high commission-to-equity ratios. However, prior to November 2017, the firm did not require the designated principal responsible for reviewing actively traded accounts to regularly review the active account reports. Instead, the designated principal attempted to identify excessively traded accounts based on his own manual calculations, which compared the commissions charged in an account to the account's current value, rather than its average net equity, and which often understated the cost-to-equity ratio.[2]

As a result of this manual review, the firm failed on numerous occasions to identify accounts that had red flags of excessive trading, including accounts with cost-to-equity ratios greater than 20 percent. For example:

*   Joseph Stone received an active account report dated October 31, 2017, that showed Customer A had been charged more than $12,000 in commissions in the 10 months since the account was opened, resulting in a cost-to-equity ratio of more than 27 percent. The firm's designated principal did not review that report, and the firm principal instead erroneously calculated the account's cost-to-equity ratio as 14 percent. Because Joseph Stone failed to identify the excessive trading in Customer A's account, the firm did not take any steps to address it. Customer A was thereafter charged more than $10,000 in additional commissions until April 2018, when Customer A closed his account. Over the life of the account, the recommended trades

---

[2] In a separate AWC with FINRA, the principal at the firm responsible for reviewing actively traded accounts consented to findings that he failed to reasonably supervise customer accounts for potentially excessive trading, in violation of FINRA Rules 3110 and 2010. As part of the settlement, the principal consented to sanctions including a five-month suspension in all principal capacities, a $5,000 fine, and 20 hours of continuing education.

in Customer A's account resulted in an annualized cost-to-equity ratio of more than 44 percent and an annualized turnover rate of more than 13.

* Joseph Stone received an active account report dated April 30, 2016, that showed Customer B had been charged more than $4,000 in commissions in the three months since the account was opened, resulting in a cost-to-equity ratio of more than 21 percent. Joseph Stone's designated principal for reviewing actively traded accounts did not review this report and did not review trading in Customer B's account at all until December 2016, at which point the firm imposed a commission restriction on the account. By that time, however, Customer B had been charged over $19,000 in commissions in the ten months the account had been open, resulting in a cost-to-equity ratio in excess of 77 percent. Over the life of the account, the recommended trades in Customer B's account resulted in an annualized cost-to-equity ratio of more than 74 percent and an annualized turnover rate of more than 17.

Joseph Stone's system for responding to red flags of excessive trading also was unreasonable, both before and after the firm began using exception reports in November 2017 to identify excessively traded accounts. When Joseph Stone identified an account with red flags of excessive trading, the designated principal for reviewing actively traded accounts frequently restricted the commissions that the firm's representatives could charge the account going forward. However, the commission restrictions, in a number of instances, did not become effective until a month after the firm determined they were necessary, which allowed representatives to continue charging unrestricted commissions after the firm had determined that commissions should be restricted. In addition, the restrictions did not limit the number or frequency of trades or aggregate costs and commissions that could be charged to the affected accounts. As a result, after a restriction was in effect limiting the amount of commissions that could be charged for each individual trade, representatives were not prevented from placing more frequent trades in a customer's account, thus earning commissions on a higher number of trades. The firm also did not restrict commissions on certain trades where the customer made a realized gain, irrespective of the account's overall performance or the overall amount of commissions that had been charged. As a result, Joseph Stone customers were charged thousands of dollars in commissions even after their accounts had been flagged for excessive trading.

For example, in December 2016, Joseph Stone restricted the commissions that could be charged on trades in Customer C's account to a maximum of 1.5 percent on any purchase and no commission on any sale that resulted in a realized loss. At that time, the customer's cost-to-equity ratio was 20 percent for the six months the account had been open. Although the firm imposed progressively more stringent restrictions on the commissions Customer C could be charged on purchases, the firm never restricted the commissions that Customer C's representative could charge on sales that resulted in a realized gain. Between January 2017 and November 2019, Customer C was charged over $70,000 in commissions, primarily on individual sales where the customer realized a gain. Notwithstanding the commission restrictions imposed, the recommended trades in Customer C's account resulted in an annualized cost-to-equity ratio of more than 34 percent over the life of the account.

4

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                        RECEIVED NYSCEF: 06/14/2024

Finally, Joseph Stone did not have a reasonable system for enforcing the commission restrictions that it imposed or keeping track of what restrictions had been imposed. In fact, the firm lacked any automated system for enforcing commission restrictions that the designated principal had imposed, and instead relied on branch managers to monitor commission restrictions by reviewing trade blotters. On several occasions, the firm's representatives charged commissions that substantially exceeded restrictions the firm imposed.

As a result of these supervisory failures, Joseph Stone failed to identify or address red flags of excessive trading in 28 customer accounts handled by 15 registered representatives. The trades recommended in such accounts resulted in annualized turnover rates ranging from 6 to 57 and annualized cost-to-equity ratios ranging from 21 percent to 96 percent, making it unlikely that the customers' accounts would reach their break-even points or earn a positive return. Collectively, the trading caused the customers to pay over $1 million in commissions, fees, and margin interest.

By this conduct, Respondent violated FINRA Rules 3110(a) and (b) and FINRA Rule 2010.

B.    Respondent also consents to the imposition of the following sanctions:[3]

- a censure;

- restitution of $825,607.59;[4]

- an undertaking that within 90 days of notice that this AWC has been accepted, a registered principal of Respondent shall certify in writing to Kerry Land, Senior Counsel, FINRA Department of Enforcement, Brookfield Place, 200 Liberty Street, 11th Floor, New York, NY 10281 (kerry.land@finra.org), that the firm has implemented a reasonable heightened supervision plan for the five registered representatives who are still associated with the firm and had customers who are the subject of this AWC and will maintain the plan for a period of no less than two years;[5] and

---

[3] Pursuant to the General Principles Applicable to all Sanction Determinations contained in the *Sanction Guidelines*, FINRA imposed no fine against the firm or pre-judgment interest on the restitution ordered in this case after it considered, among other things, the firm's revenues and financial resources, as well as its agreement to pay full restitution to the affected customers. *See* Notice to Members 06-55.

[4] Certain Joseph Stone registered representatives have already paid restitution in the amount of $211,487.71 to customers pursuant to other AWCs connected to this matter. This AWC orders restitution in the amount of $825,607.59, which includes the total costs (commissions, fees, and margin interest) paid by customers whose accounts were excessively traded ($1,037,095.30) minus the restitution already paid pursuant to other AWCs connected to this matter.

[5] Heightened supervision is ordered for the five representatives who remain registered through Joseph Stone and who handled certain of the customer accounts that are the subject of this AWC. The registered representatives are identified in Attachment B.

• an undertaking that within 90 days of notice that this AWC has been accepted, a registered principal of Respondent shall certify in writing to Kerry Land, Senior Counsel, FINRA Department of Enforcement, Brookfield Place, 200 Liberty Street, 11th Floor, New York, NY 10281 (kerry.land@finra.org), that the firm has adopted and implemented policies, procedures, and systems to address the violations described above, including identifying and responding to red flags of potentially excessive trading.

Restitution is ordered to be paid to the customers designated on Attachment A to this AWC in the total amount of $825,607.59;

A registered principal on behalf of Respondent shall submit satisfactory proof of payment of restitution (separately specifying the date and amount paid to each customer designated on Attachment A) or of reasonable and documented efforts undertaken to effect restitution. Such proof shall be submitted by email to EnforcementNotice@FINRA.org from a work-related account of the registered principal of Respondent. The email must identify Respondent and the case number and include a copy of the check, money order, or other method of payment. This proof shall be provided by email to EnforcementNotice@FINRA.org no later than 120 days after the date of the notice of acceptance of the AWC.

If for any reason Respondent cannot locate any customer identified in Attachment A after reasonable and documented efforts within 120 days after the date of the notice of acceptance of the AWC, or such additional period agreed to by FINRA in writing, Respondent shall forward any undistributed restitution to the appropriate escheat, unclaimed property, or abandoned property fund for the state in which the customer is last known to have resided. Respondent shall provide satisfactory proof of such action to FINRA in the manner described above, within 14 calendar days of forwarding the undistributed restitution to the appropriate state authority.

Respondent specifically and voluntarily waives any right to claim an inability to pay, now or at any time after the execution of this AWC, the monetary sanction imposed in this matter.

The imposition of a restitution order or any other monetary sanction in this AWC, and the timing of such ordered payments, does not preclude customers from pursuing their own actions to obtain restitution or other remedies.

Restitution payments to customers shall be preceded or accompanied by a letter, not unacceptable to FINRA, describing the reason for the payment and the fact that the payment is being made pursuant to a settlement with FINRA and as a term of this AWC.

Respondent has demonstrated a limited ability to pay. In light of Respondent's financial status, the sanctions do not include a monetary fine or pre-judgment interest on the restitution ordered.

The sanctions imposed in this AWC shall be effective on a date set by FINRA.

II.

6

FILED: NASSAU COUNTY CLERK 06/14/2024 01:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                         RECEIVED NYSCEF: 06/14/2024

## WAIVER OF PROCEDURAL RIGHTS

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.   To have a complaint issued specifying the allegations against it;

B.   To be notified of the complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made, and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council (NAC) and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

Respondent understands that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

C.   If accepted:

1.    this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future action brought by FINRA or any other regulator against Respondent;

2.    this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.    FINRA may make a public announcement concerning this agreement and its subject matter in accordance with FINRA Rule 8313; and

4.    Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party. Nothing in this provision affects Respondent's testimonial obligations in any litigation or other legal proceedings.

D.    Respondent may attach a corrective action statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this statement. This statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA.

8

J00210023123070324

FILED: NASSAU COUNTY CLERK 06/14/2024 11:47 PM

NYSCEF DOC. NO. 3

INDEX NO. 610488/2024

RECEIVED NYSCEF: 06/14/2024

The undersigned, on behalf of Respondent, certifies that a person duly authorized to act on Respondent's behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that Respondent has agreed to the AWC's provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth in this AWC and the prospect of avoiding the issuance of a complaint, has been made to induce Respondent to submit this AWC.

8-12-21
Date

Joseph Stone Capital L.L.C.
Respondent

Print Name: _____

Title: _____

Reviewed by:

Michael P. Gilmore, Esq.
Counsel for Respondent
Moss & Gilmore LLP
129 Third St.
Mineola, NY 11501

9

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

Accepted by FINRA:

Signed on behalf of the
Director of ODA, by delegated authority

September 8, 2022
Date

Kerry L. Laird
Senior Counsel
FINRA
Department of Enforcement
Brookfield Place, 200 Liberty Street – 11th Floor
New York, NY 10281

Joshua J. Bone
Principal Counsel
FINRA
Department of Enforcement
99 High St. #900
Boston, MA 02110

10

FILED: NASSAU COUNTY CLERK 06/14/2024 12:10 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

## Attachment A (Public Version)

Ordered restitution:

| Customer | Ordered Restitution Amount |
|---|---|
| Customer A | $34,566.82 |
| Customer B | $24,428.20 |
| Customer C | $128,788.99 |
| Customer D | $8,062.99 |
| Customer E | $9,635.89 |
| Customer F | $15,607.92 |
| Customer G | $41,461.68 |
| Customer H | $19,591.85 |
| Customer I | $15,939.44 |
| Customer J | $153,507.00 |
| Customer K | $20,900.53 |
| Customer L | $17,265.05 |
| Customer M | $50,000.00 |
| Customer N | $13,079.16 |
| Customer O | $39,935.17 |
| Customer P | $19,035.52 |
| Customer Q | $11,281.19 |
| Customer R | $17,080.99 |
| Customer S | $62,439.20 |
| Customer T | $132,000.00 |

Restitution already paid in connection with other AWCs in this matter:

| Customer | Restitution already paid |
|---|---|
| Customer U | $147,031.50 |
| Customer V | $10,357.00 |
| Customer W | $11,097.00 |
| Customer X | $7,653.21 |
| Customer Y | $10,349.00 |
| Customer G | $16,032 (partial) |
| Customer N | $5,058 (partial) |
| Customer P | $3,910 (partial) |

FILED: NASSAU COUNTY CLERK 06/14/2024    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 06/14/2024

## Attachment B (Public Version)

Registered representatives for heightened supervision:

| Name |
|------|
| Registered Representative 1 |
| Registered Representative 2 |
| Registered Representative 3 |
| Registered Representative 4 |
| Registered Representative 5 |

FILED: NASSAU COUNTY CLERK 06/14/2024 01:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024

# EXHIBIT 2

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                              RECEIVED NYSCEF: 06/14/2024



**E*TRADE Futures**
10 S. Riverside Plaza, Suite 500
Chicago, IL 60606

Please contact us at 877-553-8887 with any questions
or concerns.

MONTHLY STATEMENT
STATEMENT DATE: APR 28, 2023
GMI ACCOUNT NUMBER: O 76203456
20000

JAMES A STAMULIS
85 CHESTNUT AVE
FLORAL PARK NY 11001

Interested Party: FTP OPTIONSHOUSE FIRM O

\* \* \* \* \* \* \* \* \* \* \* \* Y O U R   A C T I V I T Y   T H I S   M O N T H \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| DATE | AT | LONG/BUY | SHRT/SELL | DESCRIPTION | | PRICE/LEGND | CC | DEBIT | CREDIT |
|------|----|----|----|---------------------------------------|---|------------|-----|----------|----------|
| 4/03/23 | US | 3 | 3 | JUN 23 EMINI S&P 500 | E | P&L | US | | 300.00 |
| 4/03/23 | US | 3 | 3 | JUN 23 EMINI S&P 500 | E | FEE/COMM | US | 17.10 | |
| 4/03/23 | US | 1 | 1 | PUT   APR 23 CME EMINMONW1 4115 | E | MEMO P&L | US | | |
| 4/03/23 | US | 1 | 1 | PUT   APR 23 CME EMINMONW1 4115 | E | NET PREM | US | 364.14 | |
| 4/03/23 | US | | | SWEEP TO BROKERAGE ACCOUNT | | | US | 12,386.45 | |
| 4/04/23 | US | 1 | 1 | JUN 23 EMINI S&P 500 | E | P&L | US | | 125.00 |
| 4/04/23 | US | 1 | 1 | JUN 23 EMINI S&P 500 | E | FEE/COMM | US | 5.70 | |
| 4/04/23 | US | 9 | 9 | JUN 23 CME MICRO S&P | E | P&L | US | | 1,395.00 |
| 4/04/23 | US | 18 | 9 | JUN 23 CME MICRO S&P | E | FEE/COMM | US | 43.20 | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4125 | E | MEMO P&L | US | | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4125 | E | NET PREM | US | 159.14 | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4140 | E | MEMO P&L | US | | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4140 | E | NET PREM | US | 49.14 | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4155 | E | MEMO P&L | US | | |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINTUEW1 4155 | E | NET PREM | US | | 195.86 |
| 4/04/23 | US | 1 | 1 | PUT   APR 23 CME EMINWEDW1 4120 | E | NET PREM | US | 589.57 | |
| 4/04/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | | US | | 81.24 |
| 4/05/23 | US | 2 | 2 | JUN 23 CME MICRO S&P | E | P&L | US | 553.75 | |
| 4/05/23 | US | 2 | 2 | JUN 23 CME MICRO S&P | E | FEE/COMM | US | 6.40 | |
| 4/05/23 | US | 1 | 1 | PUT   APR 23 CME EMINTHUW1 4110 | E | NET PREM | US | 639.57 | |
| 4/05/23 | US | 1 | | PUT   APR 23 CME EMINWEDW1 4120 | E | MEMO P&L | US | | |
| 4/05/23 | US | 1 | 1 | PUT   APR 23 CME EMINWEDW1 4120 | E | NET PREM | US | | 685.43 |
| 4/05/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | | US | | 980.64 |
| 4/06/23 | US | 1 | | PUT   APR 23 CME EMINMONW2 4100 | E | NET PREM | US | 489.57 | |
| 4/06/23 | US | 1 | | PUT   APR 23 CME EMINTHUW1 4085 | E | NET PREM | US | 117.07 | |
| 4/06/23 | US | 1 | | PUT   APR 23 CME EMINTHUW1 4085 | E | EXPIRE | US | | .00 |
| 4/06/23 | US | 1 | 1 | PUT   APR 23 CME EMINTHUW1 4100 | E | MEMO P&L | US | | |
| 4/06/23 | US | 1 | 1 | PUT   APR 23 CME EMINTHUW1 4100 | E | MEMO P&L | US | 314.14 | |
| 4/06/23 | US | 1 | 1 | PUT   APR 23 CME EMINTHUW1 4110 | E | MEMO P&L | US | | |
| 4/06/23 | US | 1 | 1 | PUT   APR 23 CME EMINTHUW1 4110 | E | NET PREM | US | | 610.43 |
| 4/06/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | | US | | 551.29 |
| 4/10/23 | US | 1 | 1 | PUT   APR 23 CME EMINMONW2 4100 | E | MEMO P&L | US | | |
| 4/10/23 | US | | 1 | PUT   APR 23 CME EMINMONW2 4100 | E | NET PREM | US | | 12.93 |
| 4/10/23 | US | 1 | | PUT   APR 23 CME EMINTUEW2 4100 | E | NET PREM | US | 237.07 | |
| 4/10/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | | US | | 984.10 |
| 4/11/23 | US | 19 | 19 | JUN 23 CME MICRO S&P | E | P&L | US | 515.00 | |
| 4/11/23 | US | 10 | 19 | JUN 23 CME MICRO S&P | E | FEE/COMM | US | 54.23 | |
| 4/11/23 | US | 1 | | PUT   APR 23 CME EMINTUEW2 4100 | E | EXPIRE | US | | .00 |
| 4/11/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | | US | | 238.89 |
| 4/12/23 | US | 1 | 1 | JUN 23 EMINI S&P 500 | E | P&L | US | | 212.50 |
| 4/12/23 | US | 1 | 1 | JUN 23 EMINI S&P 500 | E | FEE/COMM | US | 5.70 | |
| 4/12/23 | US | 1 | 1 | PUT   APR 23 CME EMINWEDW2 4105 | E | MEMO P&L | US | | |
| 4/12/23 | US | 1 | 1 | PUT   APR 23 CME EMINWEDW2 4105 | E | NET PREM | US | 66.64 | |
| 4/12/23 | US | | | SWEEP TO BROKERAGE ACCOUNT | | | US | 2,006.02 | |

Retain for Tax Records                                        Terms and Conditions on Reverse Side

FILED: NASSAU COUNTY CLERK 06/14/2024 04:30 PM          INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 06/14/2024

# E✳TRADE FUTURES

E*TRADE Futures
10 S. Riverside Plaza, Suite 500
Chicago, IL 60606

Please contact us at 877-553-8887 with any questions
or concerns.

JAMES A STAMULIS
85 CHESTNUT AVE
FLORAL PARK NY 11001

MONTHLY STATEMENT
STATEMENT DATE: APR 28, 2023
GMI ACCOUNT NUMBER: 0 76203456
20000

Interested Party: FTP OPTIONSHOUSE FIRM 0                                    PAGE    2

| DATE | AT | LONG/BUY | SHRT/SELL | DESCRIPTION | PRICE/LEGND | CC | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|---|
| 4/13/23 | US | 1 | | MAY 23 NYM LT CRUDE | FEE/COMM | US | 3.02 | |
| 4/13/23 | US | 1 | | PUT APR 23 NYM CRUDEOIL2 8200 | NET PREM | US | 472.97 | |
| 4/13/23 | US | | | SWEEP TO BROKERAGE ACCOUNT | | US | 140.16 | |
| 4/14/23 | US | 1 | | PUT MAY 23 NYM LT CRUDE 8200 | NET PREM | US | 403.02 | |
| 4/14/23 | US | | 1 | PUT APR 23 NYM CRUDEOIL2 8200 | MEMO P&L | US | | 17.03 |
| 4/14/23 | US | | 1 | PUT APR 23 NYM CRUDEOIL2 8200 | NET PREM | US | | |
| 4/14/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 1,641.99 |
| 4/17/23 | US | 1 | 1 | PUT MAY 23 NYM LT CRUDE 8200 | MEMO P&L | US | | 1,096.98 |
| 4/17/23 | US | | 1 | PUT MAY 23 NYM LT CRUDE 8200 | NET PREM | US | | |
| 4/17/23 | US | 1 | | PUT APR 23 NYM CRUDEOIL3 7900 | NET PREM | US | 532.97 | |
| 4/17/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 413.99 |
| 4/18/23 | US | 1 | 1 | MAY 23 NYM LT CRUDE | P&L | US | 1,950.00 | |
| 4/18/23 | US | | 1 | MAY 23 NYM LT CRUDE | FEE/COMM | US | 3.02 | |
| 4/18/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 2,802.99 |
| 4/19/23 | US | 1 | | JUN 23 NYM LT CRUDE | FEE/COMM | US | 3.02 | |
| 4/19/23 | US | 1 | 1 | PUT APR 23 NYM CRUDEOIL3 7900 | MEMO P&L | US | | 54.06 |
| 4/19/23 | US | 1 | 1 | PUT APR 23 NYM CRUDEOIL3 7900 | NET PREM | US | | |
| 4/19/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | 2,607.98 | |
| 4/20/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 744.96 |
| 4/21/23 | US | 1 | | PUT APR 23 NYM CRUDEOIL3 7650 | NET PREM | US | 242.97 | |
| 4/21/23 | US | 1 | | PUT APR 23 NYM CRUDEOIL3 7650 | EXPIRE | US | | .00 |
| 4/21/23 | US | 1 | 1 | PUT APR 23 NYM CRUDEOIL3 7900 | MEMO P&L | US | | |
| 4/21/23 | US | | 1 | PUT APR 23 NYM CRUDEOIL3 7900 | NET PREM | US | | 1,657.03 |
| 4/21/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 1,524.00 |
| 4/24/23 | US | 1 | | PUT APR 23 NYM MW4WK4OPT 7700 | NET PREM | US | 108.27 | |
| 4/24/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 4,465.94 |
| 4/25/23 | US | 1 | 1 | PUT APR 23 NYM MW4WK4OPT 7700 | MEMO P&L | US | | |
| 4/25/23 | US | | 1 | PUT APR 23 NYM MW4WK4OPT 7700 | NET PREM | US | | 48.73 |
| 4/25/23 | US | 1 | 1 | PUT APR 23 NYM CRUDEOIL4 7700 | MEMO P&L | US | | |
| 4/25/23 | US | 1 | 1 | PUT APR 23 NYM CRUDEOIL4 7700 | NET PREM | US | | 474.06 |
| 4/25/23 | US | | | SWEEP TO BROKERAGE ACCOUNT | | US | 1,218.73 | |
| 4/26/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 1,604.21 |
| 4/27/23 | US | 1 | 1 | JUN 23 NYM LT CRUDE | P&L | US | 5,200.00 | |
| 4/27/23 | US | | 1 | JUN 23 NYM LT CRUDE | FEE/COMM | US | 3.02 | |
| 4/27/23 | US | 1 | | CALL APR 23 NYM CRUDEOIL4 7475 | NET PREM | US | 852.97 | |
| 4/27/23 | US | | | SWEEP FROM BROKERAGE ACCOUNT | | US | | 2,770.00 |
| 4/28/23 | US | 1 | | CALL MAY 23 NYM CRUDEOIL1 7450 | NET PREM | US | 1,862.97 | |
| 4/28/23 | US | | 1 | CALL APR 23 NYM CRUDEOIL4 7475 | MEMO P&L | US | | |
| 4/28/23 | US | | 1 | CALL APR 23 NYM CRUDEOIL4 7475 | NET PREM | US | | 547.03 |
| 4/28/23 | US | | | SWEEP TO BROKERAGE ACCOUNT | | US | 5,714.01 | |

Retain for Tax Records                                    Terms and Conditions on Reverse Side

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024



E*TRADE Futures
10 S. Riverside Plaza, Suite 500
Chicago, IL 60606

Please contact us at 877-553-8887 with any questions
or concerns.

JAMES A STAMULIS
85 CHESTNUT AVE
FLORAL PARK NY 11001

MONTHLY STATEMENT
STATEMENT DATE: APR 28, 2023
GMI ACCOUNT NUMBER: O 76203456
20000

Interested Party: FTP OPTIONSHOUSE FIRM O    PAGE    3

```
* * * * * * * * * * * * *  P O S I T I O N S   I N   Y O U R   A C C O U N T  * * * * * * * * * * * * * * * *

DATE AT   LONG/BUY  SHRT/SELL     DESCRIPTION           PRICE/LEGND  CC    DEBIT           CREDIT
4/28/23 US      1              CALL MAY 23 NYM CRUDEOIL1 7450   1.86   US                   2,950.00
                1#             OPTION MARKET VALUE              2.95                        2,950.00"
                               2,280.00  LIM EXPIRE 5/05/23
```

| | *SEGREGATED USD* | **TOTAL SEGREGATED** | *CONVERTED TOTAL* |
|---|---|---|---|
| BEGINNING BALANCE | 12,386.45 | 12,386.45 | 12,386.45 |
| THIS MONTH'S ACTIVITY | 13,702.39- | 13,702.39- | 13,702.39- |
| ENDING BALANCE | 1,315.94- | 1,315.94- | 1,315.94- |
| NET FUTURES PROFIT OR LOSS | 6,330.66- | 6,330.66- | 6,330.66- |
| NET OPTION PREMIUM | 2,102.62- | 2,102.62- | 2,102.62- |
| OPTIONS MARKET VALUE | 2,950.00 | 2,950.00 | 2,950.00 |
| ACCOUNT VALUE AT MARKET | 1,634.06 | 1,634.06 | 1,634.06 |
| CONVERTED MARKET VALUE | 1,634.06 | 1,634.06 | 1,634.06 |
| COMMISSION | 165.00- | 165.00- | 165.00- |
| EXCHANGE FEE | 64.83- | 64.83- | 64.83- |
| NFA FEE | 2.20- | 2.20- | 2.20- |
| TOTAL COMMISSION AND FEES | 232.03- | 232.03- | 232.03- |

| SUMMARY | | M-T-D | Y-T-D |
|---|---|---|---|
| REALIZED P&L | | | |
| | USD | 8,201.25- | 11,933.75- |
| COMMISSION | | | |
| | USD | 165.00- | 550.50- |
| FEES | | | |
| | USD | 67.03- | 297.66- |

Retain for Tax Records    Terms and Conditions on Reverse Side

FILED: NASSAU COUNTY CLERK 06/14/2024 01:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                                    RECEIVED NYSCEF: 06/14/2024

# EXHIBIT 3

FILED: NASSAU COUNTY CLERK 06/14/2024 03:24 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/14/2024



There is a newer version of the New York Consolidated Laws    ↓

View our newest version here    →

# 2012 New York Consolidated Laws CVP - Civil Practice Law & Rules Article 50 - (5001 - 5021) JUDGMENTS GENERALLY 5001 - Interest to verdict, report or decision.

**Universal Citation:** NY CPLR § 5001 (2012)

§ 5001. Interest to verdict, report or decision. (a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

FILED: NASSAU COUNTY CLERK 06/14/2024 01:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 3                                    RECEIVED NYSCEF: 06/14/2024

(c) Specifying date; computing interest. The date from which interest is to be computed shall be specified in the verdict, report or decision. If a jury is discharged without specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit. The amount of interest shall be computed by the clerk of the court, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded.

**Disclaimer:** These codes may not be the most recent version. New York may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024

NYSCEF DOC. NO. 4                                                  RECEIVED NYSCEF: 06/14/2024

# EXHIBIT C

# EXHIBIT C

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM INDEX NO. 610488/2024
NYSCEF DOC. NO. 4                                    RECEIVED NYSCEF: 06/14/2024

# BAILEY | CAVALIERI

**THOMAS E. GEYER**
E tgeyer@baileycav.com
D 614-229-3206

October 18, 2023

**VIA EMAIL & CERTIFIED MAIL**

Adam Maggio
New Age Venture Capital
585 Stewart Ave
Suite L60
Garden City, NY 11530
amaggio@na-vc.com

RE:  Insurer:              Scottsdale Insurance Company
     First Named Insured:  VCS Venture Securities, LLC
     Policy No.:           BFS0003062-NY-09-01
     Claim No.:            02148731
     Claimant:             James A. Stamulis

Dear Mr. Maggio:

This law firm has been retained by Nationwide, on behalf of Scottsdale Insurance Company ("Scottsdale"), to represent its interests in connection with the above-referenced matter. On behalf of Scottsdale, we write at this time regarding the Amended Statement of Claim filed in the FINRA arbitration proceeding captioned *James A. Stamulis v. Joseph Stone Capital LLC, et al.* (the "Arbitration")

We address this letter to you as the authorized insurance representative for VCS Venture Securities, LLC ("VCS"), Rocco Maselli, and yourself. If you are not serving in this role, please advise us with whom we should communicate as to the insurance issues pertaining to the Arbitration.

Scottsdale has carefully considered the information provided for purposes of evaluating coverage for the Arbitration under Policy No. BFS0003062-NY-09-01 (the "Policy").[1]

For the reasons discussed in this letter, Scottsdale must respectfully disclaim coverage for the Arbitration under the Policy. Accordingly, Scottsdale shall have no obligations under the Policy for the Arbitration, and shall not provide a defense nor any indemnity for this matter. Neither of the other two respondents in the Arbitration—Jospeh Stone Capital LLC and Damian Maggio—are insured under the Policy and thus Scottsdale has no obligations to either of them.

---

[1] Terms that appear in quotation marks but are not defined in this letter have the meanings assigned in the Policy.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 4                                                      RECEIVED NYSCEF: 06/14/2024

Adam Maggio
October 18, 2023
Page 2

### A.    Summary of the Arbitration

Claimant alleges that he was introduced to Respondent Maselli in 2019, and alleges that in or about October 2019 Respondent Maselli directed Claimant to sell call options on an existing position in Cara Therapeutics that Claimant held since 2014. According to Claimant, Respondent Maselli also started directing Claimant to purchase low-price, speculative stocks such as Milestone Scientific at $1.34 per share, Aytu BioSciences at $1.77 per share, and Fuel Cell at $1.37 per share. Claimant alleges that he closed his managed account with Baxter Brothers and opened an account with Respondent Jospeh Stone Capital LLC ("JSC"), where Respondent Maselli was registered.

Claimant contends that September 8, 2022, Respondent JSC signed a Letter of Acceptance, Waiver, and Consent ("AWC") accepting and consenting to certain regulatory violations. Claimant further contends that Respondent JSC is named in a FINRA arbitration proceeding demanding over $2.8 million in damages.

Claimant asserts that you and Damian Maggio entered into an agreement with VCS "to effectively act as the successor to Respondent JSC." According to Claimant, "Respondent Maselli hurriedly joined Respondent VCS in September, 2021, and transferred Claimant's account to the new firm."

Claimant alleges that after his account at Respondents JSC and VCS showed significant losses, Respondent Maselli "induced Claimant into opening a new type of account at E*TRADE" and that "Respondent Maselli's new game was to trade financial and commodities futures and options for the Claimant."

Claimant asserts that "Respondents, acting through their registered representative, Respondent Maselli, engaged in excessive and unsuitable securities trading on margin in Claimant's accounts and concentrated those accounts in high-risk stocks." Claimant further alleges "a pattern of self-dealing and deceit to manipulate the Claimant into opening an account with Respondent JSC, and transfer that account to Respondent VCS."

Claimant contends that Respondents "had complete and total control of Claimant's accounts from their inception" and "Claimant made clear and Respondents knew full well that he totally relied upon them to make all the investment recommendations."

Claimant asserts claims for relief based on fraud in violation of the federal securities laws; violation of the New York Consumer Protection Act; breach of contract; common law fraud; breach of fiduciary duty; negligence; and gross negligence. Claimant seeks the recovery of damages in an amount to be determined by the arbitration panel, believed to be approximately $500,000, as well as bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, and punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

FILED: NASSAU COUNTY CLERK 06/14/2024 03:40 PM        INDEX NO. 610488/2024

NYSCEF DOC. NO. 4                                      RECEIVED NYSCEF: 06/14/2024

Adam Maggio
October 18, 2023
Page 3

### B.    Summary of the Policy

Scottsdale issued the Policy to VCS for the "policy period" of September 10, 2022 to September 10, 2023. The Policy was issued on a claims-made-and-reported basis. The Policy contains a Policy Aggregate Limit of Liability of $1,00,000.

Section II—Coverage Agreements—of the Policy states:

A. COVERAGE

We will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the insured shall become legally obligated to pay as "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible, but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":

1.    arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative";

2.    occurs during the "coverage period" for both the insured and the "individual", if any, for whose acts the insured is legally responsible; and

3.    results in a "written claim" which is first made against the insured and presented to us during the insured's "policy period"; provided, in case of cancellation or non renewal of this policy with respect to an insured, if a "written claim" is first made against that insured during the last fifteen days of that insured's "policy period", that "written claim" may be presented to us no later than fifteen days immediately following the effective date of such cancellation or non renewal if, as a condition precedent to that right, that insured has not procured or does not have available to him/her/it other insurance which applies to said "written claim" or which would apply in the absence of this policy.

Section IV—Who is Insured under this Policy—of the Policy states:

Each of the following is an insured under this policy to the extent set forth below:

A.    The First Named Insured.

B.    Each "financial services professional" who is a named insured on this policy.

C.    If a named insured "entity" is a partnership, association, corporation or limited liability company, each of that insured's present, former and future

BAILEY | CAVALIERI

Adam Maggio
October 18, 2023
Page 4

partners, members, officers and directors, but each is covered only for his/her vicarious liability as a result of such status and arising out of the provision of covered "financial services" by a named insured or a "representative"; provided, no such partner, member, officer or director is an insured under this policy with respect to liability arising out of or in conjunction with his/her own acts or omissions as a "financial services professional" unless he/she is a named insured on this policy.

Terms used in the Policy are defined in Section I of the Policy. The defined terms include:

"Financial services" means the provision of: services by a "broker"-"dealer" to its "clients" of its "registered representatives"; "financial planning services" by a "financial planner"; "investment management services" by a "registered investment adviser" or an "associated person" of a "registered investment adviser"; the purchase or sale of "securities" or the provision of "investment advice" by a "registered representative"; and the proposed sale or sale of products authorized to be sold by a properly licensed "life insurance agent", including, without limitation, life, health, disability and accident insurance products and annuities; provided "financial services" does not include any advice with respect to or the sale of viatical products.

\*\*\*

"Financial services professional" means any "individual" who is a "financial planner", "registered investment adviser", "associated person", "life insurance agent" and/or "registered representative".

\*\*\*

"Wrongful act" means any negligent breach of duty, error, misstatement, misrepresentation, omission, "publication injury", or other negligent act done or attempted by an insured, or by any "individual" for whose acts the insured is legally responsible, in conjunction with the provision of covered "financial services", as set forth in the Limitation of Coverage Endorsement, for the "clients" of a named insured or "representative". Any such "wrongful act", together with any related "wrongful acts" or series of continuous, repeated or "interrelated wrongful acts", shall be considered one "wrongful act" for purposes of the application of our Limits of Liability and the applicable "retention". A "wrongful act" which is continuing in nature shall be deemed, for all purposes of this policy, to occur only on the date on which such "wrongful act" commences and not on any subsequent date. A series of continuous, repeated or "interrelated wrongful acts" shall be deemed to have occurred on the date on which the earliest of such "wrongful acts" commences. If a continuing "wrongful act" or a series of repeated or "interrelated wrongful acts"

BAILEY | CAVALIERI

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM                    INDEX NO. 610488/2024

NYSCEF DOC. NO. 4                                          RECEIVED NYSCEF: 06/14/2024

Adam Maggio
October 18, 2023
Page 5

is committed by an insured, or by any "individual(s)" for whose acts such insured in legally responsible, prior to such insured's applicable "retroactive date", there shall be no coverage under this policy for any insured for any of those "wrongful acts" even if some of those acts occur during the "policy period".

### C.    The Policy Does Not Afford Coverage for the Arbitration

As an initial matter, any coverage under the Policy would be afforded only to VCS as the First Named Insured, Mr. Masseli as a "representative" of the First Named Insured, and to you as the purported registered principal of VCS, but only for vicarious liability pursuant to Section IV.C. of the Policy noted above.  Neither JSC nor Damian Maggio are insured under the Policy.

Any coverage afforded by the Policy is subject to the terms, conditions, and exclusions of the Policy.  The Policy does not afford coverage for the Arbitration for one or more of the following, independent reasons.

First, Section VI.B. of the Policy states:

We do not cover claims which arise out of or are contributed to by an act committed by or at the direction of an insured, or ratified by an insured, or which the insured knew was being committed but failed to take any action to stop, and which act is dishonest, fraudulent, criminal, malicious or knowingly wrongful, including, without limitation, the willful violation of any laws, orders, rules or regulations of the United States, or any state, commonwealth, territory, subdivision or municipality thereof ...

Claimant alleges fraud in violation of the federal securities laws, and common law fraud. Accordingly, coverage is excluded by Section VI.B. of the Policy.

Second, Section VI.C. of the Policy states:

We do not cover any liability which any insured assumes under any contract or agreement, whether written or oral ...

Claimant alleges that he entered into contractual relationships with Respondents and that the alleged infractions "breached the contractual relationship between Claimant and Respondent" [sic].  But for the contractual relationships with Respondents, Claimant would have no claims—thus the insureds assumed liability under a contract, and coverage is excluded by Section VI.C. of the Policy.

Third, Section VI.F. of the Policy states:

Except as may otherwise be specifically provided by endorsement, we do not cover claims which arise out of or in conjunction with services any insured performs

FILED: NASSAU COUNTY CLERK 06/14/2023 01:00 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 4    RECEIVED NYSCEF: 06/14/2024

Adam Maggio
October 18, 2023
Page 6

under a "discretionary account agreement"; or the exercise of "investment discretion" whether pursuant to a discretionary account agreement" or otherwise.

Claimant alleges that Respondents "had complete and total control of Claimant's accounts from their inception." The Policy is not endorsed to provide coverage for the exercise of "investment discretion." Accordingly, coverage is excluded by Section VI.F. of the Policy.

    <u>Fourth</u>, Section VI.G. of the Policy states:

We do not cover claims: (1) made against an insured and which arise out of or in conjunction with or which are in any way related to the actual or alleged operation, management or ownership of any business or "entity" which is not a named insured on this policy …

Here, the claims made arise out of or are in conjunction with, or are in any way related to the actual or alleged operation, management or ownership of JSC, which is not a named insured on the Policy. As a result, coverage is excluded by Section VI.G. of the Policy.

### D.    Conclusion

Because coverage for the Arbitration is precluded as discussed above, Scottsdale will not at this time list other policy terms and exclusions that may apply to bar or limit coverage for the Arbitration. However, nothing in this letter or in previous communications by or on behalf of Scottsdale shall serve as a waiver of any rights that Scottsdale now has or may have in the future. Scottsdale reserves all rights available under the Policy, any other insurance, at law or otherwise, including the right to assert additional or different coverage defenses based on future developments in this matter including but not limited to the assertion of new or revised allegations. Scottsdale's coverage position is based on the facts as presented to date and should not be construed as applicable to a new claim. Scottsdale's rights to have notice of new facts, or a new claim, are reserved, as are the notice conditions of the Policy.

                   \*       \*       \*

If you have other information or materials that you believe support a contrary conclusion, you may forward such information or materials to the undersigned for evaluation by Scottsdale. Additionally, if a further amended Statement of Claim is filed, or new or revised allegations are asserted against you, you may forward such further amended Statement of Claim or such new or revised allegations to the undersigned for evaluation by Scottsdale.

                   \*       \*       \*

BAILEY CAVALIERI

Adam Maggio
October 18, 2023
Page 7


*While we encourage you to first contact the undersigned, if you believe this coverage determination to be inaccurate, or that the claim has been wrongfully denied or rejected in whole or in part, you may have the matter reviewed by the California Department of Insurance. The address is: State of California Department of Insurance, Claims Services Bureau, 11th Floor, 300 South Spring Street, South Tower, Los Angeles, California 90013. The telephone number is 1-800-927-4357 (calling from within CA); 213-897-8921 (calling outside California).*

Sincerely,

BAILEY CAVALIERI LLC

*Thomas Geyer*

Thomas E. Geyer

cc:    Jonathan Gomez (GOMEZJ8@nationwide.com)
       Agent 04548


BAILEY | CAVALIERI

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM   INDEX NO. 610488/2024

NYSCEF DOC. NO. 5                                              RECEIVED NYSCEF: 06/14/2024

# EXHIBIT D

# EXHIBIT D

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 5                                        RECEIVED NYSCEF: 06/14/2024

# BAILEY | CAVALIERI

**THOMAS E. GEYER**
E tgeyer@baileycav.com
D 614-229-3206

November 17, 2023

**VIA EMAIL & REGULAR U.S. MAIL**

David Hirschberg, Esq.
Wexler Burkhart Hirschberg & Unger, LLP
Attorneys and Counselors at Law
377 Oak Street, Concourse 2
Garden City, New York 11530
(dhirschberg@wbhulaw.com)

|  | | |
|---|---|---|
| RE: | Insurer: | Scottsdale Insurance Company |
| | First Named Insured: | VCS Venture Securities, LLC |
| | Policy No.: | BFS0003062-NY-09-01 |
| | Claim No.: | 02148731 |
| | Claimant: | James A. Stamulis |

Dear Mr. Hirschberg:

As you know, this law firm represents Nationwide, on behalf of Scottsdale Insurance Company ("Scottsdale"), in connection with the above-referenced matter. On behalf of Scottsdale, I again acknowledge receipt of, and thank you for, your November 1, 2023 email message to me (the "Nov. 1 Email") regarding coverage for the Amended Statement of Claim filed in the FINRA arbitration proceeding captioned *James A. Stamulis v. Joseph Stone Capital LLC, et al.* (the "Arbitration")

We address this letter to you as the authorized insurance representative for VCS Venture Securities, LLC ("VCS"), Rocco Maselli, and Adam Maggio. If you are not serving in this role, please advise us with whom we should communicate as to the insurance issues pertaining to the Arbitration.

Scottsdale has carefully considered the information provided in the Nov. 1 Email for purposes of evaluating coverage for the Arbitration under Policy No. BFS0003062-NY-09-01 (the "Policy").[1]

For the reasons discussed in my October 18, 2023 letter to Adam Maggio (which letter is incorporated herein by this reference) and further discussed in this letter, Scottsdale respectfully maintains the disclaimer of coverage for the Arbitration under the Policy. Accordingly, Scottsdale

---

[1] Terms that appear in quotation marks but are not defined in this letter have the meanings assigned in the Policy.

FILED: NASSAU COUNTY CLERK 06/14/2023 04:40 PM
NYSCEF DOC. NO. 5

INDEX NO. 610488/2024

RECEIVED NYSCEF: 06/14/2024

David Hirschberg, Esq.
November 17, 2023
Page 2

shall have no obligations under the Policy for the Arbitration, and shall not provide a defense nor any indemnity for this matter.

The Nov. 1 Email asserts that: "a Statement of Claim is merely an allegation ... It is a common practice of claimant contingency fee attorneys to include in its claim meritless allegations, assertions, contentions, etc. of fraud or other illegal activity to attempt to extract a settlement."

The Nov. 1 Email states that: "My client has no objection to the insurer's reservation of rights regarding indemnification, but its refusal to pay defense costs merely because an UNVERIFIED pleading contains template false allegations is improper." (Emphasis in original.)

The Nov. 1 Email concludes by stating that:

Unless your client immediately provides coverage for defense costs (subject of course to its reservation of rights with respect to indemnification) my client will hold the insurer responsible for all such costs, fees and expenses and reserves the right to seek a refund of the policy premiums it paid. My client will also file a complaint with the California Dept. of Insurance Claims Services Bureau.

Under California law, "[d]etermination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy." *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th 643, 655 (Cal. 2005); *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (Cal. 1993).

As explained in my October 18, 2023 letter to Mr. Maggio, the allegations in the Arbitration implicate multiple, independent exclusions from coverage set out in the Policy, which preclude coverage including any defense obligation. Accordingly, Scottsdale maintains the disclaimer of coverage for the Arbitration.

Because coverage for the Arbitration is precluded as discussed above and in my October 18, 2023 letter to Mr. Maggio, Scottsdale will not at this time list other policy terms and exclusions that may apply to bar or limit coverage for the Arbitration. However, nothing in this letter or in previous communications by or on behalf of Scottsdale shall serve as a waiver of any rights that Scottsdale now has or may have in the future. Scottsdale reserves all rights available under the Policy, any other insurance, at law or otherwise, including the right to assert additional or different coverage defenses based on future developments in this matter including but not limited to the assertion of new or revised allegations. Scottsdale's coverage position is based on the facts as presented to date and should not be construed as applicable to a new claim. Scottsdale's rights to have notice of new facts, or a new claim, are reserved, as are the notice conditions of the Policy.

FILED: NASSAU COUNTY CLERK 06/14/2024 02:14:50 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 5                                    RECEIVED NYSCEF: 06/14/2024

David Hirschberg, Esq.
November 17, 2023
Page 3

\*     \*     \*

If you have other information or materials that you believe support a contrary conclusion, you may forward such information or materials to the undersigned for evaluation by Scottsdale. Additionally, if a further amended Statement of Claim is filed, the Insureds may forward such further amended Statement of Claim to the undersigned for evaluation by Scottsdale.

\*     \*     \*

*While we encourage you to first contact the undersigned, if you believe this coverage determination to be inaccurate, or that the claim has been wrongfully denied or rejected in whole or in part, you may have the matter reviewed by the California Department of Insurance. The address is: State of California Department of Insurance, Claims Services Bureau, 11th Floor, 300 South Spring Street, South Tower, Los Angeles, California 90013. The telephone number is 1-800-927-4357 (calling from within CA); 213-897-8921 (calling outside California).*

Sincerely,

BAILEY CAVALIERI LLC

Thomas Geyer

Thomas E. Geyer

cc:    Jonathan Gomez (GOMEZJ8@nationwide.com)

#4872-2743-8480

BAILEY | CAVALIERI

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM INDEX NO. 610488/2024

NYSCEF DOC. NO. 6                                                    RECEIVED NYSCEF: 06/14/2024

# EXHIBIT E

# EXHIBIT E

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 6                                   RECEIVED NYSCEF: 06/14/2024

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | |
|---|---|
| In The Matter of Arbitration Between:<br><br>JAMES A. STAMULIS,<br><br>                Claimant,<br><br>  -against-<br><br>JOSEPH STONE CAPITAL, LLC., VCS VENTURE SECURITIES, ROCCO MICHAEL MASELLI, DAMIAN MAGGIO, and ADAM MAGGIO,<br><br>              Respondents. | Arbitration No. 23-02465<br><br>**RESPONDENTS**<br>**VCS VENTURE SECURITIES,**<br>**ROCCO MICHAEL MASELLI AND**<br>**ADAM MAGGIO'S**<br>**STATEMENT OF ANSWER** |

## STATEMENT OF ANSWER

Respondents VCS VENTURE SECURITIES ("VCS")[1], ROCCO MICHAEL MASELLI and ADAM MAGGIO (collectively, the "VCS Respondents") by and through their undersigned attorneys, submit the following as their Statement of Answer to the frivolous claim of Claimant James A. Stamulis ("Claimant" or "Stamulis"). The VCS Respondents reserve the right to file an amended Statement of Answer and/or move to dismiss the claim against one or more of the Respondents upon receipt of further documents and information.

## INTRODUCTION

Unfortunately, the FINRA Code of Arbitration Procedure permits any disgruntled investor to file an arbitration against a prior brokerage firm regardless of lack of merit. The instant arbitration is a classic example.

---

[1] Operating under the D/B/A New Age Venture Capital.

1

FILED: NASSAU COUNTY CLERK 06/14/2024 02:44 PM    INDEX NO. 610488/2024
NYSCEF DOC. NO. 6                                    RECEIVED NYSCEF: 06/14/2024

In this case, Claimant offers little more than conclusory statements and template (and in some cases false) "throw everything against the wall and see what sticks" causes of action. Claimant goes further, padding his claim with recitals of irrelevant regulatory matters regarding a different respondent, Joseph Stone Capital, LLC. ("JSC"), none of which are attributable to VCS. VCS respectfully reminds the Panel that this is a private customer claim: it is not a FINRA inquiry, investigation or regulatory proceeding, an Attorney General investigation or an SEC lawsuit. A mere recital of public records regarding a brokerage firm and other customers is no substitute for a claim by this investor seeking to obtain money for himself.

The VCS Respondents vehemently deny all allegations, stated or implied, of wrongful or actionable conduct. Claimant is a sophisticated investor in the market for more than 40 years, and is but one of a myriad of securities investors who, having lost money due to adverse market forces, seek to obtain a retroactive money-back guarantee from their broker. Claimant takes this one giant step further – he wants a "double dip" by demanding not only his net out-of-pocket losses, but also all of the trade commissions already included in the net loss figure. His greed knows no bounds.

Claimant's losses are attributable to two (2) factors. First, market conditions arose after Claimant's investments were made resulting in unforeseeable declines in the value of certain securities positions and the market sector as a whole. All investments involve "market risk". Stock prices fluctuate and there are no guarantees that an investment will be profitable, or that the strategy implemented will be successful. Noteworthy is the fact that the very same securities at issue in Claimant's account produced an incredible return bringing the account into the millions, however, Claimant was too greedy to take his profit and wanted more. In fact, it is FINRA's position that "[w]hen it comes to risk, here's a reality check: All investments carry

2

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 6                                    RECEIVED NYSCEF: 06/14/2024

some degree of risk."[2] Market related loss is insufficient to impose liability on a broker or broker-dealer who carries out the directives of the customer, especially an extremely experienced one, such as Claimant in this action. There must be some evidence of wrongdoing: there is none here.

Second, Claimant desired to earn substantial profits based upon an admitted speculative investment strategy. Ultimately, Claimant wishes to be placed in the enviable position of "heads-I-win, tails-you-lose." Had Claimant profited, he would reap the benefits, and had he failed to yield the expected return, he could sue to recover damages; clearly an objectionable mentality. See Wolfson v Baker, 623 F.2d 1074, 1082 (5th Cir. 1980) (rejecting "an approach that so unilaterally favors the stock purchaser at the expense of the broker").

## THE CLAIMANT

Curiously, while claiming to be an unsophisticated investor, Claimant admits that he had been investing in the stock market for years, had the benefit of a duly registered money manager prior to voluntarily opening an account at VCS, solicited advice from Respondent Rocco Michael Maselli ("Mr. Maselli") while maintaining a separate account at Charles Schwab ("Schwab"), accessed his Schwab account online, and made a profit at Schwab while calling Mr. Maselli many, many times in two (2) years picking his brain for chart movements and information on many stocks. Only after he lost money did he complain -- classic "heads-I-win, tails-you-lose."

Compare the Statement of Claim allegations against VCS with the **five (5) separate documents** he had signed confirming suitability and investment sophistication:

---

[2] http://www.finra.org/investors/reality-investment-risk

- His individual account application and agreement signed October 25, 2021

  (**Exhibit A**) confirming:

  - o  Annual income – **$100,000** (also **initialed**);

  - o  Net worth – **$2,000,000** (also **initialed**);

  - o  Liquid net worth – **$1,000,000** (also **initialed**);

  - o  Investment objective – **speculation** (also **initialed**);

  - o  Risk tolerance – **speculative** (also **initialed**);

  - o  Investment knowledge – **excellent** (also **initialed**);

  - o  Funding source – **investments**;

  - o  Stock investment experience – **over five (5) years**; and

  - o  Options investment experience – **over five (5) years**;

- His option agreement **signed** 11 days later (**Exhibit B**) confirming:

  - o  Annual income – **$100,000**;

  - o  Net worth – **$2,000,000;**

  - o  Liquid net worth – **$1,000,000;**

  - o  Investment objective – **speculation;**

  - o  Risk tolerance – **speculative** (also **initialed**);

  - o  Investment knowledge – **excellent;**

  - o  Stock investment experience – **over five (5) years**; and

  - o  Options investment experience – **over five (5) years;**

- His IRA account agreement **signed** October 25, 2021 (**Exhibit C**) confirming:

  - o  Annual income – **$100,000** (also **initialed**);

  - o  Net worth – **$2,000,000** (also **initialed**);

  - o  Liquid net worth – **$1,000,000** (also **initialed**);

4

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 6                                        RECEIVED NYSCEF: 06/14/2024

- o  Investment objective – **speculation** (also **initialed**);

- o  Risk tolerance – **speculative** (also **initialed**);

- o  Investment knowledge – **excellent** (also **initialed**);

- o  Funding source – **investments**;

- o  Stock investment experience – **over five (5) years**; and

- o  Options investment experience – **over five (5) years**;

- His IRA option account agreement **signed** November 9, 2021 (**Exhibit D**) confirming:

  - o  Annual income – **$100,000**;

  - o  Net worth – **$2,000,000**;

  - o  Liquid net worth – **$1,000,000**;

  - o  Investment objective – **speculation**;

  - o  Risk tolerance – **speculative (initialed)**;

  - o  Investment knowledge – **excellent**;

  - o  Stock investment experience – **over five (5) years**; and

  - o  Options investment experience – **over five (5) years**;

- His Roth IRA account agreement **signed** October 25, 2021 (**Exhibit E**) confirming:

  - o  Annual income – **$100,000** (also **initialed**);

  - o  Net worth – **$2,000,000** (also **initialed**);

  - o  Liquid net worth – **$1,000,000** (also **initialed**);

  - o  Investment objective – **speculation** (also **initialed**);

  - o  Risk tolerance – **speculative** (also **initialed**);

  - o  Investment knowledge – **excellent** (also **initialed**);

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 6    RECEIVED NYSCEF: 06/14/2024

    o   Funding source – **investments**;

    o   Stock investment experience – **over five (5) years**; and

    o   Options investment experience – **over five (5) years**;

In fact, Claimant's investment history goes back much more than five (5) years. Indeed, he has a history of suing his brokerage firms. Claimant conveniently does not disclose the fact that he had maintained brokerage accounts with other firms for over 40 years **and actually filed securities arbitration claims against other brokerage firms for prior losses in the market.**

On February 14, 2001, Claimant commenced an NASD (predecessor to FINRA) arbitration against his then-broker Citigroup Global Markets, Inc. formerly known as Salomon Smith Barney, Inc. and his then-account executives Glenn Fischer and Frank Melia (case no. 01-00772). He made the same allegation he does here over 20 years later: "unauthorized trading, churning, unsuitability, failure to supervise, violation of NASD rules, breach of implied covenant, common law fraud and deceit, common law negligence and breach of fiduciary duties" (**Exhibit F**).

Claimant has been around the block before and has sued brokers every time he had a loss.

Claimant also alleges that his prior Schwab account was invested in "blue-chip large capitalization stocks" – **false**.

Attached as **Exhibit G** is a May 2020 statement from his Schwab account (valued at $312,528). **There are no blue-chip large capitalization stocks**. On the contrary, 14 out of the 15 were **penny stocks**. In addition, he actively traded at Schwab: in one (1) month alone he made **36** purchases totaling **$262,774** and **22** sales totaling **$201,431** – an extremely speculative and actively traded account.

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 6                                        RECEIVED NYSCEF: 06/14/2024

## CLAIMANT'S VCS ACCOUNT TRADING

In addition to the aforesaid written representation of his investment objectives, Claimant cannot dispute that he regularly received from VCS statements of account plainly stating that his investment objective was **speculation** (**Exhibit H**). At no time did he object or indicate otherwise.

Moreover, at the time he opened his VCS account, Claimant **initialed and signed** the following acknowledgement:

Active Account:
You may have indicated speculation or growth as an investment objective for your account. This reflects an aggressive approach which entails active trading. Actively traded accounts in general are speculative in nature and typically attempt to profit from short term swings in the market and/or of individual securities, generally accrue higher costs and results in greater risks to the investor. This trading may not be suitable for all investors. Speculative investing should only be carried out with capital in which you are willing to risk losing a substantial portion, if not all of your investment funds …

Accounts have significantly higher turnover ratios and commission-to-equity ratios than accounts in which the customer merely buys and holds the position. Turnover ratios measure how often – on average – the securities in an customer's account are traded a year. The securities purchased and the account's average equity are analyzed and the turnover ratio (TR) is the "litmus test" to determine active accounts. Annualized turnover ratio of 6 or grater is likely to be considered excessive for accounts with conservative investment objectives. **You acknowledge and agree that your speculative natured account may be trading with a TR of 6 or substantially greater and that you do not consider this to be excessive in light of your investment strategies and objectives.** The commission-to-equity ratio is obtained by dividing the total commission charges (including markups) by the average equity in the customer's account.

An investment objective or risk tolerance of speculation involves a high degree of risk and allows my account to be actively traded. **I acknowledge that the performance of my account may be significantly higher or lower than the performance of the stock market or the various indices that may be tied to stock market performance, including the Dow Jones Industrials, the Standard & Poor's Index or any other index of the value or performance of the stock market. This is considered the "well managed [sic] account theory". I also acknowledge that because of the nature of my account I am not seeking returns on my investments consistent with the stock market indexes [sic] and that the performance of my account may be substantially more or less than**

FILED: NASSAU COUNTY CLERK 06/14/2024 04:40 PM          INDEX NO. 610488/2024
NYSCEF DOC. NO. 6                                        RECEIVED NYSCEF: 06/14/2024

what may be achieved under a well-managed account theory. (Emphasis added) [**Exhibit I**]

Of course, the VCS account statements, as well as the trade confirmations Claimant received, apprised him of each and every trade made in his account. Claimant cannot contend that he was unaware of or objected to the trading activity.

The opposite is true: Claimant spoke to Mr. Maselli on innumerable occasions, followed the market closely and analyzed each and every trade in his account before authorizing Mr. Maselli to make them.

## TRANSFER OF ACCOUNTS FROM JSC

Claimant admits that his investment relationship with Mr. Maselli began well before he opened his VCS accounts. The accounts were transferred to VCS via ACAT from JSC in or about October 2021 (**Exhibit J**). Claimant did not deposit any money in his VCS accounts.

Apparently, Claimant seeks to hold VCS responsible for losses for sales of securities purchased elsewhere. This is improper and contrary to Claimant's prior acknowledgment – the letter Claimant initialed and signed upon opening his VCS account. This letter expressly stated as follows:

> Transferring Accounts to New Age Venture Capital, LLC[3]:
>    **As a condition to maintaining an account at New Age Venture Capital, LLC (the "Firm") customer agrees and acknowledges that New Age Venture Capital, LLC, its officers, directors, and agents have no liability for securities transactions that the customer entered into at other brokerage firms away from New Age Venture Capital, LLC.** This includes securities that were purchased at other brokerage firms that were subsequently transferred to New Age Venture Capital, LLC … For the sake of clarity, **customer bears full responsibility for any securities positions transferred to New Age Venture Capital, LLC** unless the Firm or any registered representative of the Firm

---

[3] VCS operates under the D/B/A New Age Venture Capital, LLC.

8

FILED: NASSAU COUNTY CLERK 06/14/2024 04:10 PM   INDEX NO. 610488/2024
NYSCEF DOC. NO. 6                                   RECEIVED NYSCEF: 06/14/2024

provides written instruction to client with respect to particular course of action. (Emphasis added.) [**Exhibit I**]

VCS is not a successor or affiliate of JSC. The two firms are separate and unrelated. To this day JSC remains an active fully functioning brokerage firm unrelated to VCS.

## AFFIRMATIVE DEFENSES

In addition to denying every allegation of wrongdoing or misconduct, Respondents assert the following Affirmative Defenses:

1. The account trading was controlled by Claimant and not VCS.

2. Claimant had knowledge of and assumed the risks inherent in investing in the securities.

3. Claimant authorized and approved all transactions in the account and hence, is estopped from recovering any losses with respect to said transactions.

4. The transactions in Claimant's account were appropriate and consistent with Claimant's desires and objective.

5. Whatever damages, if any, allegedly sustained by Claimant were caused in whole, or in part, or contributed to by the acts and/or omissions of Claimant.

6. VCS acted in good faith and did not engage in any acts constituting purported violations of law.

7. Claimant failed to mitigate his alleged damages.

8. The claims are barred by the doctrines of laches, waiver and ratification.

9. VCS did not breach any duties it may have owed to Claimant.

10. Claimant has failed to set forth a basis for his demand for lost opportunity damages and provision of such was not made part of the arbitration agreement between the parties.

**WHEREFORE**, the VCS Respondents respectfully request that the claims be denied in all respects, and that all associated arbitration costs be assessed against Claimant. Respondents Adam Maggio and Rocco Maselli also reserve the right to seek expungement of this claim from their records pursuant to the FINRA Code of Arbitration Procedure § 12805.

Dated: Garden City, New York
        November 30, 2023

WEXLER BURKHART HIRSCHBERG & UNGER, LLP

*/s/ David Hirschberg*

By:_____

David Hirschberg
377 Oak Street, Concourse Level - C2
Garden City, New York 11530
T: (516) 522-2230
F: (516) 745-6449
dhirschberg@wbhulaw.com

*Attorneys for Respondents VCS Venture Securities, Adam Maggio and Rocco Michael Maselli*

10

FILED: NASSAU COUNTY CLERK 06/14/2024 02:31:40 PM    INDEX NO. 610488/2024

NYSCEF DOC. NO. 6                                                          RECEIVED NYSCEF: 06/14/2024

TO:    Charles M. O'Rourke, Esq.
       Law Offices of Charles M. O'Rourke
       2 Swenson Drive
       Woodbury, New York 11797
       T: (516) 677-9785
       cor@corlawyer.com

       *Attorney for Claimant*


       Michael P. Gilmore, Esq.
       Moss & Gilmore, LLP
       129 Third Street
       Mineola, New York 11501
       T: (516) 739-9009
       mpgilmore@mossgilmorelaw.com

       *Attorney for Respondent Joseph Stone
       Capital, LLC. and Damian Maggio*

11

Schwartz, Conroy & Hack, P.C.
666 Old Country Road, Ste. 901
Garden City, N.Y. 11530

Scotts All Insurance Company

8877 N. Gainey Center Dr.

Scotts dale, AZ

85258



GND ADV

ZIP 11530
02 7H
000605 2013

US POSTAGE

$ 015.70

JUN 17 2024

