UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VCS VENTURE SECURITIES, LLC, *d/b/a New Age Venture Capital*, ROCCO MICHAEL MASELLI, ADAM MAGGIO,

    Plaintiffs,

v.

SCOTTSDALE INSURANCE COMPANY,

    Defendant.

**MEMORANDUM & ORDER**
2:24-CV-05498 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiffs VCS Venture Securities, LLC ("VCS"), Rocco Michael Maselli, and Adam Maggio sued Defendant Scottsdale Insurance Company ("Scottsdale"), alleging that Scottsdale wrongfully denied them coverage under a broker-dealer financial services professional liability insurance policy (the "Policy") for a claim brought against Plaintiffs as part of a Financial Industry Regulatory Authority arbitration (the "FINRA Claim"). ECF No. 1-1 at 6–16 ("Compl."). Scottsdale now seeks to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6). ECF No. 17-1 (Mot. to Dismiss). For the reasons that follow, the Court GRANTS Scottsdale's motion.

## BACKGROUND

    A.    Factual History[1]

Plaintiff VCS is a New York limited liability company that operates as a broker-dealer for financial services and maintains its principal place of business in Nassau County. Compl.

---

[1]     The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). Unless otherwise indicated, when quoting cases and the parties' papers, the Court

¶ 6.  Plaintiff Maggio is a principal and owner of VCS.  *Id.* ¶ 7.  Plaintiff Maselli is a broker at VCS.  *Id.* ¶ 8.  Defendant Scottsdale is an Ohio-domiciled insurer authorized to transact business and issue policies in New York.  *Id.* ¶ 9.  Scottsdale issued the Policy to VCS, effective from September 10, 2022, through October 10, 2023, with a $1 million aggregate limit.  *Id.* ¶ 10.  The Policy includes coverage for damages resulting from "Wrongful Acts" committed in connection with financial services rendered by the insureds.  *Id.* ¶¶ 10–11.

On September 12, 2023, James A. Stamulis filed the FINRA Claim against Plaintiffs, alleging that Maselli directed him to engage in speculative trading, including selling call options and purchasing high-risk stocks, which led to significant losses.  *Id.* ¶ 12; ECF No. 1-1 at 70–114 ("FINRA Claim") at 114.[2]  Stamulis alleges that he transferred his account from Baxter Brothers to Joseph Stone Capital LLC ("JSC"), where Maselli was a broker and Maggio was a principal, and later to VCS, which he claims effectively succeeded JSC.  Compl. ¶¶ 12, 14; FINRA Claim ¶ 5.  He further contends that Maselli induced him to open a new account at E*TRADE and engaged in high-risk commodities and options trading on behalf of Stamulis.  Compl. ¶ 14.  According to Stamulis, Plaintiffs—acting through Maselli—engaged in excessive and unsuitable margin trading and maintained complete control over his accounts despite knowing that he relied

---

omits all internal quotation marks, alteration marks, emphases, footnotes, and citations.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

[2]     In addition to the Complaint, the Court also references the Policy and the FINRA Claim, both of which were attached to the Complaint.  *See* ECF No. 1-1.  The Court may consider any statements or documents incorporated in a complaint by reference at the motion to dismiss stage.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (concluding that "statements or documents incorporated in [the complaint] by reference" are properly considered on a motion to dismiss); *see also Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co.*, No. 20-cv-3350, 2021 WL 1034259, at *3 (S.D.N.Y. Mar. 18, 2021) ("In insurance disputes in particular, courts may consider the insurance policies themselves, even if they are not attached to the plaintiff's complaint."); *Pearson Cap. Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 401 (S.D.N.Y. 2015) (considering the complaint in the underlying action for which the plaintiff sought coverage in an insurance dispute at the motion to dismiss stage).

2

entirely on them for investment decisions. *Id.* ¶¶ 15–16. The FINRA Claim asserts causes of action for violations of federal securities laws, breach of contract, common law fraud, breach of fiduciary duty, negligence, and gross negligence, and seeks approximately $500,000 in damages, plus additional monetary and equitable relief. *Id.* ¶ 17.

Plaintiffs deny the allegations and assert that Stamulis was an experienced investor who approved all transactions and received regular account statements. *Id.* ¶ 18. Plaintiffs tendered the claim to Scottsdale for defense and indemnification under the Policy, but Scottsdale disclaimed coverage. *Id.* ¶¶ 19–20. Plaintiffs allege that the FINRA Claim falls within the Policy's coverage for financial services-related "Wrongful Acts" and that Scottsdale has a duty to defend them. *Id.* ¶¶ 21–27. Plaintiffs further assert that the claim was timely reported during the Policy period and that all Plaintiffs qualify as insureds under the Policy. *Id.* ¶¶ 28, 31. Plaintiffs claim to have incurred approximately $30,000 in legal expenses to date as a result of Scottsdale's refusal to defend them, and they expect additional defense costs going forward. *Id.* ¶ 30.

On August 6, 2024, this case was removed to this Court from the New York Supreme Court, Nassau County, pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332. *See* ECF No. 1. On October 29, 2024, Scottsdale moved to dismiss for failure to state a claim. ECF No. 17-1. On December 4, 2024, Plaintiffs filed their opposition. ECF No. 19. On December 18, 2024, Scottsdale filed its reply, and the motion is now fully briefed. ECF No. 20.

## LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson v. Mount Sinai Hosp. Grp.*, No. 23-466, 2024 WL 3289475, at *1 (2d Cir. July 3, 2024) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I.  California Insurance Law Governs

"A federal action based upon diversity jurisdiction, brought to recover under an insurance policy, is governed by state law." *Vam Check Cashing Corp. v. Fed. Ins. Co.*, 787 F. Supp. 2d 264, 268 (E.D.N.Y. 2011), *aff'd*, 699 F.3d 727 (2d Cir. 2012). "Federal courts sitting in diversity generally apply the choice-of-law rules of the forum state, and New York law gives full effect to the parties' choice-of-law provisions." *Lee-Jordan v. Allstate Indem. Co.*, No. 18-cv-6755, 2019 WL 3066408, at *2 n.2 (S.D.N.Y. July 12, 2019). The Policy contains a "Choice of Law Endorsement" which provides that:

> [A]ny dispute concerning the meaning, interpretation and effect of this policy, as well as the parties' rights and obligations under this policy shall be governed by the laws of the State of California.

ECF No. 1-1 at 18–68 ("Policy") at 35. Therefore, the parties' choice of California substantive insurance law governs this diversity case.

Under California law, interpretation of an insurance policy and determination of whether a policy provides coverage are questions of law to be decided by the Court. *Powerine Oil Co. v. Superior Ct.*, 118 P.3d 589, 597 (Cal. 2005). "An insurer owes its insured a broad duty to defend against claims creating a *potential* for indemnity." *Albert v. Mid-Century Ins. Co.*, 187 Cal.Rptr.3d 211, 218 (Ct. App. 2015) (emphasis in original). "The duty to defend is broader than

4

the duty to indemnify, and may exist even if there is doubt about coverage." *Id.* "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose Chem. Corp. v. Superior Ct.*, 861 P.2d 1153, 1160 (Cal. 1993). "However, the duty to defend is not unlimited; it is instead measured by the nature and kinds of risk covered by the policy." *Domokos v. Scottsdale Ins. Co.*, No. 20-cv-00336, 2020 WL 4016811, at *3 (N.D. Cal. July 16, 2020) (citing *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 628 (Cal. 1995)). "[W]here there is no possibility of coverage, there is no duty to defend." *Waller*, 900 P.2d at 627.

The insured bears the burden to establish "a potential for coverage" and thus a duty to defend. *Montrose*, 861 P.2d at 1161. Once the insured meets its burden, the insurer must establish the absence of any such potential coverage. *Id.* Therefore, "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Id.* (emphasis in original). "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann Ins. Co. v. Barbara B.*, 846 P.2d 792, 795 (Cal. 1993). "In construing insurance policy language under California law, courts must give effect to the mutual intention of the parties at the time the contract was formed, which is to be inferred, if possible, solely from the written provisions of the contract." *Domokos*, 2020 WL 4016811, at *3. "Exclusionary clauses are interpreted narrowly against the insurer, which cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *Id.* (citing *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1213 (Cal. 2003)). "[I]n order for an exclusionary clause to effectively exclude coverage, it must be conspicuous, plain and clear." *MacKinnon*, 73 P.3d at 1207.

## II. The Alleged Acts Are "Interrelated Wrongful Acts" Under the Policy

Section II of the Policy, titled "Coverage," provides that:

> [Scottsdale] will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the Insured shall become legally obligated to pay as money "damages" because of a "wrongful act" to which this policy applies committed by the insured, or by any "individual" for whose acts the insured is legally responsible, but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":
> 1. arises solely out of or in connection with the provision of covered "financial services" for the "client" of a named insured or a "representative";
> 2. occurs during the "coverage period" for the Insured; and
> 3. results in a "written claim" which is first made against the insured and presented to us during the insured's "policy period";
> . . .

Policy at 58.

According to the FINRA Claim, the first allegedly "Wrongful Act"[3] occurred in October 2019, when Maselli, who was then a broker at JSC, directed Stamulis to sell call options on a position Stamulis held in a therapeutics company and to purchase penny stocks (low-price, speculative stocks). FINRA Claim ¶ 2. Maselli allegedly told Stamulis "that he didn't even have to move his account from Charles Schwab for him to prove . . . that [Maselli's] approach to investing was better than" Stamulis's current brokerage. *Id.* Induced by the profitability of those trades, Stamulis terminated his managed account with his brokerage and opened an account with Maselli at JSC. *Id.* ¶ 3. In September 2021, Maselli joined VCS and brought Stamulis's account with him. *Id.* ¶ 7. Stamulis further alleges that there were "regulatory issues" surrounding JSC, and that Maselli joined VCS to avoid the "Taping Rule."[4] *Id.* After Stamulis's account at VCS

---

[3] "Wrongful Act" means "any negligent breach of duty, error, misstatement, misrepresentation, omission, 'publication injury', or other negligent act done or attempted by an insured, or by any 'individual' for whose acts the insured is legally responsible . . . ." Policy at 58.

[4] FINRA's "Taping Rule . . . requires special monitoring of the telemarketing activities of a broker-dealer's registered representatives, including the tape recording of their conversations,

6

showed significant losses, Maselli allegedly "induced Stamulis into opening a new type of account at E*TRADE." *Id.* ¶ 10. Finally, in April 2023, Maselli traded crude oil futures and stock index options in Stamulis's E*TRADE account. *Id.* By May 2023, Stamulis's accounts were "decimated." *Id.* ¶ 16.

Stamulis claims that Maselli's actions, taken together, constituted "excessive and unsuitable securities trading on margin"; were taken without proper disclosure of the risks involved to Stamulis; and "were unsuitable for [Stamulis] given his financial situation, needs and investment objectives." *Id.* ¶ 12. The FINRA Claim further alleges that: JSC, VCS, and Maggio, a principal and owner of VCS, negligently failed to research Maselli's background; negligently hired Maselli; and negligently failed to subject Maselli to special supervisory measures. *Id.* ¶¶ 7, 13–16.

To determine whether Scottsdale owes a duty to defend Plaintiffs against the FINRA Claim, the Court must address the threshold question of whether Plaintiffs have established "the potential for coverage." *Montrose*, 861 P.2d at 1161. To answer this question, the Court must first determine if the Stamulis allegations together constitute a series of Interrelated Wrongful Acts under the Policy. If yes, then the Court must determine whether the first Wrongful Act in the series occurred during the "Coverage Period".[5] Scottsdale argues that "the alleged misconduct began in October 2019, while Stamulis was a client of [JSC]," and then was "continuing in nature as all the wrongful conduct is 'connected by time, place, opportunity,

---

when a certain percentage of the registered representatives previously worked at broker-dealers with a disciplinary history." *Sec. & Exch. Comm'n v. Engler*, No. 20-cv-1625, 2022 WL 4596745, at *2 (E.D.N.Y. Sept. 30, 2022).

[5]  "Coverage Period" means "the period of time beginning with the applicable 'retroactive date' in this policy, and ending with the expiration of that insured's 'policy period.'" Policy at 55.

7

pattern, and most importantly, method, or modus operandi.'" ECF No. 17-1 at 22–23 (quoting *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely L. Corp.*, 162 F. Supp. 3d 1068, 1078 (C.D. Cal. 2016), *aff'd*, 708 F. App'x 374 (9th Cir. 2017)). Meanwhile, Plaintiffs argue that the allegedly Wrongful Acts in the FINRA Claim are not interrelated because "there are three different people/entities accused of wrongdoing, not one, and the allegations do not arise out of one transaction, but dozens if not hundreds of unrelated transactions over a period of years." ECF No. 19 at 21. The Court agrees with Scottsdale and finds that the Wrongful Acts alleged in the FINRA Claim are Interrelated Wrongful Acts under the Policy.

The Policy defines Interrelated Wrongful Acts broadly as "'wrongful acts' which are connected by a common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." Policy at 56. Under California insurance law, the term "related . . . encompasses both logical and causal connections." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1274 (Cal. 1993). *Bay Cities* is the "cardinal California case addressing the word 'related.'" *See Foster Farms, LLC v. Everest Nat'l Ins. Co.*, 670 F. Supp. 3d 953, 970–71 (N.D. Cal. 2023). In *Bay Cities*, the California Supreme Court found that two different acts were "related" as provided in the relevant insurance policy where an attorney made two independent errors that led to one injury for one client. 855 P.2d at 1275. Although neither error caused the other, the court reasoned that the acts were related because they "arose out of the same specific transaction," involved the same client, were "committed by the same attorney," and resulted in the same injury, so "[n]o objectively reasonable insured . . . could have expected" the claims to constitute unrelated acts given the policy language. *Id.* And although the related acts in *Bay Cities* arose out of the same transaction, related acts can span multiple transactions. Indeed, distinct transactions can be

8

"related when they are part of a single course of conduct or a single plan." *Foster Farms*, 670 F. Supp. 3d at 970. For example, in *Liberty Insurance Underwriters*, although the "[u]nderlying [a]ctions ar[ose] out of 23 distinct transactions which occurred" over six years, the court found that they were "related" because they arose from "a single course of conduct." 162 F. Supp. 3d at 1076–79. Similarly, in *WFS Financial, Inc. v. Progressive Casualty Insurance Co.*, the Ninth Circuit, applying California law, found that the third-party claims were "Interrelated Wrongful Acts" under a substantially similar definition to the Policy's definition here, where the claims involved multiple transactions, "were filed by two different sets of plaintiffs[,] in two different fora[,] under two different legal theories," but had a "common basis" of a "business practice of permitting independent dealers to mark up [automobile] loans." 232 F. App'x 624, 625 (9th Cir. 2007).

Here, the allegations in the FINRA Claim are Interrelated Wrongful Acts under the Policy's expansive definition and California law. According to the FINRA Claim: Maggio was a principal of JSC with supervisory authority over its representatives, including Maselli, *see* FINRA Claim ¶¶ 4–5; Maggio failed to supervise Maselli while they were both employed at JSC and while Maselli traded Stamulis's account, *id.* ¶¶ 12, 15, 17, 18, 41, 49; Maggio opened the VCS branch office to avoid the regulatory oversight present at JSC, became dually registered with JSC and VCS, and is a principal and owner of VCS, *id.*¶ 7; and, before Stamulis agreed to transfer his account to VCS, Maggio failed to inform him that VCS was formed to avoid regulatory oversight, *id.* ¶¶ 7–8, 15. Although the alleged Wrongful Acts involve several transactions, they are tied together by common facts and circumstances: (1) the same central actors (Maggio and Maselli); (2) the same client (Stamulis); (3) a continuing course of conduct spanning both JSC and VCS (including the continuity of Maselli's trading and Maggio's

9

supervisory role across both firms); (4) the same general type of alleged misconduct (*e.g.*, unsuitable trading, failure to supervise, concealment of regulatory-evasion motives); (5) the same injury (financial harm to Stamulis arising from Maselli's trading activities).

Plaintiffs urge the Court to consider the allegations as "multiple instances of separate advice regarding multiple types of investments."[6] *See* ECF No. 19 at 18–19. However, even if each of the alleged acts could be viewed as distinct in time or character—*e.g.*, the supervisory failures at JSC, the reckless trading, the nondisclosure of VCS's purpose—they are logically related because they form a "single course of conduct" aimed at enabling and perpetuating Maselli's trading of Stamulis's account without adequate oversight. *See Foster Farms*, 670 F. Supp.3d at 971. This characterization of the allegations is also consistent with the language of the FINRA Claim. The FINRA Claim alleges "a pattern of self-dealing and deceit to manipulate [Stamulis] into opening an account with [JSC], and [to] transfer that account to [VCS]" and that "[t]he very opening of the [VCS] branch office where [Maselli] worked was done to avoid heightened supervision and continue the practice of no supervision" undertaken at JSC. FINRA Claim ¶¶ 12, 15. As in *Bay Cities*, the acts were committed by the same insured individuals,

---

[6]  In arguing that the alleged Wrongful Acts do not constitute Interrelated Wrongful Acts, Plaintiffs primarily rely on *Illinois Union Ins. Co. v. Brookstreet Sec. Corp.*, No. 07-cv-01095, 2009 WL 10675259 (C.D. Cal. Nov. 18, 2009). *See* ECF No. 19 at 21–22. There, as here, the insurer argued that an arbitration award against its insured broker-dealer was not covered because the misconduct arose from "Interrelated Wrongful Acts" that began before the policy's retroactive date. *Id.* at *1. The claim involved a broker's alleged churning, unauthorized trades, and unsuitable investments. *Id.* at *2. Instead of deciding the duty to defend question as a matter of law, the court found that "[a] reasonable jury could conclude" that each unauthorized trade or supervisory failure constituted "separate and discrete Wrongful Acts that were not 'Interrelated.'" *Id.* at *3. In other words, *Illinois Union* improperly shifts a question of law to the jury, contrary to California law cited by Plaintiffs themselves. *See* ECF No. 19 at 27–28 ("'When determining whether a particular policy provides a potential for coverage,' a court 'is guided by the principle that interpretation of an insurance policy is a question of law.'" (quoting *Waller*, 900 P.2d at 627)). Thus, the Court finds Plaintiff's reliance on *Illinois Union* unpersuasive.

against the same client, in furtherance of the same overarching transaction or scheme, and produced a single, indivisible injury. *See* 855 P.2d at 1275. Furthermore, the relationship between Wrongful Acts in the FINRA Claim is not "so attenuated or unusual that an objectively reasonable insured could not have expected [that] they would be treated as a single claim under the [P]olicy." *Id*. Accordingly, under both the plain language of the Policy and controlling California precedent, the allegations are Interrelated Wrongful Acts and must be treated as a single claim for coverage purposes.[7]

Although the Court finds that the acts alleged in the FINRA Claim are Interrelated Wrongful Acts, this conclusion does not itself resolve whether coverage exists. Instead, it informs the application of the Policy's conditions of coverage—including that the first Wrongful Act in the series must: (1) occur during the Coverage Period, and (2) arise solely from "Financial Services" provided to a "Client" of VCS. Policy at 58.[8] As explained below, this

---

[7] Plaintiffs point to an example in the Interrelated Wrongful Acts definition involving a single investment to argue that the Policy's definition of Interrelated Wrongful Acts is "ambiguous" because it "could lead to a reasonable conclusion that multiple Wrongful Acts committed by an insured as against a single client only fall within the Interrelated Wrongful Acts [e]xclusion when such Wrongful Acts share a single investment." ECF No. 19 at 28–29. Plaintiffs further contend that any ambiguity in exclusion language must be resolved in the insured's favor. *Id*. The Court disagrees. First, the inclusion of the single-investment example does not limit the definition to that scenario. The Policy defines Interrelated Wrongful Acts broadly as Wrongful Acts "connected by" a "series of facts, circumstances, situations, events or *transactions*." Policy at 56 (emphasis added). Second, breadth and ambiguity are not one and the same. *See Bay* Cities, 855 P.2d at 1271 ("[T]he fact that 'related' can encompass a wide variety of relationships does not necessarily render the word ambiguous."). The Court joins several other courts that have consistently found similar definitions to be unambiguous. *See e.g.*, *id.*; *see also Foster Farms*, 670 F.Supp.3d at 970 ("That this provision [defining interrelated acts] is broad does not render it ambiguous.").

[8] "Client" means "an 'individual' or 'entity' which is a member of the general public and which, as the direct or ultimate consumer, uses the 'financial services' of a named insured 'entity' or a 'representative.'" Policy at 55. "Financial Services" means "the provision of services by a 'broker'-'dealer' to its 'clients' of its 'registered representatives' . . . ." *Id.* at 56.

11

characterization affects both the timing analysis (Section III) and whether the alleged conduct satisfies the Policy's client-service requirement (Section IV). Ultimately, the first act in the series fails to satisfy both conditions, each of which independently bars coverage.

### III. The First Wrongful Act Occurred Prior To The Coverage Period

Under the Policy, the earliest Wrongful Act in a series of Interrelated Wrongful Acts must occur on or after September 10, 2021, to be covered.[9] Plaintiffs highlight the fact that Stamulis was not a customer of VCS until October 2021 to argue that "VCS, the named insured, could not have committed a continuing wrongful act prior to the policy period." *See* ECF No. 19 at 16–18. Defendant counters that "even if VCS allegedly committed its first 'wrongful act' after Stamulis became a client . . . , those later 'wrongful acts' are deemed to have occurred on the earliest date than an 'interrelated wrongful act' occurred." ECF No. 20 at 16. The Court agrees with Defendant. Plaintiffs' contention that the continuing Wrongful Act provision cannot apply because Stamulis was not a VCS customer until October 2021 is belied by both the Policy language and the allegations in the FINRA Claim.

The question of whether coverage extends to the FINRA Claim does not turn on when Stamulis became a VCS customer or when VCS first committed a Wrongful Act, but instead on when the earliest Wrongful Act in the series of Interrelated Wrongful Acts occurred. *See* Policy at 58 ("A series of . . . 'interrelated wrongful acts' shall be deemed to have occurred on the date on which the earliest of such 'wrongful acts' commences."). The FINRA Claim asserts a continuous course of misconduct, beginning with Maselli's trading and Maggio's supervisory failures at JSC, and continuing with unsuitable investments and margin abuses after the transfer

---

[9] The parties agree that the Policy's Retroactive Date is September 10, 2021, for VCS and Maggio, and September 24, 2021, for Maselli. *See* ECF No. 17-1 at 20; ECF No. 19 at 9.

12

to VCS. As discussed in Section II, because these acts share a common nucleus of fact and purpose, they are deemed Interrelated Wrongful Acts occurring on the date of the earliest act.

According to the FINRA Claim, the first in the series of Interrelated Wrongful Acts occurred in October 2019, when Maselli improperly advised Stamulis to sell call options on an existing position and to purchase penny stocks. FINRA Claim ¶ 2. Because the Policy treats all Interrelated Wrongful Acts as occurring on the date of the earliest such act, October 2019, nearly two years before the September 10, 2021, all of the alleged misconduct, including acts during the Coverage Period, is excluded from the Policy's coverage.[10] Plaintiffs' attempt to sever VCS's liability from Maselli and Maggio's conduct before Stamulis became a VCS client is inconsistent with both the Policy's plain language and the allegations in the FINRA Claim.

### IV. The FINRA Claim Does Not Solely Arise Out of Covered Financial Services

Even if the allegations in the FINRA Claim had not commenced before the Coverage Period, coverage would still be independently barred for another reason: the first act in the series of Interrelated Wrongful Acts did not "arise[] solely out of or in connection with the provision of covered 'financial services' for the 'client' of a named insured or a 'representative.'" Policy at 58. Because all Interrelated Wrongful Acts are treated as a single claim, the failure of the earliest act to satisfy this condition precludes coverage for the entire claim. Scottsdale argues that because Maselli's purported misconduct began before Stamulis was ever a client of Maselli or VCS, the FINRA Claim does not arise solely from, or relate exclusively to, the provision of

---

[10] The parties disagree on whether the Interrelated Wrongful Acts provision operates as an exclusion or as a coverage provision. *See* ECF No. 19 22–23; ECF No. 20 at 6–7. This distinction can matter because "[t]he burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *MacKinnon*, 73 P.3d at 1213. Here, however, the distinction is immaterial because the Policy's conditions concerning Interrelated Wrongful Acts are "conspicuous, plain and clear," and are therefore enforceable regardless of how they are categorized. *Id.*

covered Financial Services to a Client of VCS or its "Representatives." *See* ECF No. 17-1 at 23–24.[11] Plaintiffs respond that "[t]o the extent some of the allegations are not covered under the [P]olicy, but some are, where a duty to defend exists as to one claim in an action, the insurer is obligated to defend against all claims in that action 'prophylactically' to ensure that an 'immediate' defense is provided." ECF No. 19 at 25–26 (citing *Buss v. Sup. Ct.*, 939 P.2d 766, 775 (Cal. 1997)).

To be sure, "an insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered." *Horace Mann*, 846 P.2d at 797–98. However, the language of the Policy is clear that coverage applies "*only if* the 'wrongful act', or the first in the series of continuous, repeated or 'interrelated wrongful acts' . . . arises solely out of or in connection with the provision of covered 'financial services' for the 'client' of a named insured or a 'representative.'" Policy at 58 (emphasis added). Having determined that the misconduct alleged in the FINRA Claim is a series of Interrelated Wrongful Acts, the Court finds that the Policy's unambiguous language dictates that the threshold question is whether the *first* Wrongful Act arose out of Financial Services for a Client of VCS. Therefore, Plaintiffs' contention that some of the Wrongful Acts alleged in the FINRA Claim would, in a vacuum, be covered is of no moment. According to the FINRA Claim, the first in the series of Interrelated Wrongful Acts allegedly occurred when Maselli directed Stamulis to make ill-advised trades in October 2019, before Maselli was a Representative of VCS and before Stamulis was a Client of

---

[11]    "Representative" means "a 'financial services professional' providing the type of 'financial services' covered by th[e] [P]olicy." Policy at 57.

14

VCS. FINRA Claim ¶¶ 2, 7. Therefore, coverage for the FINRA Claim is independently barred on this basis.

* * *

In sum, even assuming, *arguendo*, that Plaintiffs have made a *prima facie* showing of "the existence of a potential for coverage," Scottsdale has established "the absence of any such potential." *Montrose*, 861 P.2d at 1161. Therefore, Scottsdale does not owe a duty to defend Plaintiffs in the FINRA arbitration.[12] Furthermore, because the Court finds that there is no duty to defend, the Court must find that there is no duty to indemnify. *See Certain Underwriters at Lloyd's of London v. Superior Ct.*, 16 P.3d 94, 102 (Cal. 2001) ("[W]here there is no duty to defend, there cannot be a duty to indemnify.").

---

[12] Scottsdale also contends that coverage is independently barred by two exclusions in the Policy that bar coverage for: (1) any claim involving trading futures or commodities, and (2) any claim arising out of acts taken outside the insureds' capacities as "Registered Representatives." *See* ECF No. 17-1 at 24–26. The Court does not reach these arguments, as it already concluded that coverage does not extend to the FINRA Claim.

**CONCLUSION**

For the reasons stated herein, the Court GRANTS Scottsdale's motion to dismiss with prejudice. *See* ECF No. 17.[13] The Clerk of Court is respectfully directed to enter judgment consistent with this Order and close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
August 14, 2025

---

[13] After the Court asked Plaintiffs whether they wished to amend their Complaint to address the issues raised in Defendant's pre-motion papers, *see* September 26, 2024, Text Order, Plaintiffs expressed that they did not intend to do so in their responsive letter, *see* ECF No. 13. Nor did Plaintiffs request leave to amend in their opposition brief. *See* ECF No. 19. Because "no court can be said to have erred in failing to grant a request that was not made," the Court dismisses the Complaint with prejudice. *See Hu v. City of New York*, 927 F.3d 81, 107 (2d Cir. 2019) (affirming dismissal of complaint without leave to amend).